CASE NO. 08-CV-5996 (VM)(AJP)


UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____

_____


TWANA ADAMS, *et al.*,
PLAINTIFFS,


-against-


NEW YORK STATE EDUCATION DEPARTMENT, *et al.*
DEFENDANTS.

_____

_____


PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS

_____

_____


LAW OFFICES OF NICHOLAS A. PENKOVSKY, P.C.
*Attorney for Plaintiffs Michael Ebewo, Joann Hart, Julianne Polito,*
*Brandi Dawn Scheiner, Thomasina Robinson*
112 Madison Avenue-Sixth Floor
New York, NY 10016
Tel (212) 216-9708; Fax (212) 216-9491


JOY HOCHSTADT, P.C.
*Attorney for Plaintiffs Twana Adams and Josefina Cruz*
300 Central Park West, Suite 2E
New York, New York 10024
Tel (212) 580-9930; Fax (212) 580 9322

## TABLE OF CONTENTS

**TABLE OF AUTHORITIES** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **iii**

**PRELIMINARY STATEMENT** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **1**

**STATEMENT OF THE FACTS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **4**

**FACTS COMMON TO ALL PLAINTIFF** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **4**

**FACTS RELATING INDIVIDUALLY TO THE PLAINTIFFS** . . . . . . . . . . . . . . . . . . . . **13**

      **PLAINTIFF TWANA ADAMS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **13**
      **PLAINTIFF JOSEFINA CRUZ** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **18**
      **PLAINTIFF MICHAEL EBEWO** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **18**
      **PLAINTIFF JOANN HART** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **20**
      **PLAINTIFF JULIANNE POLITO** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **24**
      **PLAINTIFF BRANDI DAWN SCHEINER** . . . . . . . . . . . . . . . . . . . . . . . . . . **29**
      **PLAINTIFF THOMASINA ROBINSON** . . . . . . . . . . . . . . . . . . . . . . . . . . . . **32**

**ARGUMENT** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **34**

**POINT I: PLAINTIFFS NEED NOT EACH FILE**
**WITH THE EEOC AS LONG AS ONE HAS FILED**
**THEY ARE ALL ABLE TO "PIGGY BACK" ON THAT CHARGE** . . . . . . . . . . . . . . . **34**

**POINT II: A HOSTILE WORK ENVIRONMENT IS**
**A CONTINUING TORT WHOSE STATUTE OF LIMITATIONS**
**ONLY BEGINS TO RUN WHEN THE LAST ACT IS COMMITTED** . . . . . . . . . . . . . . **36**

**POINT III: PLAINTIFFS HAVE PLEADED A CLAIM FOR**
**EMPLOYMENT RETALIATION FOR THEIR EXERCISING**
**THEIR FIRST AMENDMENT RIGHTS TO FREE SPEECH** . . . . . . . . . . . . . . . . . . . **39**

**POINT IV: THIS COURT MUST APPLY A BROAD READING**
**OF THE SECOND AMENDED COMPLAINT FILED BY THE**
*PRO SE* **PLAINTIFFS ON THIS FEDERAL RULE OF**
**CIVIL PROCEDURE RULE 12 MOTION TO DISMISS** . . . . . . . . . . . . . . . . . . . . . . . . **43**

**POINT V: FEDERAL PLAINTIFF MUST HAVE ADEQUATE OPPORTUNITY FOR**
**JUDICIAL REVIEW OF CONSTITUTIONAL CLAIMS DURING OR AFTER STATE**

**PROCEEDING FOR THE FEDERAL COURT TO ABSTAIN** ..................... **45**

**POINT VI: PLAINTIFFS HAVE ADEQUATELY PLEADED CLAIMS
FOR VIOLATION OF THEIR DUE PROCESS RIGHTS
UNDER THE FOURTEENTH AMENDMENTS** ................................ **48**

**CONCLUSION** ........................................................... **50**

## TABLE OF AUTHORITIES

ATSI Commc'n, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007) . . . . . . . . . . . . . . . .44

Barry v. Barchi, 443 U.S. 55 (1979). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

Board of Regents v. Roth, 408 U.S. 408 U.S. 564, 577 (1972),. . . . . . . . . . . . . . . . . . . . . . . . 48

Boise v. Burford, 121 Fed.Appx. 890, 893 (2d Cir.2005) . . . . . . . . . . . . . . . . . . . . . . . . 38 (*fn 6*)

Brennan v. Metropolitan Opera Ass'n, Inc., 192 F.3d 310, 318 (2d Cir.1999). . . . . . . . . 38 (*fn 6*)

Church v. GMC, 74 F.3d 795, 798 (7th Cir. 1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

 Christ the King Regional High School v. Culvert, 815 F.2d 219, 224 (2d Cir.1987), cert. denied, 484 U.S. 830 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

Cioffi III v. Averill Park Central Sch. Dist. Board of Ed., 444 F.3d 158, 162 (2d Cir. 2006). 39,41

Cleveland Board of Education v. Loudermill, 470 U.S. 532, 538 (1985) . . . . . . . . . . . . . . 48, 49

Cotarello v. Village of Sleepy Hollow Police Department, 460 F.3d 247, 252 (2d Cir. 2006) . . 41

Cruz v. Coach Stores Inc., 202 F.3d 560, 570 (2d Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . 37

Cullen v Fliegner, 18 F.3d 96 (2d Cir 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

Farragher v. City of Boca Raton, 524 U.S. 775, 787-88 (1998) . . . . . . . . . . . . . . . . . . . . . . . 37

Fitzgerald v Henderson, 251 F.3d 345 (2d Cir 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37 (*fn 3*)

Garcetti v. Ceballos, 547 U.S. 410 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39,40

Grief Brothers Cooperage v. United Mine Workers of America, 42 LA 555 (Daugherty 1964).  47

Harris v. Forklift Systems, 510 U.S.17, 21-22 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

Holowecki v. Federal Exp. Corp., 440 F.3d 558 (2d Cir. 2006) . . . . . . . . . . . . . . . . . . . . 35, 36

Karpova v. Snow, 473 F.3d 262, 270 (2d Cir. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

Konits v. Valley Stream Central High School District, 394 F.3d 121, 125 (2d Cir. 2005) . . . . 41

Kugler v. Helfant, 421 U.S. 117 (1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

Levy v. United States Gen. Accounting Office, 175 F.3d 254, 255 (2d Cir 1999). . . . . . . . . . 36

Lewellen v. Raff, 843 F.2d 1103, 1109-10 (8th Cir.1988), cert. denied, 489 U.S. 1033 (1989)   47

Matthews v. Eldridge, 424 U.S. 319,  96 S.Ct. 893 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

Matter of Lessem v. Community School Dist # 2 (McAuliffe), 32 Educ. Dept. Rep. (1991). . . . . . .11

Meritor Savings, FSB v Vinson, 477 U.S. 57  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37 (fn 2)

Mooney v. Aramco Servs. Co., 54 F.3d 1207, 1223-24 (5th Cir.1995) . . . . . . . . . . . . . . . . . . 36

Morris v. Lindau, 196 F.3d 102, 110 (2d Cir.1999)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

NAACP v. Button, 371 U.S. 415 (1963) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .41

National Railroad Passenger Corporation v. Morgan, 536 U.S. 101 (2002) . . . . . . . . . . . . . . 38

Ohio Civil Rights Comm'n v. Dayton Christian Sch., Inc., 477 U.S. 619, 627-29 (1986). . . . . . 46

Palkovic v. Johnson, 281 Fed.Appx. 62 (2d Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

Patrolman's Benevolent Ass'n of NY v. City of New York, 310 F.3d 43, 51 (2d Cir. 2002) . . . 36

Pickering v. Bd. of Education of Township  High School District 205, Will County, Illinois, 391
U.S. 563, 572,(1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

Preda v. Nisho Iwai America Corp., 128 F.3d 789, 789 (2d Cir. 1997)  . . . . . . . . . . . . . . . . . . 36

Rowe v. Griffin, 676 F.2d 524 (11th Cir.1982)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

Spinelli v. City of New York, 579 F.3d 160 (2d. Cir 2009)  . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

Teachers4Action et al v Bloomberg et al 08-CV-0548 (VM)(AJP) . . . . . . . . . . . . . . . . . . . . . . . 2, fn.5

Thompson v. Carter, 284 F.3d 411 (2d Cir. 2002)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

Tolliver v. Xerox Corp., 918 F.2d 1052, 1058 (2d Cir. 1990)  . . . . . . . . . . . . . . . . . . . . . . . . 35

iv

Whidbee v. Garzarelli Food Specialties, 223 F.2d 62, 69 (2d Cir. 2000) . . . . . . . . . . . . . . . . . 37

Younger v. Harris, 401 U.S. 37(1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

United States Constitution

U.S. Const. amend. I,  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

U.S. Const. amend XIV §1  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41, 48

Statutes

42 U.S.C.§1983  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39,41

Civil Rights Act of 1964, § 706(e, f), 42 U.S.C.A. § 2000e-5(e, f) Title VII  . . . . . . . . . 35, 36, 38

Americans with Disabilities Act 42 U.S.C. §12111 *et seq*  . . . . . . . . . . . . . . . . . . . . . . . . . . 35, 38

Age Discrimination in Employment Act  29 U.S.C. §621 *et seq*.  . . . . . . . . . . . . . . . . . 35. 36, 38

NYS CPLR Article 75  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

NYS Education Law §2568  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1 (*fn 2*)

NYS Education Law §2590-g . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    . 4

NYS Education Law § 2590-j . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   . . . 7

NYS Education Law § 3020  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 12 *fn* 14

NYS Education Law § 3020-a . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *im passim*

NYS Education Law § 3813 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .3, *fn*.8

Rules

Fed R. Civ. P.  12 (b)(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

Fed. R. Civ. P. 12 ( c)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

Regulations

Chancellor's Regulation C-770_. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 24

8 NYCRR 82-1.3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

8 NYCRR 82-1.4_ . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . <u>11</u>

8 NYCRR 82-1.6 (a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

8 NYCRR 82-1.6 (b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

8 NYCRR 82-1.6 ( c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

8 NYCRR 82-1.6(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

8 NYCRR 82-1.10 _ . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

<u>Other Materials</u>

http://www.decimation.com/markw/wp-content/uploads/2007/08/firing_chart.pdf      1, *fn*.3

http://overlawyered.com/2007/11/problem-teachers-dig-in-nyc-lawyers-up/      1, *fn*.3

http://www.uft.org/member/contracts/moa/teacher_sal_may192008_sal06.pdf      1, *fn*.1

Collective Bargaining Agreement with the United Federation of Teachers.............. 1, *im passim*

Disciplining tenured Teachers and Administrators ("DTT") . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

## PRELIMINARY STATEMENT

This action has elements common to whistle-blower and protected-class discrimination and retaliation claims, i.e., harassment, disparate and contrived disciplinary actions and evaluations, unfairly docked pay, *inter alia*. However, there are also first impression issues. Job security for New York City ("NYC") tenured teachers *de jure* is akin to that of Article III Judges. Just as impeachment remedies are available for Congress to remove Article III Judges, Education Law ("Ed.L.") §3020-a ("§3020-a") is available for discipline or removal of tenured teachers. Both procedures are to be used rarely and only when absolutely necessary for public good.

The Bloomberg and Klein administration enters in 2002. The NYC Board of Education is dismantled and replaced with the NYC Department of Education ("NYCDOE") which the Mayor is empowered to manage. Seminars within NYCDOE instruct administrators on techniques to reduce the average teacher's salary from $70,000.00 to $60,000.00 *per annum ("p.a.")* even as NYCDOE had just executed a new Collective Bargaining Agreement ("CBA") with the United Federation of Teachers ("UFT") where the top teacher's salary rises to over $100,000.00 *p.a*[1].[2] Suddenly, the number of teachers subjected to disciplinary charges rises from a few dozen p.a. to many hundred p.a.[3] Those awaiting disposition of charges (almost 800 for the 2007-2008 school year) are significantly older, more minority teachers, higher paid (average salary > $85,000.00 *p.a.*) than

---

[1] 2009 entry salary with B.A. is $45,530.00, top salary reached in 22 longevity steps and 6 differentials for Masters, Ph.D. and coursework. See schedule at http://www.uft.org/member/contracts/moa/teacher_sal_may192008_sal06.pdf

[2] "Average salary" reduction methods taught include: "encouraging" retirement; §3020-a disciplinary charges; Ed. L. §2568 ("§2568") medical/psychological "fitness" exams; schools are reorganized; principals choose "new teachers" to employ in the reformation. School budgets evolve from number of teachers allocated to dollars spent on teacher salaries.

[3] The Chancellor also recently publicized the initiative to hire teams of attorneys to go into the schools to help develop disciplinary charges against teachers and to create the documentation to sustain the charge. This plan was quickly abandoned after public outrage. *See* http://overlawyered.com/2007/11/problem-teachers-dig-in-nyc-lawyers-up/ and http://www.decimation.com/markw/wp-content/uploads/2007/08/firing_chart.pdf

average.[4]  Many charges are now trivial yet the arbitration panel has gone from three to a single permanent arbitrator with no choice to the employee, contrary to the §3020-a statute.[5]  Arbitrators "report" to NYCDOE *ex parte*; they are not the "impartial hearing officers" §3020-a mandates.

All this takes place under a well-publicized cover that student achievement improves by purging "deadwood" i.e., teachers fused to "old" teaching methods[6]. (*See also, fn.* 5). Experienced teachers are "troublemakers" even when they silently grimace at intentional noncompliance.[7] Every whit of the above takes place under color of state law, by government supervisors who are constitutionally mandated to provide equal protection to all teachers, and to provide due process that is uncorrupted by bias and *ultra vires* practices. Instead, there is piecemeal "taking," through "reassignment" and ultimately the actual "taking" of property interests of life-tenured NYC teachers' employment, amounting to millions of dollars for each teacher for the balance of their lives through termination or constructive termination (*e.g.,* coerced retirement).

The mistreatment that disfavored tenured teachers receive is unrelenting, severe and dehumanizing to proud professionals who served for decades before the newly empowered, and

---

[4] Teachers are also much less often now accused of improprieties with a student.  Improper relationships with students and improper touching or other such conduct was the main reason for charges before 2003; now the same number of charges are brought on these grounds but the vast balance of increased charges cover the spectrum of inconsequential "misconduct" and contrived incompetence charges against older teachers. Teachers awaiting disposition of charges have been described by one administrator to another as the two peered into a "rubber room." "Here is where they keep the old nags until they are ready for the glue factory." overheard by teacher Michelle Bender in 2007.

[5]  When the DOE is questioned on this clear violation of §3020-a, they claim a memo with the UFT exists, but then fail to produce it, Deposition of Theresa Europe, Esq. in Teachers4Action et al v Bloomberg et al 08-CV-0548 (VM)(AJP).

[6] Or when student achievement failed to improve after hiring new young teachers, the DOE scape-goated the experienced teachers, saying the DOE must purge them faster and hire replacement fresh faces. *See* fn. 4.

[7] Teachers' loyal efforts to report violations to NYCDOE only, are now called time-barred by the defense.  Surely Equitable Doctrines would have accrual begin no earlier than when they realize that neither NYCDOE or its supposed watchdog  Special Commissioner for Investigations ("SCI") agreed to meetings not to better comply, but only to craft some allegation of misconduct against the messenger for concern as a citizen as to conduct of this public employer.

newly hired Principals were encouraged to rid themselves of any teacher whom they found "unmalleable" to new ideas, another euphemism for older skilled and highly paid professionals, meets the standard of so pervasive and humiliating a workplace as to alter the terms and conditions of employment, the legal definition of a Hostile Work Environment ("HWE").[8]

The HWE tenured teachers endure differs from one based on sexism or racism in industry. It always comes from above, never from peer teachers.  It is NYCDOE intended rather than merely condoned.  Precisely because NYCDOE is unable to summarily terminate a tenured teacher, it can constructively terminate or contrive a case and actually terminate after one or more [9][10]tries.

On this background, this Court must consider *Adams, et al v. New York State Department of Education, et al.*

---

[8]  If the teacher brings an action when the harassment, subjective negative reviews, reassignment to the Teacher Reassignment Center ("TRC," *i.e.* rubber room), preferring of unwarranted disciplinary charges begins or is ongoing, the DOE argues that all internal and administrative remedies must be exhausted, that the teacher must await a final disposition, and that to date there has been no adverse employment action.  After all, the teacher is receiving full pay/benefits and however harshly treated, it is no harsher than "working" conditions of all teachers similarly reassigned to remain idle while awaiting (usually for years) disposition of charges.  If, alternatively, the teacher files grievances, goes through the several level process and either awaits final disposition of charges, or until it is evident that loyal efforts to improve the employer's practices has engendered retaliation and discrimination, then DOE arrives to recite the statute of limitations to bring suit against the DOE is one year as provided for in Ed. L. §3813, and any teacher "disciplined" via the Ed. L. §3020-a process may only appeal the arbitral award under §3020-a provisions (having a 10 day statute of limitations) with review limited to corruption, bias and exceeding the authority of the arbitrator.  Absent judicial review, or no vacatur, upon review, the DOE argues collateral estoppel, issue preclusion, *res judicata*  despite a flawed and corrupt §3020-a arbitration that lacks both due process and equal protection.

[9]  Assigned counsel for the 3020-a specifically will not argue disparate treatment as a defense in the proceeding, since the best possible outcome after several years of being subject to a HWE on the basis of age, race and disability (or combination thereof, in that frequency) is exoneration, thus, leaving the claims to be later pursued in another action unless collaterally estopped by the arbitrator not finding them substantiated. Therefore NYSUT attorneys know how infrequently their clients prevail in the 3020-a and thus attempt to protect the client by not raising issues of disparate treatment.

[10]  Given that DOE may renew or not renew the $1,400.00-$1,800.00/day stipend it is paying each of the 24 panel arbitrators for subsequent years service for 54, five hour workdays per year plus expenses and extra pay for longer days if they occur, arbitrators do what is necessary to keep their jobs.  The UFT wished not to renew a specific arbitrator because she fired everyone the DOE wanted fired; the DOE offered the UFT another seat on the CBA committee to keep her.

## STATEMENT OF THE FACTS

### FACTS COMMON TO ALL PLAINTIFFS

In 2002, the Mayor of NYC, by power granted to him by enabling legislation of the New York State ("NYS") legislature took control of the administration of the NYC public schools. The independent Board of Education ("BOE") was dissolved and operation of the City School District for the City of New York was taken over by NYCDOE.  One of its first acts was to install a "Chancellor" who had no educational experience but whose principal job was to rid the system of tenure, fire tenured pedagogues or make their work lives unbearable. Defendants place budget over programs and competence. Students, teachers, plaintiffs and the entire NYC public school system suffer.  Some, but not all, functions of the previous BOE were transferred to a 13 member "Panel on Educational Policy" appointed by the Mayor. Its functions are set forth in NYS Educ.L. §2590-g.

However, unlike the checks and balances and protections prior to Mayoral take over, NYS Educ.L. §2590-g does not address the issue of review and scrutiny of whether there is Probable Cause to proceed with prosecution of Disciplinary Charges against tenured educational personnel. The NYS Ed. L. 3020-a requirements, under which tenured personnel may be disciplined for "Just Cause," are absolute and require that before charges can be brought the School Board must:

Determine that there is "probable cause" for proceeding with charges by a majority vote;

Make this determination within 5 days of the Charges being filed with the Board; and

Ensure the decision to proceed with charges is not frivolous, arbitrary, capricious or discriminatory.[11]

Without a School Board in NYC to perform these functions, and without the duty to perform

---

[11]  NYS Ed. L. 3020-a

this independent review assigned to the Panel on Educational Policy, there is no oversight by anyone other than the tenured educator's Principal who initiates the disciplinary process and the Local Superintendent to endorse the Principal's request to prefer charges against any educator the Principal chooses to remove from the school. The lack of independent review and the lack of oversight by anyone other than the tenured educator's Principal and Local Superintendent is not consistent with NYS Ed. L. § 3020-a under which New York law allows the discipline of tenured teachers. This removal of due process review for Disciplinary Charges mandated by 3020-a has been occurring since Mayoral Control of the NYC Schools began in 2002 and continues to the present.

Concomitant to the failure of a School Board to review, there has been a fourfold or greater increase of 3020-a charges brought against NYC teachers compared to a lack of increase in the rate of similar charges being brought against tenured educators elsewhere in the State. These differential rates of filing disciplinary charges confirm the *de facto* denial of equal protection of 3020-a. Plaintiffs and other pedagogues brought up on disciplinary charges, since the advent of Mayoral control, earn average salaries that are at least $20,000.00 higher than the average for other educators. They also have the right to earn significant extra "per session" pay for summer school, after school, evening, Saturday, early morning classes, coaching or other school activities which they are deprived of as soon as they are under investigation and until they are completely exonerated.[12]

When teachers go through disciplinary hearings conducted under NYS Educ.L. 3020-a, complete exoneration of all charges is exceptionally rare. NYCDOE lawyers work with Principals make the complaints, file the charges and then themselves decide that there is "probable cause" upon

---

[12] This is not the overtime that other departments offer and which has been found not to be a constitutionally protected property, but positions for which they compete based on qualification and gain "retention rights" analogous to tenure.

which to proceed and enumerate as many "specifications" or individual charges as can be made and, at times, stretch facts so arbitrators find that some allegation is substantiated, no matter how trivial. Once found guilty of even a frivolous, *de minimus,* or trivial allegation, that teacher in NYC is not returned to regular service but is relegated to serve as an "Absent Teacher Reserve" ("ATR") or day-to-day substitute, albeit at the same salary level as before.

NYC teachers who are accused of misconduct that could be construed as an inappropriate relationship or inappropriate touching of a student, even if no criminal charges are pending, undergo a very brief "probable cause determination" before an arbitrator which is essentially an *ex parte* inquisition where the teacher is present but does not testify or present any witnesses. If an arbitrator finds probable cause the teacher is removed from the payroll for three months.

Outside NYC, only conviction of a drug felony or physical abuse of a minor would cause suspension without pay of a teacher pending the hearing; conviction of sexual abuse of a minor leads to termination without an additional 3020-a hearing.

Defendants have held workshops during the 2007-2008 School year during which they instructed staff that the goal of reducing average teacher salary from $70,000.00 p.a. to $60,000.00 p.a. includes bringing teachers up on 3020-a charges and getting them to retire.  Teachers brought up on disciplinary charges are also disproportionately African-American, Latino, and over 50 years of age. Without oversight of an independent Board, the charges preferred are more often than not, frivolous, arbitrary, capricious, and frequently an attempt to silence criticism by senior teachers observing new Principals undertaking inappropriate means to make it appear that students are progressing more successfully than is actually occurring to protect their own jobs having traded their tenure for considerable incentive pay based on student performance.

6

More often than not, charges are preferred against the highest paid teachers, because actual teacher salaries rather than the number of teachers allocated  to a specific school are charged to school budgets only the advent of Mayoral control of NYC schools.  NYC students are thus deprived of the best educated and most experienced teachers under the guise of purging the system of what the Chancellor deems "deadwood," but in actuality is any teacher or administrator perceived by the school Principal to even question much less challenge that Principal's practices.

NYC students have lost some of their most acclaimed teachers in Math, the Sciences, Film, Arts, and other subjects.  The minority students who were prepared each year for the best colleges have lost an important vehicle to upward achievement and mobility. Teachers with established contacts to assist students with their lives and careers have been removed from the classroom and replaced with younger less experienced teachers to save money and gain submissiveness. The students of teachers removed without probable cause have suffered. The fine educational programs developed by these teachers have been discontinued. Instructional initiatives taking years to develop are abandoned when an experienced teacher is replaced with a first year recruit. Such replacement of tenured teachers to save money is detrimental to instruction, against the law and is a deprivation of contractual, statutory and constitutional rights, comprising a "taking" without due process, when charges are brought without "probable cause" and adjudicated without "just cause."

School Districts can be assessed all costs associated with prosecution of frivolous charges. Ed. L. §§ 2590-j, 3020-a and 3020 were amended to treat NYC different from the rest of the state; these changes *de jure* deny due process and equal protection previously enjoyed by NYC tenured educators but which remain the rights of tenured educators in the rest of the state.

These changes include but are not limited to:

7

•      Loss of the right to select procedures under either a Collective Bargaining Agreement ("CBA") or the statutory language of 3020-a; itself.  Only in NYC are tenured educators, denied the provisions of the very statute under which their due process rights are protected  and have no option other than that offered by the CBA.

•      Only in NYC do tenured educators have no say in selection of an arbitrator for their proceeding; instead they are assigned an arbitrator from a panel whose members are selected or retained by a process that may be influenced by factors other than obtaining the fairest and most sympathetic arbitrators for the union members facing charges.

•      Only in NYC are tenured educators brought up on charges for incompetence and denied the statutory provision of the right to a three member panel for their arbitration.

•      Only in NYC, are arbitrators on a permanent panel paid up to $2000/day while serving on a panel, when the statutory provision is that only *ad hoc* individually selected arbitrators may be paid at the American Arbitration Association ("AAA") rate, while permanent panel members may only be paid $200.00/day. This arrangement tends to induce arbitrator dependence on the steady permanent arrangement and to favor the employer they perceive as the more powerful in influencing their own job retention in this role.

•      Only in NYC are tenured educators, always removed from their assignment pending long waits until their hearings in "reassignment centers"; elsewhere in the state tenured educators who face allegations that are not deemed dangerous to students await their proceedings while working in their regular assignments; those accused of conduct that could harm students await their proceedings at home.

Only in NYC must tenured educators await their hearings on 3020-a charges in reassignment

centers tantamount to constructive termination and intentionally operated to induce constructive termination before a 3020-a hearing has ever begun.

Only in NYC are teachers who have not been convicted or pled guilty removed from payroll for three months if the allegation relates to an impropriety of a physical or sexual nature; whether or not any criminal complaint is pending based only upon a student's or third party allegation.

Elsewhere in the state when the tenured educator has the 3020-a process, they are returned to regular duty after a suspension, fine or reprimand letter is imposed as a penalty.

Only in NYC are the only tenured educators to be returned to regular assignment those exceedingly few who are totally exonerated of any and all charges.

In NYC all tenured educators who have undergone a 3020-a process and been fined, even nominally, or reprimanded, are thereafter relegated to perform day-to-day substitute assignments and looked down upon as "pharisees" or "pariahs".

Only tenured educators in NYC, awaiting 3020-a hearings, are reassigned to "holding pens" where their movements are monitored by uniformed guards; where they must agree in writing not to use electronic devices of any kind; and where they have no assigned duties but are not permitted to perform other work. These practices violate of Chancellor's Regulation C-770 which specifies tenured educators must be reassigned in their own community school district, to meaningful, appropriate professional work, and be treated in a dignified, professional and respectful manner.

On June 27, 2008, NYCDOE and the UFT entered into an agreement to end many of the most egregious practices. Said agreement is annexed as Exhibit 1 to the Complaint and was executed by Defendant Klein and Randi Weingarten, then UFT President. That agreement has not been complied with by NYCDOE or defendants. Instead, NYC teachers have been, and continue to be, herded into

9

over-crowded spaces which confine as many as 300 tenured educators, in a single space or in detention camp environments comprised of trailers within chain link cages, prison-style, supervised by a uniformed employee referred to as a "warden."

No one confined to the reassignment centers or "rubber rooms," sometimes for three or more years, has been found guilty of any infraction, whatsoever. **The "rubber rooms" are totally pre-adjudication detention**.

Actual § 3020-a practice itself also denies due process.[13] There are many protections to due process, but none of them are followed for NYC teachers. As already stated, § 3020-a requires that within 5 days of filing charges a school board must decide by majority vote whether there is probable cause to proceed with charges. § 3020-a (2)(a) NYS Educ.L. In NYC there is no school board. Principals signal an intention to file charges by either notifying the Superintendent or requesting a Technical Assistance Conference where NYCDOE attorneys convert allegations into "charges", "rubber stamped" by the Superintendent. No "investigation" to determine probable cause is ever held when incompetence is the issue.

The law provides that school board's decision to proceed with charges may not be arbitrary, capricious or discriminatory. §3020-a (4)(c) NY Ed. L. Yet NYCDOE withdrew one of the charges (Specification 7) and they dismissed two charges in the case of Cruz, even though Petitioner did not put on a case of her own nor cross-examine any NYCDOE witness.

---

[13] If Plaintiff Cruz would have had a 3020-a hearing compliant with the strict time lines 3020-a provisions, her hearing would have been long over before the issue of her fine attorney, Mitchell Rubinstein, Esq., ever withdrawing could have arose.  Given that there was contradictory testimony to the most significant charge, that she had failed to administer the Spanish Regents exam: oral component in January 2006, the cross examination of DOE witnesses, coupled with their contradictory testimony when deposed by Dr. Cruz, civil attorney in 2007, would have if not exonerating her completely would have surely saved her job.  She currently contests the 3020-a she was forced to go through without representation.  In addition, she sought to reopen her hearings once the June 27, 2008 agreement was signed, only three weeks after it closed but five months prior to receiving the decision terminating her.

The charges (specifications) must be voted on by the school board, before they are served on the employee. <u>Matter of Lessem v. Community School Dist. # 2 (McAuliffe)</u>, 32 Educ. Dept. Rep. (1991). This clearly does not happen absent a school board and this duty is not delegated to any other independent panel or board.

Once being served, the teacher facing charges has 10 days to give notice that the teacher wishes a hearing and "if the charges involve pedagogical incompetence or issues of pedagogical judgment, the teacher or administrator must further indicate at that time if he or she prefers that the charges be heard by a single hearing officer or a three member panel. §3020-a (2)(c) NY Ed. L.; <u>see also</u> *Disciplining Tenured Teachers and Administrators*, p. 7, 1:11. *Plaintiffs who had incompetency as a component of their charges all requested a three member panel. Said Plaintiffs all received a single arbitrator, for which they had no say in the matter.*

Within 10 days of the commissioner's mailing, the school board and the employee must agree on a hearing officer. Ed. L. 3020-a (3)(b)(ii). Should they fail to agree on a hearing officer the commissioner shall ask the AAA to appoint one. *Id.* (3)(b)(iii). The commissioner notifies the chosen hearing officer and receives confirmation of acceptance of the assignment (8 NYCRR §82-1.6(d). *Plaintiffs each received a letter informing them that they were being assigned specific NYSUT counsel as defense counsel and a single named Arbitrator as hearing officer. Plaintiffs had no choice or even input into the selection.* Also the regulations require 10 days after Plaintiff's request for a 3 member panel for the Hearing Officers to be assigned. *Plaintiffs therefore should have received a list of Labor Arbitrators for a Hearing Panel from the American Arbitration Association; instead each was notified that a single arbitrator had been ASSIGNED.* §3020-a (3)(a),(b)(iii) NYS Ed. L., 8 NYCRR§ 82-1.6(a),(b). Three member panels sit in incompetence cases when requested

11

by the employee; the instant plaintiffs have requested a three member panel but no one has gotten

a three member panel in the last several years, the mandate of the law is simply ignored under this

Chancellor. *See* §§ 3020-a (2)(c),(3)(b)(i),(iv),(4)(a) NY Ed. L.; *See also*

8 NYCRR§§ 82-1.3, 82-1.3(b),(d), 82-1.4, 82-1.10(g).[14]

Within 10-15 days of Hearing officer's acceptance of the assignment to preside over the

3020-a, the Hearing officer is required to hold a pre-hearing conference. § 3020-a (3)(c)(ii). NY Ed.

L. 8 NYCRR§82-1.6 (c.)  Plaintiffs' pre-hearings were not held until between one and more than

more than five years after the Arbitrator accepted the assignment.

Section 3020-a mandates that the hearing be completed within 60 days of the pre-hearing

conference. *For these Plaintiffs the 3020-a hearings lasted anywhere from 5.5 hours for fourteen*

*specifications (including 35-minute DOE prosecutor's final argument) (Cruz) to more than 18*

*months and on going (Ebewo).*[15]

When the hearing is held under the rules of the American Arbitration Association and the

employee and NYCDOE jointly select an arbitrator or panel of arbitrators, NYS Education

Department ("NYSDOE") will pay the customary and usual fee for the panel; however, if there are

alternative procedures (e,g, permanent panel of arbitrators) rather than *ad hoc* assigned arbitrators,

chosen by NYCDOE and employee, then in that case the arbitrator shall be paid no more than

$200/day. Laws of 1996, Chapter 474 §134.

---

[14] Buried in section 4 rather than in section 2 of the statute where this is specified, if the amendment that only in NYC shall teachers be bound by the CBA rather than the Statute in all other parts of the State teachers have a choice between the provisions of the Statute or those of their CBA.  We herein make a frontal challenge to the unconstitutionality of this provision of §3020-a. NYC teachers are denied equal protections the § 3020 compared to teachers in the rest of NYS.

[15] Typical 3020-a proceedings require at least 1 day for each specification, another day for the pre-hearing and a final day for closing arguments. Each hearing day averages 5.5 hours. Therefore, Ms. Cruz's hearing should have lasted for about 88 hours instead of the 5.5 that it took for Arbitrator Riegel to hear unvetted testimony upon which he terminated Dr. Cruz.

These violations or amendments to the statutory provisions exist for NYC alone and came into being only in the last decade. We posit that they violate the due process and equal protection rights of plaintiffs and all NYC teachers.

## FACTS RELATING INDIVIDUALLY TO PLAINTIFFS

TWANA ADAMS:   Plaintiff Twana Adams ("Ms. Adams") is a forty-seven year old African-American woman and a resident of the State of New York in New York County who has been employed by the NYC DOE since 1986 [SAC ¶¶ 27, 28]. Ms. Adams received her Bachelors of Science degree in Chemistry from Howard University and her Masters degree in Science and Technology Education from Teachers College at Columbia University. [SAC ¶26]. She has also earned a Masters degree in Public Administration from Baruch College. [SAC ¶26].

For the next 16 years she taught General Science, Chemistry and Math at NYCDOE regular and alternative Public Schools at the Junior High and High School levels. [SAC ¶¶ 27, 28]. She is a tenured Teacher and her employment record has been exemplary. [SAC ¶ 28]. In 1992 she was voted a Teacher of the Year in Bronx County, received a NEWMAST-NASA Teaching Fellowship and was in residence at the NASA-Ames Research in Mountain View, California. [SAC ¶¶ 26, 27].

Ms. Adams resigned from NYCDOE in 2000 to teach in Washington, DC. She returned to New York and was accepted into NYCDOE's Excelsior Program choosing to work at Middle School 44 because of its existing NASA program. [SAC ¶ 36]  However, Ms. Adams found that the NASA program existed only on paper. Ms. Adams request to work with the program was ignored by MS 44's Principal. She never met NASA staff or received any NASA communications. [SAC ¶ 37].

Additionally, Ms. Adams found that MS 44, which was predominantly Black and Hispanic, and housed in the same building as the "Computer School," which was predominately White, was

offering a discriminatory educational experience for her students at MS 44 where she deemed that a two-tiered educational system existed with separate and unequal facilities based upon the race and nationality of the respective student bodies in the building. Ms. Adams complained to the Principal at MS 44 about these conditions at staff meetings and to the Principal both orally and in writing as well as sending memos to the Principal and the District Superintendent.  Ms. Adams specifically objected to the dangerous and chaotic conditions at MS 44, its failing to properly prepare and submit incident reports of violence in the school to the NYC DOE, and the fact that she could not properly teach the curriculum because MS 44 students were banned from the Building's Computer Room and did not take the frequent class trips as did the students at the predominantly white Computer School.

Ms. Adams's statements, memos and letters decried what she perceived as an environment created for failure and degradation of her students and all the students at MS 44. [SAC ¶¶ 29-34]. As a result of Ms. Adams speaking out on the conditions at MS. 44, opposing the race-based disparities between the two student bodies housed in the same building, Principal Ortiz was not pleased with her and became openly disrespectful to Ms. Adams in front of students, staff and parents. [SAC ¶ 38].  Principal Ortiz specifically began appearing at Ms. Adams classes without prior notice and badgered her about her lessons in front of the students. [SAC ¶ 39]. Yet, at her formal classroom observation before the end fo the school year, the Assistant Principal complimented Ms. Adams on an "excellent science lesson." [SAC ¶ 39]. This complimentary result was apparently never reduced to writing, as promised and required. [SAC ¶¶ 39].

In or about June 2006, as part of the reorganization of MS 44 Ms. Adams informed the school that she would not be returning for the 2006-07 academic year. On the form provided for the reorganization she expressed her reason for not returning as her unwillingness to be an accomplice

to the educational genocide at MS 44 that generates mass failure of students. [SAC ¶ 40]. Beginning in June 2006 and repeatedly through September 2006, Ms. Adams requested to be placed upon the transfer/excess list so that she could seek employment to another school. In retaliation, Principal Ortiz did not place her on that list until October 2006. After Ms. Adams interviewed at another school, Principal Ortiz informed her she had given a negative report to that school as concerns Ms. Adams because she did not want her at that school. [SAC ¶ 41].

All this time Principal Ortiz continued to be confrontational. On September 8, 2006 she ordered Ms. Adams and two other tenured teachers to report to the bench in the hallway front of the Principal's office and to stay there daily and throughout the day until assigned to other duties. [SAC ¶ 42]. This public punishment continued until October 20, 2006. Ms. Adams objected to this degrading practice which was witnessed and questioned by students, parents and other teachers and which was a violation of the United Federation of Teachers ("UFT") Collective Ba  with NYCDOE in that it was deemed to be a prohibited public reprimand. [SAC ¶ 43].

Principal Ortiz was not finished with her ongoing retaliation against Ms. Adams for speaking out about the conditions at MS 44. Principal Ortiz seized the opportunity when Ms. Adams made a simple clerical error on a mandatory Accident Report reporting her having been body slammed by a student when she printed the Principal's name on the line indicated. [SAC ¶¶ 46, 48, 49]. Rather than ask Ms. Adams to correct the form as Principal Ortiz did when other teachers made mistakes, Principal Ortiz filed false, erroneous and retaliatory forgery charges claiming that Ms. Adams had "signed" Principal Ortiz's name to the Report when in fact Ms. Adams had merely block printed the Principal's name. [SAC ¶ 49]. Until this time, Ms. Adams had never been cited for poor teaching practices, absence lateness, abusive conduct or any other improper conduct in connection with her

15

employment by NYCDOE. [SAC ¶ 48].

As a result of these charges, on October 27, 2006 Ms. Adams was relieved of her teaching duties at MS 44 and reassigned to NYCDOE's Temporary Reassignment Center ("TRC") at 333 Seventh Avenue in Manhattan with a reporting date of October 30, 2006 ("7th Avenue TRC"). The TRC is in reality a detention center for teachers who are confined to a conference room that held more than 75 teachers during school work hours each day and was one of the facilities that are known as "Rubber Rooms". [SAC ¶¶ 52, 56, 57]. On December 5, 2006 Ms. Adams was reassigned to teaching at MS 54. [SAC ¶ 53].  But in January 2007 she was sent back to the 7th Avenue TRC without explanation. [SAC ¶ 54]. Finally on April 13, 2007 Ms. Adams was sent to the TRC at West 125th St. in Manhattan ("125th St. TRC") in which conditions are even more onerous. [SAC ¶ 55].

The conditions at the 7th Avenue TRC are primitive and unfitting to employees in this country or any a civilized society. Ms. Adams found 75 other adults, all teachers in various stages of the disciplinary process. [SAC ¶ 55]. The TRC is actually a single room in which the teachers are confined, including other plaintiffs herein. There is no privacy, no phones and no computers. The room is windowless, lacks adequate ventilation, any air purification and one door for entry and exit. [SAC ¶ 57]. All charged teachers are assigned there ,including some of whom have been charged with criminal conduct. [SAC ¶ 57]. Heated arguments are common. [SAC ¶ 57, 58]. Ms. Adams was forced to sign a Memo from NYCDOE indicating her agreement that she would not bring any electronic devices to the Rubber Room, including Laptop computers. [SAC ¶ 60].

Ms. Adams was routinely subject to disrespect, ridicule and verbal abuse by NYC DOE unskilled clerical aides to the Deputy Director of Human Resources Judith Rivera, working at the 7th Avenue TRC. [SAC ¶ 61]. Ms. Adams was refused permission to go to the restroom and

16

commanded to listen to announcements by one of the clerical aides (Donna Dennis) and has been berated for illegible handwriting on her time sheets and yelled at on other occasions by the other assistant to Ms. Rivera. [SAC ¶ 61].

Ms. Adams has objected to the conditions and treatment at the 7th Avenue TRC to the two clerical aides running roughshod over her, as well in memos to Judith Rivera at the NYC DOE. [SAC ¶ 62]. Soon thereafter, one of the two office aides to Judith Rivera, Donna Dennis walked into the Rubber Room yelling at Ms. Adams and told her to "get your stuff, you are out of here" and handing her a letter informing her that she was being moved to the 125th Street TRC. [SAC ¶ 63]. When Ms. Adams did not gather all of her belongings unskilled clerks were nasty to her and called the Police and they escorted Ms. Adams from the Rubber Room further humiliating and embarrassing her. [SAC ¶ 63].  Ms. Adams later learned that Principal Ortiz had worked with the NYC DOE Human Resources Aides who dictate to the teachers as Rivera's proxies, and she believes that the abusive conduct was in retaliation for her disagreements with Principal Ortiz. [SAC ¶ 63].

Conditions at the 125th Street TRC were worse than those at the 7th Avenue TRC. Magnetic entry cards are required for entrance to the building, the elevator and certain floors. Unlike other NYC DOE employees the teachers assigned to that Rubber Room are not provided with cards or appropriate professional duties.

When the time finally arrived for Ms. Adams' 3020-a hearings, she overheard an *ex parte* interchange about her case between her arbitrator Andree McKissick, and DOE's supervisor to all the DOE prosecutors whose job it is to get the teachers fired, Theresa Europe, Esq.  She reported this and it was one of the affidavits in the forerunner of this action. Teachers4Action *et al* v Bloomberg *et al.*  Ms. Adams was also the lead Plaintiff in the original version of Adams *et al* v. NYSED *et al.*

17

the instant matter, but where all the arbitrators are named defendants. While other teachers suffered in that they lost their counsel when UFT was a defendant, retaliation can be the only explanation for the harsh penalty that Ms. Adams was awarded. Arbitrator McKissick, agreed that there were two lines that required entry for and by the Principal, one requested Principal's name be supplied; the other asked for the Principal's Signature. The Arbitrator agreed that block printing the Principal's name in the first and the block printing of the Principal's name in the second identically to the first was inadvertent, that there were mitigating circumstances, Adams had made several errors on the form. It was only a short while after she had been assaulted by the student body slamming her, she was in serious pain, and had administered two tablets of hydrocodone to manage the pain which was sufficient to impair her thought cohesion in the 15-20 minutes that had elapsed.

The Arbitrator found all this mitigating, said it was an inadvertent error and then proceeded to fine Ms. Adams $10,000.00 which is a significant and onerous sum to someone with a gross salary in the 70 thousands, a net pay of about $40,000.00 and substantial family financial obligations. Further the Arbitrator ruled that it should be paid in 10 monthly installments of $1000.00 each. See Arbitrator Award in SED # 7653.

JOSEFINA CRUZ:    See separate Declaration of Josefina Cruz .

MICHAEL EBEWO:  Plaintiff Michael Ebewo ("Dr. Ebewo") is a black man, a resident of the State New Jersey and has employed by the NYC Department of Education ["NYCDOE"] as a teacher since 1990. [SAC ¶¶ 25, 157, 164]. Dr. Ebewo is a tenured teacher teaching eighth grade Special Education at which he has taught for most of his professional career. [SAC ¶¶  6, 167].

Born and first educated in Nigeria, Dr. Ebewo earned degrees from the College of Education in Nigeria in Biology/Chemistry/Education in1974 and in 1977 he earned a Certificate in Education

18

to teach high school chemistry and biology. [SAC ¶158]. Coming to the United States in the early 1980's he earned a Bachelor of Science degree in Agri-Science and Masters of Education degree from Wichita State University in Wichita, Kansas. [SAC ¶ 159]. He earned his Doctorate of Education at Oklahoma State University in 1986. [SAC ¶160]. Dr. Ebewo also earned a Masters Degree in Science Education at the City College of NYC in December 1992. [SAC ¶161].

Dr. Ebewo has been continually employed as a teacher and has taught high school math and science, special education and was a member of the adjunct faculty at Kean University in New Jersey. [SAC ¶¶ 162, 163, 166]. He has continually been recognized for his excellence as a teacher including during his employment by NYCDOE. [SAC ¶¶ 168, 170, 172, 202].

Dr. Ebewo's history of excellent performance as a teacher suddenly changed in 2006 when NYCDOE targeted Dr. Ebewo and began efforts to remove him from his teaching position. [SAC ¶168, 170, 172, 173, 176, 182, 206]. Despite his receiving praise from his United Federation of Teachers' Mentor for his performance as a Special Education teacher, Lisa Nelson, a NYC DOE employee and the Principal at Dr. Ebewo's school began to openly criticize Dr. Ebewo's teaching performance. [SAC ¶¶ 165, 169, 172, 175, 186]. Ms. Nelson unfairly criticized Dr. Ebewo's lesson plans and continuously filed inaccurate performance reports.

Ms. Nelson offered Dr. Ebewo the opportunity to transfer to another school and offered to give him a satisfactory rating on his annual review if he could find another school in which to teach. [SAC ¶¶ 177, 178]. When he could not find another position, Ms. Nelson gave him a poor review and subjected him to disciplinary charges so that she could hire two teachers on his salary line. [SAC ¶¶ 179, 180, 194]. This tactic became the norm when NYCDOE created a policy in which Principals became responsible for budget decisions within their individual schools. [SAC ¶ 181].

19

Because Dr. Ebewo refused to stop protesting policies in his school which he believed would harm the students the faculty and the public education system he was targeted for harassment, false charges and evaluations, and ultimately removed from his school to a TRC. [SAC ¶ 183, 184, 185, 203]. He was the only teacher whose work was consistently found by Ms. Nelson to be unsatisfactory. [SAC ¶ 187]. She unfairly criticized his lesson plans and exaggerated his work on her observations resulting in consistently Unsatisfactory ratings while less experienced teachers received Satisfactory ratings. [SAC ¶¶ 186-188]. He worked extra hours at Ms. Nelson's direction for which he was not compensated, was removed from summer school assignments and was subject to her publicly threatening to fire him. [SAC ¶¶ 189-192]. She offered inducements for students to be disruptive in his classes and refused to assist him when he was assaulted by students and hid one such student from the police. [SAC ¶¶ 192, 193].

In September 2007 without explanation Ms. Nelson removed Dr. Ebewo from his regular teaching assignment and assigned an uncertified teacher in his place; Dr. Ebewo became a day to day substitute class. [SAC ¶ 195]. On October 3, 2007 Ms. Nelson reassigned Dr. Ebewo to a TRC without explanation and did not permit him to take his personal belongings with him which belongings were subsequently stolen. [SAC ¶ 196]. In March 2008 Ms. Nelson falsely charged Dr. Ebewo with incompetence, insubordination, neglect of duty and inefficiency. [SAC ¶ 198]. Dr. Ebewo has experienced horrific conditions in the TRC in conformity with those of the other plaintiffs herein. [SAC ¶ 199]. As a result of his reassignment he has suffered the loss of professional development courses and the right to associate with his colleagues. [SAC ¶ 201]. He has suffered personal and emotional injuries from conditions in TRCs. [SAC ¶ 200, 204].

<u>JOANN HART</u>:         Plaintiff Joann Hart ("Ms. Hart") is a sixty-two year old white woman and a

20

resident of the State of New Jersey [SAC ¶ 205]. Ms. Hart has been continuously employed by NYCDOE since March 1977 and is a tenured teacher. [SAC ¶¶ 6, 210]. Since 1978 she has concentrated in teaching Special Education students. [SAC ¶ 213].

Ms. Hart earned her Bachelors degree from Southampton College in 1970 and her Masters of Science degree in Education from the College of New Rochelle in 1972. In September 1972 she received her permanent certification from NYS for teaching Nursery through Sixth Grade. [SAC ¶ 209]. In 1981 Ms. Hart received her license to teach emotionally handicapped children. [SAC ¶ 210]. During her entire career, Ms. Hart received satisfactory ratings and praise for her work at her schools, particularly with Special Education students. [SAC ¶¶ 213, 216-220].

All of that changed on May 16, 2006 when Ms. Hart was falsely accused of assaulting a student who feared trouble when he was about to be reprimanded. [SAC ¶ 221]. Ms. Hart was entering a classroom to administer a standardized state test for English learners when she found the class in chaos. In an effort to gain necessary control of the class she told D.H., a student who refused to sit down, that she would report him to the Principal.[SAC ¶ 223].

At the end of the day, the school's Principal summoned Ms. Hart to his office informing her that D.H. made the innocuous claim that she "hurt him". [SAC ¶ 224]. Two days later the Principal again summoned Ms. Hart to his office. The Principal and the Assistant Principal were present as was the district superintendent who attended by phone. Ms. Hart was questioned about her age, the number of years she had been employed and about her retirement plans. [SAC ¶ 225]. At the meeting's conclusion she was given a letter stating that a "serious allegation" had been brought against her and reassigning her to the 7th Avenue TRC as of May 18, 2006. [SAC ¶¶ 213, 216-220].

Ms. Hart was reassigned to the 7th Avenue TRC because of false charges of incompetence

and because of her age and the number of years of her employment. [SAC ¶¶ 225, 226]. While there, Ms. Hart was presented with a letter on June 1 from NYCDOE Office of Special Investigation ("OSI") informing her that she was under investigation for allegations of corporal punishment and inappropriate conduct by anonymous accusers. [SAC ¶ 227]. Despite the investigator's refusal to disclose the identity of the anonymous accusers when asked, Ms. Hart cooperated with the OSI investigator. [SAC ¶¶ 228, 229].

At that point Ms. Hart's situation worsened. On June 21, 2006 while in the 7th Avenue TRC, Ms. Hart was summoned by the TRC's secretary to answer a call from NYC Police Department Detective assigned to the East 119th Street's Homicide Squad. At his request, she appeared at the precinct and was arrested, fingerprinted, photographed and run through the system falsely charged with two counts of assault in the third degree, attempted assault in the third degree, and harassment in the third degree.[SAC ¶¶ 232, 233]. All the while NYCDOE supported these unfounded charges, but NYCDOE's witnesses were repeatedly unavailable. Finally, after 15 months and numerous postponements, these unfounded and unsupported charges were dismissed. [SAC ¶¶ 234-236].

Because of these unfounded charges, wrongly supported by NYCDOE and its employees, Ms. Hart incurred thousands of dollars in legal fees, was forced to make numerous criminal court appearances, suffered the stigma of the charges and the emotional turmoil of being falsely, but nonetheless charged. [SAC ¶¶ 234-236]. Finally, NYCDOE, apparently not satisfied that these charges were dismissed then placed her on its Ineligible/Inquiry List barring her from working in after school and summer programs and denying her the professional development sessions required of all NYCDOE teachers. [SAC ¶¶ 236, 237].

In November 2006, the NYSDOE brought charges against Ms. Hart pursuant to NYS Ed.L.

§§ 3020 and 3020-a. [SAC ¶¶ 238]. In response, she filed a request for a hearing. [SAC ¶ 239]. Soon thereafter her district superintendent threatened her and NYCDOE initiated a probable cause hearing which could lead to removal from the payroll. [SAC ¶¶ 240, 241].

In early January 2007, NYCDOE scheduled Ms. Hart's probable cause hearing[16] for January 22 and then almost immediately it withdrew its request for the hearing. [SAC ¶ 242]. Not satisfied with harassing of Ms. Hart, NYCDOE sent a "reminder" letter setting forth again the allegations against Ms. Hart and again warning her not to return to MS 44. [SAC ¶ 243].

Finally, 11 months after entering the 7th Avenue TRC Ms. Hart's § 3020-a hearing was convened. [SAC ¶ 244]. The delay which her due process rights to a hearing within a reasonable time was further compounded when the NYS DOE hearing officer found the testimony of Ms. Hart's accusers "less than plausible" and that she did not inflict corporal but nonetheless imposed a fine against her for the purpose of "send[ing] a message" to other teachers. [SAC ¶¶ 245, 246, 247]. Ms. Hart's rights were further violated when, despite the hearing officer's actual findings that Ms. Hart did not commit the wrongful conduct charged, the hearing officer punished her by changing her employment status from tenured teacher to an Absent Teacher Reserve ("ATR"). This status change is not permitted by law and has greatly diminished her continued employment and resulted in her being returned to the 7th Avenue TRC. [SAC ¶¶ 250, 252]. After 23 months in the 7th Avenue TRC, Ms. Hart was assigned to an elementary school in her former district on April 27, 2008. [SAC ¶¶ 250, 252]. However, since that time, Ms. Hart has been moved from school to school performing duties other than those of a teacher of her status such as manual labor. [SAC ¶¶ 253, 254].

---

[16] A probable cause hearing is a truncated quasi *exparte* Inquisition before an Arbitrator, during which the respondent does not testify or present witnesses, to determine whether sufficient evidence exists to removed the teacher from the payroll for three months.  It is used whenever there are felony charges of sexual, drug or assault pending.

Ms. Hart spent more than 23 months in the stressful, demeaning and dangerous conditions of the 7th Avenue TRC awaiting the outcome of her NYS Ed. L. § 3020-a Hearing; an outcome that was in her favor yet she was still punished, fined and demoted and likely to lose her job.[SAC ¶¶ 245, 246, 249-252, 254, 255, 257]. Clearly defendants have given up on the application of the laws and rights of our Republic in favor of the use of gulag-like tactics against tenured teachers to set about "reforming" NYC Public Schools.

The 7th Avenue TRC is intended to be a place where teachers who have been removed from their schools pending hearings or investigations are assigned to perform alternate duties commensurate with their job titles. *Chancellor's Regulation-770.* Reality is something else.

The conditions in the TRC are not those of a school or a workplace. [SAC ¶ 260]. Eighty people occupied a converted conference room of not more than 720 square feet; 9 square feet or a 3 foot by 3 foot space per person. [SAC ¶ 259]. Ms. Hart and the 80 others were confined in a poorly lit inadequately ventilated room without windows furnished with hard plastic chairs and bridge tables on a moldy carpet. [SAC ¶ 261]. Emergency exits within the room were plastered over so teachers' entry and exit could always be observed on video; emergency egress would have to be across an alcove and filth with rodent droppings and dead cockroaches filled the stairwell. [SAC ¶ 261]. The door was hung opening into the room expecting egress through the now sealed off wall and stair ensuring a stampede and inability to open the door into the room if people tried to exit through it *en masse.*[17]

JULIANNE POLITO:        Plaintiff Julianne Polito ("Ms. Polito"), a white woman over 40 years of age, resides in the State of New York. She is a tenured teacher employed by NYCDOE since

---

[17] Only in early 2008 long after Hart had left the rubber room did workmen arrive to rehang the door to open outward into the alcove and corridor.

1993. [SAC ¶¶6, 318]. She has worked for NYCDOE as a Principal, Assistant Principal, Middle School Director and Special Education Instructional Support Specialist ("ISS"). [SAC ¶¶ 303, 322]. She served as Director of Middle School Reform on Manhattan's Lower East Side. [SAC ¶ 322].

Ms. Polito received the Levitt Foundation Teacher Award and has been recognized by *Cambridge Who's Who* and the Bank Street Principals Institute. [SAC ¶ 304]. She is currently a Doctoral Candidate at the University of Phoenix. *Id.*

Ms. Polito has long worked to advance civil rights, educational excellence and a peaceful and equitable society, values which NYCDOE first valued and recognized in the responsibilities it gave her. [SAC ¶¶ 303, 307-310, 315-318]. As part of that recognition, Ms. Polito, founded and was Principal of TASS, Middle School 301. [SAC ¶ 303].

NYCDOE personnel began to target Ms. Polito in 2003 after Ms. Polito submitted a proposal to reform NYCDOE's New Small School Initiative, which they apparently found threatening to their then existing positions within NYCDOE. [SAC ¶ 323]. The targeting worsened when Ms. Polito was awarded funding for her reform proposal. [SAC ¶ 324]. Apparently, Ms. Polito's achievement did not sit well with NYCDOE district in which the school was situated and which, through the efforts of its Local Instructional Superintendent Alexis Penzell, set out to destroy Ms. Polito's career. [SAC ¶ 309]. Ms. Penzell has a reputation for harassing and firing the most number of Principals in Ms. Polito's Region 9 and replacing them with friends or persons over whom she could impose her own educational philosophy notwithstanding the negative results for the students under Ms. Polito's care and instructional programs. [SAC ¶ 328].

The targeting worsened throughout the years until finally in January 2005 Ms. Penzell was given authority over Ms. Polito. [SAC ¶ 325]. In staff meetings and interviews Ms. Polito spoke out

openly against Ms. Penzell's illegal practices of violating employees' privacy and other rights. [SAC ¶ 330]. In May and June 2005 Ms. Penzell's attacks and those of other NYCDOE employees worsened and an effort was made to re-characterize Ms. Polito from an experienced caring educator to that of a liar and a child abuser. [SAC ¶¶ 326, 327, 329].

Beginning in September 2005, and without reason or any apparent authority, Ms. Penzell forced Ms. Polito to withdraw her middle school's intended curriculum, altered her class configurations, interfered with programs and withheld budgeted funds from the school. [SAC ¶ 331]. She prohibited Ms. Polito from hiring office staff, publicly reprimanded her and made false accusations in an effort to have Ms. Polito fired as Principal. [SAC ¶ 332].

In October 2005 at a meeting of Principals Ms. Penzell publicly chastised Ms. Polito for asking a question leading to Ms. Penzell's then being reprimanded for treating Ms. Polito in a disrespectful and unprofessional manner. [SAC ¶ 333]. This appeared to be the breaking point for Ms. Penzell who then began verbally abusing, harassing and attacking Ms. Polito on a daily basis in a clear effort to have her removed from her position as Principal of TASS. [SAC ¶¶ 334-336]. Ms. Polito complained of these personal attacks and the interference with her middle school's curriculum and budget, all to no avail. [SAC ¶ 337].

In November 2005, Ms. Polito tried to prevent a small group of students from forming a gang. [SAC ¶ 340]. She arranged a meeting with parents, Principals, school safety officers, and students from the three neighboring schools. [SAC ¶ 340]. Ms. Penzell refused to attend this meeting. [SAC ¶ 340]. However, after the meeting, Ms. Penzell in her continuing campaign of harassment and retaliation convinced the parent of one of the students who was forming the gang to make a false complaint against Ms. Polito claiming that she was prejudiced against this one

particular student. [SAC ¶¶ 338, 339, 341].

Ms. Penzell then commenced a vicious campaign against Ms. Polito using innocent and impressionable middle school students to make false and scurrilous complaints and allegations against Ms. Polito. [SAC ¶¶ 342-347]. First, Ms. Penzell initiated a complaint falsely accusing Ms. Polito of using corporal punishment that resulted in NYCDOE charges against her on these accusations. [SAC ¶ 342]. These false complaints and charges were subsequently found to be unsubstantiated and were dismissed. [SAC ¶ 342]. When these charges were dismissed Ms. Penzell fabricated false allegations that Ms. Polito sexually abused a female student. [SAC ¶ 343]. NYCDOE investigated and dismissed the charges for lack of evidence. [SAC ¶ 344].

Thereafter, followed numerous and additional charges instituted solely to harass Ms. Polito and caused her tremendous aggravation and embarrassment but all were dismissed for lack of evidence and inconsistent testimony of witnesses. [SAC ¶¶ 345-347]. Having failed, Ms. Penzell tried another tactic and charged Ms. Polito with numerous violations of her ministerial duties as Principal. [SAC ¶ 348]. Again, all charges were dismissed as unfounded. [SAC ¶ 349].

After these efforts were unavailing, Ms. Penzell then attacked Ms. Polito by threatening to place disparaging letters in Ms. Polito's employee file which would have required Ms. Polito to respond to these false charges which would contractually remain as part of Ms. Polito's employment record for at least three years. [SAC ¶¶ 350, 369]. In her continued effort to destroy Ms. Polito and remove her as Principal at her middle school, Ms. Penzell began telling Ms.  these charges were all false, unfounded, and dismissed. [SAC ¶¶ 351-356]. Ms. Penzell went so far as to schedule staff meetings without informing Ms. Polito at which Ms. Penzell threatened school staff with firings and told them they can and should avoid Ms. Polito because of "charges" which Ms. Penzell knew were

unfounded and had been dismissed. [SAC ¶¶ 357, 358].

Next, Ms. Polito was falsely charged with interfering in the selection process of a Principal for her middle school. [SAC ¶ 359]. While not being given an opportunity to respond to these charges, despite her efforts to do so, and her complaining of this violation of her rights to due process, Ms. Polito was further investigated, falsely charged and removed as Principal at her middle school and reassigned. [SAC ¶¶ 360-363]. Her reassignment to Regional Administrator, a temporary assignment, resulted in her losing salary and thousands of dollars in unexplained deductions improperly taken from paychecks which remain unreimbursed. [SAC ¶¶ 363-365].

Ms. Polito has since been reassigned numerous times and was finally assigned to a TRC where she sat for three years awaiting actual charges and a hearing. [SAC ¶¶ 366-368, 374, 375]. In addition to enduring horrific conditions of the TRC, Ms. Polito has been deprived of the opportunity to work as an educator, been deprived of professional advancement, has suffered personal and emotional injuries and has lost thousands of dollars in salary, benefits and pension benefits all due to the harassment and retaliatory conduct of defendants. [SAC ¶¶ 364, 370-376].

Were Ms. Polito permitted to either amend or supplement her complaint based upon the documents that she filed with this court and which are incorporated in the Second Amended Complaint would specifically point to the fact that she has repeatedly been subject to allegations that were all deemed unfounded. But all of which resulted in her spending years in a TRC.

She was first removed from her position as Principal in February 2006 pending an Office of Special Investigations' investigation and which charges were unfounded. She returned to the classroom as a teacher at a greatly reduced salary in September 2006. She was again removed on October 23, 2006 pending an investigation for serious allegations which again were unfounded. She

28

returned to the classroom as a teacher in September 2008 and was again removed with serious allegations on September 16, 2008 returning to the classroom on May 8, 2009. She resumed teaching this September and was removed from her classroom and her students on October 2, 2009 pending an investigation.

In each instance Ms. Polito did not have a NYS Ed. L. 3020-a hearing but was removed from her job for no apparent reason other than retaliation and harassment as all allegations against her were unfounded. Nonetheless, Ms. Polito has spent more than three academic years confined in TRCs all in violation of her rights.

BRANDI DAWN SCHEINER:        Plaintiff Brandi Dawn Scheiner ("Ms. Scheiner") is a tenured teacher employed by defendant NYCDOE since 1984. [SAC ¶¶ 6, 457, 464]. Ms. Scheiner earned her Bachelor of Arts from Binghamton University and her Masters of Arts in Urban Education from Adelphi University. [SAC ¶458]. Prior to becoming employed by NYCDOE Ms. Scheiner worked with children as an arts and media specialist and as an early childhood counselor. [SAC ¶460].

Ms. Scheiner began working for NYCDOE as a per diem teacher in 1984 and accepted a full time assignment at an elementary school in 1984 where she remained until 2007. [SAC ¶¶ 463, 464]. During her career she was lauded as an outstanding teacher, receiving satisfactory yearly ratings from the five Principals she served under and receiving letters of excellence and commendations from her supervisors and colleagues. [SAC ¶¶ 465, 467]. In addition to her teaching duties Ms. Scheiner served as an elected member of the School Leadership Team, a collaborative parent-teacher administrative body, and as a Peer Mediation Coach. [SAC ¶ 466].

Despite her outstanding career, when NYCDOE appointed an Acting Interim Principal at Ms. Scheiner's school, Ms. Scheiner found herself and her career under attack. NYCDOE Acting Interim

29

Principal Susan Felder, determined that Ms. Scheiner was too expensive, too senior, too talented and shockingly and suddenly not appropriate for the school. [SAC ¶ 468]. During the school years 2005-2006 and 2006-2007, Acting Interim Principal Felder set out on a persistent course of harassment, intimidation retaliation, excessive classroom observations, verbal abuse, hostility, and changing of Ms. Scheiner's class assignments from second grade, her specialty, to Pre-K. [SAC ¶ 469, 470, 474, 475]. She filed frivolous charges against Ms. Scheiner alleging incompetence, insubordination, and unsatisfactory performance of her employment duties, including improper snack time, dismissal time and ultimately falsely alleging that Ms. Scheiner engaged in verbal abuse and corporal punishment of her students. [SAC ¶ 469, 475].  For example, Ms. Felder charged Ms. Scheiner with "poor rug management", "allowing excessive use of glue", "writing below the lines", and other ridiculous and frivolous charges leading to an Unsatisfactory rating. [SAC ¶ 470, 475].

In March 2007, NYCDOE District Superintendent observed Ms. Scheiner's class and acted in conformity with Ms. Felder's attacks against Ms. Scheiner rating her performance Unsatisfactory. [SAC ¶ 476].  Shortly thereafter, Ms. Scheiner suffered a workplace injury and was unable to return to work. [SAC ¶ 477]. Notwithstanding the debilitating injury, Ms. Felder refused to grant Ms. Scheiner her requested medical leave charging her with "unexcused excessive absences". [SAC ¶¶ 477, 478]. As a result of these numerous unfounded charges Ms. Scheiner was suspended from her teaching duties and reassigned to the 7th Avenue TRC. [SAC ¶ 478].

Challenging the frivolous charges and Acting Interim Principal Felder's improper conduct, Ms. Scheiner filed grievances with NYCDOE and complaints with the NYS Division of Human Rights ("NYSDHR"). [SAC ¶ 471]. After Ms. Scheiner filed her grievances and NYSDHR complaints, Ms. Felder increased her retaliatory tactics and harassment throughout 2005-2006 and

2006-2007 culminating with year end performance ratings of Unsatisfactory. [SAC ¶¶ 473, 474].

Although the grievances were never acted upon, investigations were conducted by NYSDHR. [SAC ¶¶ 472, 479]. While Ms. Scheiner was assigned to the 7th Avenue TRC, the NYSDHR made several findings after investigation. [SAC ¶¶ 479-482]. NYSDHR found that the explanations offered by NYCDOE and Acting Interim Principal Felder were "pretextual" and "unworthy of credence"; that NYCDOE discriminated against Ms. Scheiner and retaliated against her for filing grievances and her complaint with the NYSDHR. [SAC ¶¶ 479, 480]. NYSDHR also found that NYCDOE had subjected Ms. Scheiner to disparate treatment in the terms, conditions and privileges of her employment relating to age, injuries and performance and that she suffered economic losses, physical injuries and humiliation. [SAC ¶¶ 481, 482].

Concurrent with the NYSDHR findings, Ms. Scheiner began speaking out against NYCDOE's misguided policies and unlawful practices directed at tenured teachers and the improper use of TRCs. [SAC ¶ 483]. NYCDOE increased its harassment and retaliatory tactics against Ms. Scheiner for her speech and for her becoming affiliated with Teachers4Action. [SAC ¶¶ 484, 485].

From June 2007 until the present, Ms. Scheiner has endured stressful and dangerous conditions in the 7th Avenue TRC in conformity with those endured by the other plaintiffs herein. [SAC ¶¶ 245, 246, 249-252, 254, 255, 257, 259-261].

NYCDOE employees have demeaned and humiliated Ms. Scheiner by shouting orders, making threats and referring to her and other teachers confined to the TRC in demeaning and derogatory terms. [SAC ¶ 490]. On occasion, physical fights have broken out and verbal arguments are common. [SAC ¶ 491]. Despite the legal and contractual requirements imposed upon defendants in reassigning tenured teachers to a TRC, Ms. Scheiner has no responsibilities as a teacher, is forced

31

to sign in and out every day, her movements are monitored by security guards and surveillance cameras, are restricted and she is subject to conditions similar to being in a prison. [SAC ¶ 492].

As a result of the conditions in the 7th Avenue TRC, the physical harassment and retaliation, and the violation of her rights Ms. Scheiner has suffered physical injury, including circulatory and orthopedic problems, emotional distress, a loss of salary and benefits. [SAC ¶ 489, 493, 494].

THOMASINA ROBINSON:   Plaintiff Thomasina Robinson ("Ms. Robinson") is a licensed physical education teacher who has been teaching since 1958 and became a tenured teacher with NYCDOE 1993. [SAC ¶¶ 6, 377, 380]. For the past 17 years she has been teaching at the Fashion Institute High School ("FIHS"). [SAC ¶ 384]. During her years as a teacher Ms. Robinson has also held the position of Athletic Director administering and overseeing all the school's athletic teams and has coached the Girls' Basketball and Boys' Volleyball Teams, duties outside her teaching obligations and for which she received additional "per session" compensation. [SAC ¶ 392, 393].

Ms. Robinson earned her Bachelors of Science degree in Physical Education from Hunter College and her Masters of Science degree in Education from the City College of New York.  [SAC ¶ 378]. From 1992 to 2004 she served in the additional capacity as Dean of Students in the FIHS cafeteria which required that she skillfully manage and guide the student body and deal with conflict resolution, crowd management and assist professional security personnel in mediating physical altercations between students and working to avoid turmoil and problems for the students, faculty and Defendant NYCDOE. [SAC ¶¶ 388, 390].

She has continually been regarded and recognized by her peers, colleagues and Principals as an excellent teacher and she never received an unsatisfactory rating as a teacher. [SAC ¶¶ 384-386, 389, 394]. In 1996, Ms. Robinson received the Teachers Appreciation Award from her colleagues

in recognition of her distinguished service as a classroom teacher. [SAC ¶ 387].

Despite her outstanding career, Ms. Robinson was retaliated against by NYCDOE and its employees when, in October 2006 she challenged a new policy that she believed was illegal and destructive to the school's students' educational advancement. [SAC ¶¶ 395, 396]. At that time the school's Principal informed Ms. Robinson and the other physical education teachers that they would need to readjust the grading policies for physical education as pertains to student attendance. [SAC ¶¶ 397]. Ms. Robinson challenged this adjustment noting that, in fact, this new policy violated NYS law. [SAC ¶¶ 398-400, 401, 403, 404 ]. Ms. Robinson was clear that State law required that students may not receive a passing grade for physical education if they do not attend class and to do otherwise jeopardized the students and the school. [SAC ¶ 405].

As a result of Ms. Robinson's good faith refusal to implement an unlawful NYCDOE policy without further explanation and confirmation, she was purposefully targeted for harassment, retaliation and ultimately demotion. [SAC ¶¶ 406, 407, 409, 410, 412, 416]. The school's Principal threatened Ms. Robinson and the other physical education teachers with insubordination charges if they refused to implement the policy; Ms. Robinson was so falsely charged. [SAC ¶¶ 402, 408].

Finally, the Principal summoned Ms. Robinson to the Principals' office by an announcement over the school's public address system where she was subject to false and unsubstantiated accusations of "Corporal Punishment/Verbal Abuse". [SAC ¶¶ 411, 414, 416]. At the Principal's office Ms. Robinson was not allowed to review the charges but was told she needed to sign the charging form. [SAC ¶ 415]. Without an opportunity to discuss the charges with her union representative, Ms. Robinson was then assigned to the 7th Avenue TRC and escorted from the school by security without even the opportunity to remove her personal belongings. [SAC ¶¶ 417-420].

33

Ms. Robinson has remained in the 7th Avenue TRC for more than two years. [SAC ¶¶ 422, 434]. The conditions she experienced in the 7th avenue TRC are horrific and entirely in line with those experienced by the other plaintiffs confined there. [SAC ¶¶ 421-432, 434, 436-439].

Confinement without freedom of movement is particularly harsh for Ms. Robinson who has spent her entire teaching career as a physical education teacher. [SAC ¶ 440]. She tried to form an informal exercise time in the TRC she was reprimanded and forced to stop. [SAC ¶ 441]. She has suffered physical and emotional injury from the prolonged confinement. [SAC ¶ 442]. She has been deprived of working as a teacher and prohibited from contact with former students. [SAC ¶ 443].

In January 2007, Ms. Robinson learned that the Office of Special Investigations was conducting an investigation into the corporal punishment charges against her. [SAC ¶ 444]. In May 2007 charges were proffered against her but she has yet to have a § 3020-a hearing more than 2 years later, all this time she has been confined to the 7th Avenue TRC. [SAC ¶¶ 445-447].

Ms. Robinson contends that the charges and her being reassigned to a TRC are all arising from her age and tenure and in retaliation for her speaking out against a policy that NYCDOE and its employees sought to institute and would result in violation of State law and damage to the students. [SAC ¶¶ 448, 449].

## ARGUMENT

### POINT I

### PLAINTIFFS NEED NOT EACH FILE WITH THE EEOC AS LONG AS ONE HAS FILED THEY ARE ALL ABLE TO "PIGGY BACK" ON THAT CHARGE

Josefina Cruz has filed with the Equal Employment Opportunity Commission (EEOC). She claimed discrimination on the basis of race, ethnicity (national origin), disability, age and

retaliation.  Her Right to Sue Letter claims each of these violations of her rights and is timely[1].

Under Title VII, according to the "piggybacking rule," or single filing rule, where one plaintiff has filed a timely EEOC complaint, other non-filing plaintiffs may join in the action if their individual claims arise out of similar discriminatory treatment in the same time frame;.  However, when the allegedly discriminatory activity affects a large group, piggybacking is not allowed unless the filed charge provides some indication that the grievance affects a group of individuals defined broadly enough to include those who seek to piggyback on the claim. Civil Rights Act of 1964, § 706(e, f), 42 U.S.C.A. § 2000e-5(e, f).

The evidence that there was a prima facie case of discrimination for several of plaintiffs with regard to each charge that each plaintiff makes comes from individual facts.  Further, all of the other Plaintiffs share some charge in common with Dr. Cruz and virtually all or all join her in claiming that they have been retaliated against for protected behavior.

Holowecki v. Federal Exp. Corp., 440 F.3d 558 (2d Cir. 2006) provides an example of a situation where a large number of plaintiffs have a collective claim.  The fact that the Rubber Rooms are predominantly comprised of all the protected groups is a showing that under the Bloomberg/Klein administration of the schools the teachers that are most at risk fall in the very categories that the Congress found it necessary to protect with Title VII, ADEA, and ADA.  "Some indication that the grievance affects a group of individuals defined broadly enough to include those who seek to piggyback on the claim." Tolliver v. Xerox Corp., 918 F.2d 1052, 1058 (2d Cir. 1990) is a criterion that this Circuit has used for the past several decades.  Further, an individual who has previously filed an EEOC charge cannot piggyback onto someone else's

---

[1]  How far back this recent letter extends shall be the subject of another point of law as we establish the existence of a hostile work environment with regard to all the protected categories covered by her Right to Sue Letter.

EEOC charge. See <u>Levy v. United States Gen. Accounting Office</u>, 175 F.3d 254, 255 (2d

Cir.1999).  Scheiner has filed a NYS Division of Human Rights charge, which in this State is

always cross-filed with the EEOC and thus her charge applies to her and anyone who seeks to

piggy-back on her claims rather than Cruz.  They must allege the same type of discrimination

attributable to the same employer conduct.  It is evident from the facts that racism, ageism, and

retaliation apply that plaintiffs had the same humiliating experiences.  "Where the party wishing

to piggyback has filed his own EEOC charge," he is "bound by the parameters of his own EEOC

charge, and cannot subsequently utilize the single filing rule to avoid the statute of limitations."

<u>Mooney v. Aramco Servs. Co.</u>, 54 F.3d 1207, 1223-24 (5th Cir.1995) (abrogated on other

grounds). The Second Circuit has held that it concurs with this analysis. <u>Holowecki v. Federal</u>

<u>Exp. Corp.</u>, 440 F.3d 558 (2d Cir.2006).  Thus, though the defense may parse whether the rubber

rooms are retaliation for protected behavior, or whether because Ebewo claims only national

origin, race, age, and retaliation while Cruz claims disability as well they share common claims

sufficiently that her right to sue letter can suffice, there is no doubt that Josefina Cruz, or Brandi

Scheiner provide the jurisdictional basis for all Plaintiffs Claims.

**POINT II**

**A HOSTILE WORK ENVIRONMENT IS A CONTINUING TORT WHOSE STATUTE
OF LIMITATIONS ONLY BEGINS TO RUN WHEN THE LAST ACT IS COMMITTED**

Diminution of responsibilities is actionable under Title VII/ADEA. Plaintiffs'

responsibilities have not only been reduced, they have been  eliminated.  See, <u>Patrolman's</u>

<u>Benevolent Ass'n of New York v. City of New York,</u> 310 F.3d 43, 51 (2d Cir. 2002); <u>Preda v</u>

36

<u>Nisho Iwai America Corp.</u>, 128 F.3d 789, 789 (2d Cir. 1997).[2] [3]  When considering whether

harassment incidents constitute a HWE, the Court  must consider the totality of the

circumstances, <u>Whidbee v. Garzarelli Food Specialties,</u> 223 F.2d 62, 69 (2d Cir. 2000).  In

<u>Farragher v. City of Boca Raton,</u> 524 U.S. 775, 787-88 (1998) (citing <u>Harris v. Forklift Systems,</u>

510 U.S.17, 21-22 (1993), the Supreme Court published a non exclusive list of factors which

included the severity of the conduct; whether the conduct was humiliating; whether the conduct

unreasonably interferes with an employee's work performance.  A plaintiff can establish a HWE

by showing either that a single incident was extraordinarily severe, or that a series of incidents

were sufficiently continuing and concerted to have altered the conditions of plaintiff's working

environment.  <u>Cruz v. Coach Stores Inc.</u>, 202 F.3d 560, 570 (2d Cir. 2000).  Plaintiffs'

reassignment and persecution have been intentionally designed by DOE to be hostile and induce

resignation, or to ultimately end in termination no matter how long it takes.[4]  Any Principal may

single out any teacher for discriminatory treatment under color of state law; however it goes *pari*

---

[2]  In order to prevail under the theory of HWE (C.¶194), Plaintiff needs to establish that he was subjected to a workplace that is sufficiently severe or pervasive so as to alter the conditions of his working environment and create an abusive one. See, <u>Meritor Savings Bank, FSB v. Vinson,</u> 477 U.S. 57, 67 (1986).  Pakter has done that.

[3]  Plaintiffs' must show a specific basis for imputing liability for the HWE to the employer. <u>Fitzgerald v. Henderson,</u> 251 F.3d 345, 357 (2d Cir. 2001).  It is the acts of the employer *only*, here.

[4]  As to the pain and humiliation, on the one hand we have an acclaimed and respected teachers, then consider the alternative to which the employer sent him daily for the last 26 months. It is a small windowless room in a warehouse/commercial edifice.  Uniformed security agents, stationed at the door, whose diction and demeanor indicate minimal education, enforce "rules," and supervise mostly age >55, well-educated professionals who must sign in and out every time they seek a mere drink of water or to use the rest room.  Teachers sit on molded plastic straight back armless chairs.  The guards earn ~$16.00 per hour.  The professionals they must oversee don't have access to anywhere unescorted but the "room" and earn mostly between $80,000.00 to $100,000,00 and they have been singled out for arbitration of non-consequential conduct that is being labeled as misconduct so serious that it purportedly justifies the "taking" of property interests (worth usually $1,000,000,to $3,000,000.00 over the balance of their lives). Liberty interests are abridged here as well.

passu with age, longevity on the job, salary (the latter two being proxies for age)[5] and a perceived threat to Principal's job security.

The statute of limitations for HWE is found in <u>National Railroad Passenger Corporation v. Morgan,</u> 536 U.S. 101 (2002). <u>Morgan</u> holds that in an ongoing atmosphere of discrimination, the individual instances of painful, humiliating and demeaning acts not all or sometimes not any of them may be actionable as a single act but cumulatively they are very destructive, degrading and prohibited by Title VII [ADA, ADEA[6] *inter alia*]. Employer liability accrues for allowing the practice of continuous, ongoing and repetitive discrimination to occur[7]. *Id.* at 108. The statute of limitations reaches back to treat the entire series of wrongful events and conditions as a single act that starts with the first violation or unlawful condition of Title VII, and continues to the most recent act or mistreatment. <u>Id</u>. at 112. Therefore, it is only the most recent incident in a continuing violation has to have occurred within the 300 day statute of limitations for the prerequisite filing of an EEOC charge and cross-filing with Division of Human Rights ("DHR") or *vice versa.* Furthermore, <u>Morgan</u> holds that even if some or all of the individual incidents were sufficiently severe to be actionable on their own, when they form the continuum of a HWE

---

[5] The practice or policy begins in the school. It continues until the teacher has been terminated pursuant to a §3020-a decision, constructively terminated by dissuasion from going through a §3020-a after being advised that it is rare that the teacher is totally exonerated, and if not, will be barred from public school employment anywhere in the U.S., while if they resign or retire the record will be expunged and they will only be ineligible for NYC public school employment. The process usually takes two years after removal from the school, but has often taken much longer (26 months after removal, Pakter's hearing has not been scheduled; it is 52 months since he was first removed, never to return to work in his appointed title). The HWE practices continue from the time the Principal begins to target the teacher, all through the harassment that goes *pari passu* with case building, being reassigned to the humiliating "rubber rooms" without knowing why, to months later being brought up on spurious charges that represent malicious prosecution, to the actual sham adjudications by arbitrators who want to retain their continuing engagement with the DOE for 270 hours a year or more @ at $280,00-$360.00 per hour plus expenses, and seem to be reporting to DOE, a party to each of the cases.

[6] HWE is recognized for ADEA claims in this Circuit. *See* <u>Boise v. Burford</u>, 121 Fed.Appx. 890, 893 (2d Cir.2005); <u>Brennan v. Metropolitan Opera Ass'n, Inc.</u>, 192 F.3d 310, 318 (2d Cir.1999).

[7] Here the employer is orchestrating the discrimination, and requiring subordinates to carry it out in addition to DOE.

38

claim they are part of the ongoing prohibited practice and they may not be barred as to recovery,

whether or not they could have been claimed in their own right during the statutory time limit.

Therefore, once having established that the employer's wrongful conduct was sufficiently related

to a single discriminatory and unlawful animus, to terminate Plaintiffs or severely fine them, for

being a whistleblower or get them to retire because they are old enough and the employer wants

them to, and will use any and every possible means, then the employer is liable for all its bad

acts.  While the animus here began in 2003 when Klein took over as Chancellor, it continues to

this day.  There are no discrete acts here.  The most recent wrongful acts of defendants include,

but are not limited to, malicious prosecution of absurd disciplinary charges.  The time limits of

§3020-a are disregarded.  Plaintiffs are kept in limbo rather than the charges being resolved so

that they could return to work instead they are required to "sit" in a fetid "rubber rooms" awaiting

a hearing years after they were removed from the work of their profession.

### POINT III

### PLAINTIFFS HAVE PLEADED A CLAIM FOR EMPLOYMENT RETALIATION FOR THEIR EXERCISING THEIR FIRST AMENDMENT RIGHTS TO FREE SPEECH

"It is well settled that public school teachers … do not check their First Amendment rights

at the schoolhouse door when they enter public employment." Cioffi III v. Averill Park Central

School District Board of Ed., 444 F.3d 158, 162 (2d Cir. 2006).

This rule remains undisturbed by the United States Supreme Court in its recent decision on

First Amendment claims by public employees for employment retaliation under 42 U.S.C. § 1983.

In Garcetti v. Ceballos, 547 U.S. 410, 126 S.Ct. 1951 (2006), the United States Supreme Court held

that a supervising deputy district attorney was merely performing his official duties when he wrote

a memo that he claimed led to employment retaliation and that he was therefore not entitled to First Amendment protection for speaking on a matter of public concern.

However, *Garcetti* specifically noted the important differences between teachers and other public employees when it wrote that teachers are "the members of a community most likely to have informed and definite opinions." *Id.* 547 U.S. at 421, 126 S.Ct. at 1959, citing Pickering v. Bd. of Education of Township High School District 205, Will County, Illinois, 391 U.S. 563, 572, 88 S.Ct. 1731, 1736 (1968). In Pickering the Supreme Court stated that with respect to teachers, "it is essential that they be able to speak out freely *without fear of retaliatory dismissal*." Pickering v. Bd. of Education of Township High School District 205, Will County, Illinois, 391 U.S. 563, 572, 88 S.Ct. 1731, 1736 (1968). Emphasis supplied.

Additionally, Justice Kennedy, writing for the majority, specifically excluded teachers from the public employee holding in Garcetti, writing that speech,

> "related to academic scholarship or classroom instruction implicates additional constitutional interests that are not fully accounted for by this Court's customary employee-speech jurisprudence. We need not, and for that reason do not, decide whether the analysis we conduct today would apply in the same manner to a case involving speech related to scholarship or teaching."

> Garcetti v. Ceballos, 547 U.S. at 425, 126 S.Ct. at 1962.

Consequently, the jurisprudence of Pickering and its progeny concerning retaliatory employment actions against public school teachers who speak on matters of public concern remains undisturbed by the public employee exception articulated in Garcetti.

The right of teachers to contribute to public debate is equivalent to the right of any member of the general public. Pickering v. Bd. of Ed. of Tp. H. S. Dist. 205, Ill., 391 U.S. at 573, 88 S.Ct. at 1737. In considering public protection for employee speech rights it does not matter that the

40

employee spoke privately to an administrator. Just because a public employee "speaks privately, rather than publicly, [does] not remove [that speech] from First Amendment protection." Cioffi III v. Averill Pk. Cent. School Dist. Bd. of Ed., 444 F.3d at 165 (Internal citations and quotations omitted). "[S]tatements concerning the quality of education in schools is a matter of public concern." Id., 444 F.3d at 164. (Internal citations and quotations omitted).

To raise a § 1983 claim of First Amendment employment retaliation a public employee "must show that: (1) his speech addressed a matter of public concern, (2) he suffered an adverse employment decision, and (3) a causal connection exists between the speech and that employment decision, so that it can be said that plaintiff's speech was a motivating factor in the adverse employment action." Id., 444 F.3d at 162, citing Morris v. Lindau, 196 F.3d 102, 110 (2d Cir.1999). While the public employer may defend on several grounds, where there is no defense raised there is no need to balance a public employer's management of the workplace and the sole inquiry is directed to the public employee's claim of retaliation. Id., 444 F.3d at 163.

It is well established that the vigorous advocacy of a legal position is protected by the First and Fourteenth Amendments. NAACP v. Button, 371 U.S. 415 (1963). Advocating for public good against what is deemed oppressive governmental action is clearly protected by the First Amendment. Id., 371 U.S. at 429-430. The Second Circuit has repeatedly held that public employee participation in lawsuits raising public concerns is protected activity for First Amendment purposes. See e.g., Cotarello v. Village of Sleepy Hollow Police Department, 460 F.3d 247, 252 (2d Cir. 2006) (Lawsuit concerning discrimination in public workplace is matter of public concern); Konits v. Valley Stream Central High School District, 394 F.3d 121, 125 (2d Cir. 2005) (Lawsuit concerning retaliation for offering testimony in discrimination suit in school district is a matter of public concern).

The claims of retaliation for First Amendment Speech raised by plaintiffs rest on three issues: their right to speak out on (1) policies and programs being implemented in the NYC Public School system with which they disagreed *See* [SAC ¶¶555-557, 564-566]; (2) violations of their due process rights and violations of NYS Ed. L. § 3020-a; *See* [SAC ¶¶ 555, 558-560 and 564-566]; and (3) use of TRCs for punishment and the dangerous conditions therein\. [SAC ¶¶ 555, 561-566].

The collective constitutional jurisprudence of the Supreme Court makes clear that schools are special places and that scholarship and teaching are subject to broad constitutional safeguards. Plaintiffs' claims of retaliation are all related to speaking on attacks on their protected property interests in their teaching positions, standards of teaching and safeguards of students, faculty and staff of their particular schools and the NYC Public School system as a whole.

Ms. Adams alleges she was retaliated against and sent to TRC when she spoke to her principal about unequal educational opportunities for Black and Hispanic children housed in the same building as a school for predominantly white children. [SAC ¶¶ 29-34]. She also alleges that as a result, the Principal became openly disrespectful, blocked her move to another school, publicly punished her and finally brought her up on charges relating to a simple clerical error that resulted in Ms. Adams being sent to a TRC. [SAC ¶¶ 39-57].

Dr. Ebewo alleges  he was retaliated against for speaking out concerning policies in his school which he believed would harm the students, faculty and the public education system and that as a result he was targeted for harassment, false charges and evaluations, and ultimately removed from his school to a TRC. [SAC ¶ 183-185, 203].

Ms. Polito alleges she first came under attack after submitting a proposal to reform NYCDOE's New Small School Initiative. [SAC ¶¶ 323]. In fact, NYCDOE made Ms. Polito the

target for a person known for firing principals. [SAC ¶¶ 309, 328]. Even after targeting, Ms. Polito continued to speak out to protect her employees, staff and students. [SAC ¶¶ 330, 333, 340]. She was removed from her job as Principal and reassigned to a TRC. [SAC ¶¶ 364, 366-368, 370-376].

Ms. Scheiner alleges that in response to her claims of unfair and discriminatory treatment directed against her she filed a charge with the NYS Division of Human Rights (NYSDHR). [SAC ¶ 471]. After that the Acting Interim Principal at her school increased her retaliatory tactics and harassment culminating with Unsatisfactory performance ratings. [SAC ¶¶ 473, 474]. As a result, Ms Scheiner was assigned to a TRC. [SAC ¶ 478]. Ms. Scheiner also spoke out against NYCDOE's misguided policies and unlawful practices directed toward tenured teachers and the improper use of TRCs. [SAC ¶ 483]. NYCDOE increased its harassment and retaliation against Ms. Scheiner for her speech and for becoming affiliated with Teachers4Action. [SAC ¶¶ 484, 485].

Ms. Robinson has alleged that she was retaliated against by NYCDOE and its employees for challenging a new school policy that she knew was illegal and destructive to the students' education. [SAC ¶¶ 395, 396]. As a result of Ms. Robinson's good faith refusal to implement that policy she was purposefully targeted for harassment, retaliation and ultimately demotion. [SAC ¶¶ 406, 407, 409, 410, 412, 416]. Finally, she was assigned to a TRC. [SAC ¶¶ 416].

Each plaintiff has alleged speaking on matters of public concern, as a result each suffered an adverse employment action and that there is a causal connection between the protected speech and the adverse action. Therefore plaintiffs have raised a claim of employment retaliation.

## POINT IV

### THIS COURT MUST APPLY A BROAD READING OF PRO SE PLAINTIFFS' SECOND AMENDED COMPLAINT ON THIS RULE 12 MOTION TO DISMISS

43

On a Rule 12(b)(6) motion to dismiss a complaint this court must "accept[] all factual allegations in the complaint and draw[] all reasonable references in plaintiff's favor. <u>ATSI Commc'n, Inc. v. Shaar Fund, Ltd.</u>, 493 F.3d 87, 98 (2d Cir. 2007). The complaint must plead "enough facts to state a claim to relief that is plausible on its face". <u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. 544,127 S.Ct. 1955, 1974 (2007).

A Rule 12(c) motion is designed to test the pleader's claims for relief and therefore may consider only the pleadings and the incorporated exhibits, any extraneous materials must be excluded. <u>Church v. GMC</u>, 74 F.3d 795, 798 (7th Cir. 1996).

A *pro se* complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that plaintiff cannot prove any set of facts entitling her to relief applies with particular force when plaintiff alleges civil rights violation. See <u>Thompson v. Carter</u>, 284 F.3d 411 (2d Cir. 2002). Plaintiffs herein filed this Second Amended Complaint as *pro se* parties and have alleged numerous civil rights violations pertaining to their First Amendment Rights to speak about the conditions of their particular schools and the policies and practice in the NYC School system. They have also raised numerous violations of their substantive due process interests in their continued employment as tenured teachers and violations of their procedural due process rights in the manner in which both the City and State defendants have not afforded them the opportunity to challenge these adverse employment actions with a hearing held within a reasonable time and in a reasonable manner. The plaintiffs have alleged particular facts that support the causes of action alleged in the Second Amended Complaint.

This court must also be mindful that the *Pro Se* plaintiffs' Second Amended Complaint was filed on February 11, 2009. *See* Docket Item (hereafter "DKT") 94. Issue was joined by all

defendants serving and filing their respective answers on March 16, 2009. *See* DKT 106, 107, 108, 109. Rather than proceed to discovery, this court ordered defendants to Answer and improperly allowed them to serve their respective motions to dismiss (1) after the pleadings had closed and (2) prior to permitting any discovery. This Court should deny defendants' motions for it would be manifest error to permit defendants to end run Civil Procedure Rules pertaining to discovery and to motion practice on the pleadings. While this court has no obligation to assist a *pro se* plaintiff in pursuing its claims, it also should not create procedural hurdles or deny plaintiffs the opportunity to pursue their claims by preventing discovery.

### POINT V

### FEDERAL PLAINTIFFS MUST HAVE ADEQUATE OPPORTUNITY FOR JUDICIALREVIEW OF CONSTITUTIONAL CLAIMS

A federal court must abstain under the Younger doctrine when any of three factors are present. First, there must be an ongoing state proceeding. Second an important state interest must be implicated in that proceeding. Third, a federal plaintiff must have adequate opportunity for judicial review of constitutional claims during or after the proceeding. See Christ the King Regional High School v. Culvert, 815 F.2d 219, 224 (2d Cir.), cert. denied, 484 U.S. 830 (1987).

Federal courts may not abstain in the present matter because state review of 3020-a decisions under CPLR Article 75 limits review to whether (a) an application to vacate or modify an award was made in 10 days after receipt of the decision. (Ed. L. §3020-a). Since the statute of limitations for every other arbitration decision is "within ninety days after its delivery", the 10-day statute of limitations, in itself, violates constitutional due process requirements.

Grounds for vacating an award are limited. An award shall be vacated on the application

45

of a party who either participated in the arbitration or was served with a notice of intention to arbitrate if the court finds that the rights of that party were prejudiced by: (i) corruption, fraud or misconduct in procuring the award; or (ii) partiality of an arbitrator appointed as a neutral, except where the award was by confession; or (iii) an arbitrator, or agency or person making the award exceeded his power or so imperfectly executed it that a final and definite award upon the subject matter was not made; or (iv) failure to follow the Article 75 procedure, unless the party seeking vacatur continued the arbitration with notice of the defect and without objection.

The facts common to all plaintiffs enumerate the numerous violations of the provisions that exist in 3029-a as it is administered in NYC.

The federal abstention doctrine, first enunciated in Younger v. Harris, 401 U.S. 37(1971), is based on the premise that ordinarily a state proceeding provides an adequate forum for the vindication of federal constitutional rights, Kugler v. Helfant, 421 U.S. 117 (1975), and so due deference ought to be paid the principles of comity and federalism. Younger, 401 U.S. at 44. Younger abstention applies to state judicial and administrative proceedings, so long as the state court has a means of reviewing constitutional claims. See, e.g., Ohio Civil Rights Comm'n v. Dayton Christian Sch., Inc., 477 U.S. 619, 627-29 (1986).

Intervention is warranted upon a showing of "bad faith, harassment or any other exceptional circumstance that would call for equitable relief." Younger, 401 U.S. at 48. Generally, for such a showing to be made, the party bringing the state action must have no reasonable expectation of obtaining a favorable outcome. See Kugler, 421 U.S. at 126 n. 6, But, a refusal to abstain is also justified where a prosecution or proceeding has been brought to retaliate for or to deter constitutionally protected conduct, or where a prosecution or proceeding

is otherwise brought in bad faith or for the purpose to harass. E.g., <u>Lewellen v. Raff</u>, 843 F.2d

1103, 1109-10 (8th Cir.1988), cert. denied, 489 U.S. 1033 (1989) (bad faith prosecution brought

in retaliation for exercise of First Amendment rights); <u>Rowe v. Griffin</u>, 676 F.2d 524 (11th

Cir.1982) (bad faith prosecution after assurances of immunity to defendant).

  Plaintiffs contend that they are being retaliated against for protected speech, they are

brought up on fallacious charges, the disciplinary hearings do not use the appropriate standard of

each of the seven prongs of the "just cause" standard. See, <u>Grief Brothers Cooperage v. United

Mine Workers of America,</u> 42 LA 555 (Daugherty 1964). Instead merely the preponderance of

the evidence first prong is used and then especially without School Board majority vote to ensure

that frivolous charges are not being brought just to deny the educator their property rights in their

tenured position, there is no check for constitutionality.  Ms. Adams' charge is an example.  She

was injured by a student and was in great pain.  She took two hydrocodone tablet to manage the

pain effecting her cognitive ability.  She made several errors on the incident report she was

required to complete.  One of those errors was block printing the Principal's name on the line for

Principal's name and again to block print it on the line for the Principal's signature.  The

arbitrator called it Ms. Adams errors inadvertent and cited her impairment from the pain and

medication as mitigating factors and corroborated by the several mistakes she made elsewhere on

the form.  Yet the arbitrator fined her an enormous sum of money.

  Abstention serves no purpose here because the state does not have a legitimate interest in

discouraging the exercise of constitutional rights, see, e.g., <u>Lewellen v. Raff</u>, 843 F.2d at 1110

(8th Cir 1988), or in continuing actions otherwise brought in bad faith, thereby reducing the need

for deference to state proceedings. <u>See also</u> <u>Cullen v. Fliegner</u>, 18 F.3d 96 (2d Cir.1994).

**POINT VI**

**PLAINTIFFS HAVE ADEQUATELY PLEADED CLAIMS FOR VIOLATION OF
THEIR DUE PROCESS RIGHTS UNDER THE FOURTEENTH AMENDMENT**

The Fourteenth Amendment provides that a governmental entity may not "deprive any person of life, liberty, or property without due process of law". U.S. Const. amend. XIV, §1. Due process of law requires that "no person may be deprived of life, liberty, or property without reasonable notice and an opportunity to be heard." Karpova v. Snow, 473 F.3d 262, 270 (2d Cir. 2007). "The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." Matthews v. Eldridge, 424 U.S. 319, 333, 96 S.Ct. 893 (1976).

Plaintiffs have a protectable property interest arising from their status as tenured teachers in the NYC Public School System. Their Fourteenth Amendment rights arise from their contract and pursuant to NYS law as provide in NYS Ed. L. §§ 3020 and 3020-a. Property interests arise not from the constitution but from a separate source such as state law. Board of Regents v. Roth, 408 U.S. 408 U.S. 564, 577, 92 S.Ct 2701, 2709 (1972), see also Cleveland Board of Education v. Loudermill, 470 U.S. 532, 538, 105 S.Ct 1487, 1491 (1985). Plaintiffs' property interests extend beyond mere payment of a salary. Presently, plaintiffs confined to TRCs receive their salary. However, they are deprived of the additional income and benefits attendant to their position as teachers. The loss of income is evidenced by the loss of income in the form of per session fees, payments for coaching school teams and from teaching summer school. They lose pension benefits attendant to their incomes which have also been diminished as a result of confinement in TRCs. They are not assigned duties commensurate with their teaching duties as required, instead they are assigned to TRCs in which they sit and do not perform any duties. They are deprived of associating with teaching

colleagues including their not being permitted to attend mandatory professional development sessions.[SAC ¶¶176, 185, 187, 534].

As all employees, plaintiffs are entitled to a safe and secure workplace free of harassment and intimidation. Plaintiffs have all alleged that the conditions of the TRC are horrific. They have also alleged that these horrific conditions are environmentally unsafe and also at time unsafe in that some of those so confined are alleged to have committed criminal acts. They have alleged that NYCDOE employees harass and mock them and monitor their movements. These are not the property interests attendant to their positions as tenured teachers.

The deprivation of plaintiffs' property interests is compounded by the utter failure to afford them their procedural due process rights under both state law and the United States Constitution. NYS Ed. L. §§ 3020 and 3020-a provide a structure in which hearings are to be held. [¶ 577-581]. However, § 3020-a, despite its language does not provide plaintiffs with adequate due process protections in conformity with the constitutional mandates. When state law provides for a due process hearing it must still meet the federal law and federal law determines the adequacy of that remedy, not state law. Cleveland Bd. of Ed. v. Loudermill, 470 U.S. at 540, 105 S.Ct. at 1492.

Hearings are not held in a meaningful time. Plaintiffs languish in TRC for two years and more waiting for hearings. They are confined to TRCs for years without even a hearing being commenced or held. In other contexts, a delay of a hearing for fifty-eight days was held to be a significant constitutional deprivation. Spinelli v. City of New York, 579 F.3d 160 (2d. Cir 2009). The Supreme Court has held that a suspended horse trainer was entitled to a prompt post-suspension hearing to determine the state's accusations. Barry v. Barchi, 443 U.S. 55, 99 S.Ct. 2642 (1979). Teachers must be afforded no less protection under the Fourteenth Amendment than are afforded

49

other license holders in this State.

The fact that defendants do not classify plaintiffs as "suspended" and pay their salaries is a distinction without a difference. Plaintiffs maintain significant property interests in the maintenance, improvement and use of their teaching licenses. They are deprived of earning the full potential of income and ability to seek other teaching positions while defendants hold their licenses hostage in Rubber Rooms.

Ms. Polito has continually been subjected to repeated charges that have confined her to Rubber Rooms without any hearing. Notwithstanding, all charges against her have been dismissed as unfounded. Defendant' bringing unproven allegations until they maybe get "lucky" violates her due process rights and she has satisfied her pleading obligations instating a claim for denial of her due process rights. See Palkovic v. Johnson, 281 Fed.Appx. 62 (2d Cir. 2008). Plaintiffs have been deprived of significant protected property interests and the opportunity for hearings concerning the deprivation of those property interests within a meaningful time and in a meaningful manner in violation of their Fourteenth Amendments rights.

## **CONCLUSION**

For the foregoing reasons plaintiffs respectfully request that the defendants' motions be denied in their entirety.                                        Respectfully submitted,

Dated: November 13, 2009                         _____/s/_____
      New York, NY                              Joy Hochstadt, Esq. JH-0935
                                   _____/s/_____
                                   Nicholas A. Penkovsky, Esq. NP-0134