UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

TWANA ADAMS, et al.,                                :

    Plaintiffs,                      :

                 :    08 Civ. 5996 (VM) (AJP)

   -against-                           :  **REPORT AND RECOMMENDATION**

                 :

NEW YORK STATE EDUCATION
DEPARTMENT, et al.,                              :

    Defendants.                      :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**ANDREW J. PECK, United States Magistrate Judge:**

**To the Honorable Victor Marrero, United States District Judge:**

    Plaintiffs Twana Adams, Josephina Cruz, Michael Ebewo, Joann Hart, Julianne

Polito, Thomasina Robinson and Brandi Dawn Scheiner bring this action against the New York State

Department of Education ("NYSED"), State Commissioner of Education Richard Mills, Manager

Deborah A. Marriot, the City of New York, the New York City Department of Education ("DOE")

and DOE Chancellor Joel Klein alleging that:  (1) defendants violated their First Amendment rights

by retaliating against them after they spoke out against the polices and programs that the City, the

DOE and Klein (the "City Defendants") "implement[ed]" in the New York City school system and

the "unconstitutionality" of New York Education Law § 3020-a "as enacted, changed and/or

implemented against them"  (Dkt. No. 94: 2d Am. Compl. ¶¶ 556-66, 627, 631-34); (2) the City

Defendants deprived them of their due process rights to "fair and impartial" § 3020-a hearings by

"negotiating Article 21G in contravention of NYS Education Law §§ 3020 and 3020-a" (2d Am. Compl. ¶¶ 591-605); (3) NYSED, Mills and Marriot (the "State Defendants") violated plaintiffs' Fourteenth Amendment due process rights by employing and failing to supervise "Hearing Officers" who failed to comply with Education Law §§ 3020 and 3020a, 8 NYCRR § 82-1 and the "Arbitration Contract" (2d Am. Compl. ¶¶ 568-81, 584-88); (4) defendants subjected plaintiffs to a hostile work environment by confining them in the Temporary Reassignment Centers (2d Am. Compl. ¶¶ 608-20); and (5) defendants breached the June 27, 2008 Letter Agreement between the DOE and the UFT (2d Am. Compl. ¶¶ 622-29).

Presently before the Court is the City Defendants' motion to dismiss the second amended complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure or alternatively for judgment on the pleadings pursuant to Rule 12(c) (Dkt. No. 153: City Defs. Notice of Motion), on the grounds that:  (1) plaintiffs' Title VII hostile work environment claim fails to allege that plaintiffs "filed a charge with the EEOC and/or . . . received a right to sue letter" (Dkt. No. 156: City Defs. Br. at 15-20); (2) plaintiffs' Title VII retaliation claim alleges that only two of the plaintiffs (Cruz and Scheiner) filed a "charge of discrimination prior to instituting their federal lawsuits" and fails "to identify with any specificity any action allegedly taken by City defendants since June or July 2008 in retaliation for plaintiffs' federal lawsuits/protected activities" (City Defs. Br. at 20-23); (3) plaintiffs' First Amendment retaliation claim fails to allege "any details of the plaintiffs' alleged protected speech, and contains only conclusory allegations of retaliation" (City Defs. Br. at 23-27); (4) plaintiffs fail to properly allege a 42 U.S.C. § 1981 claim because, with the exception of Ebewo,

plaintiffs fail to identify their race or allege racial discrimination and Ebewo "makes [a] conclusory allegation of race discrimination but offers no additional details to support his allegation" (City Defs. Br. at 27-29); and (5) plaintiffs' due process claim fails to establish that plaintiffs had a "constitutionally protected property interest" and did not receive the process that was due (City Defs. Br. at 29-35).

Also presently before the Court is the State Defendants' motion for judgment on the pleadings pursuant to Rule 12(c) (Dkt. No. 149: State Defs. Notice of Motion) on the grounds that: (1) "plaintiffs' § 1981, 1983 and state law claims against the State Defendants are barred by the Eleventh Amendment" (Dkt. No. 151: State Defs. Br. at 7-9); (2) "to the extent that plaintiffs' due process claims were resolved in prior state court proceedings, they are collaterally estopped from re-litigating such claims in this action" (State Defs. Br. at 9-10); (3) this Court should "abstain from consideration of plaintiffs' due process claims under the Younger abstention doctrine" (State Defs. Br. at 11-12); (4) plaintiffs' First Amendment retaliation claim fails to allege that plaintiffs "engage[d] in constitutionally protected speech" and that the State Defendants "retaliated against them because of their speech" (State Defs. Br. at 12-15); (5) plaintiffs' due process claim fails to assert that plaintiffs "were deprived of a constitutionally protected property interest without due process of law" (State Defs. Br. at 15-17); and (6) plaintiffs' Title VII hostile work environment and retaliation claims fail to allege that the State Defendants employed plaintiffs, that plaintiffs exhausted their administrative remedies, that the State Defendants subjected them to a hostile work

environment based on their membership in a protected class, or that plaintiffs opposed any practice prohibited by Title VII (State Defs. Br. at 17-21).

At plaintiffs' counsel's request, the Court heard oral argument on the motions on February 19, 2010.  Plaintiffs' counsel submitted a post-argument brief on February 22, 2010.

For the reasons set forth below, defendants' motions to dismiss (Dkt. Nos. 149 & 153) should be <u>GRANTED</u> and the second amended complaint should be dismissed in its entirety.

## FACTS

The facts alleged in plaintiffs' second amended complaint are assumed to be true for purposes of this motion, and will be set forth herein without use of the preamble "plaintiffs allege."

**Allegations Common to All Plaintiffs**

The DOE has singled out plaintiffs because they are "tenured teachers" with "decades of experience" who are "at the high end of the pay scale" and thus the City Defendants wanted to get rid of them.  (Dkt. No. 94:  2d Am. Compl. ¶ 6.)  The DOE has reassigned plaintiffs from their "positions" to "hostile environments" in the Temporary Reassignment Centers ("TRC"), which plaintiffs (and the media) refer to as the "Rubber Rooms."  (2d Am. Compl. ¶ 8.)

All plaintiffs, except Polito, have spent time confined to the 7th Avenue TRC.  (2d Am. Compl. ¶¶ 52, 135, 196, 226, 416, 478.)  The 7th Avenue TRC is a windowless "small converted conference room" that has "no lounge, inadequate staircases, sealed exits, narrow exit doors, smelly moldy carpets, mildew, rodent dropping[s], broken steps, poor lighting, improper ventilation, . . . fluctuations from hot to cold, filth, dead roaches" and "inadequate toilet facilities."

(2d Am. Compl. ¶¶ 52, 56, 138, 199, 421, 425, 430-31, 487-88.)  "At times," the DOE has squeezed more than eighty-six people into the 7th Avenue TRC.  (2d Am. Compl. ¶ 424; see id. ¶¶ 52, 56.)  For six hours and fifty minutes per day, the DOE "force[s]" the 7th Avenue TRC "confinees" to sit on hard plastic chairs at bridge tables and prohibits "confinees" from using "electronic devices," speaking to "fellow confinees in the hallways," and accessing "lounges, libraries, drinking fountains or other normal workplace conditions."  (2d Am. Compl. ¶¶ 60, 138, 427, 437, 488.)  The DOE requires confinees to "sign in and out" every day, and security guards and closed circuit surveillance cameras monitor the confinees' movements.  (2d Am. Compl. ¶¶ 138, 265, 428, 492.)  On a daily basis, verbal and physical fights break out "over personal space and possessions."  (2d Am. Compl. ¶¶ 58, 199, 267-69, 491.)  The 7th Avenue TRC employees "bark[s] orders at the teachers . . . , force[s] them out of the room, yell[s] at them publicly, refer[s] to them in demeaning and derogatory terms, [and] threaten[s] and embarrasse[s] them at every chance."  (2d Am. Compl. ¶¶ 138, 266, 490.)

Plaintiffs were retaliated against after they spoke "out against certain discriminatory, illegal and improper policies that were being implemented by the" City Defendants, "the unconstitutionality of the 3020a laws," and "the dangerous conditions, hostile environments and damages caused to them in" the TRCs.  (2d Am. Compl. ¶¶ 7, 8, 10-12.)  Plaintiffs also "were discriminated and retaliated against" for participating in the Teachers4Action case, 08 Civ. 0541. (2d Am. Compl. ¶¶ 14-15.)

On June 27, 2008, the DOE and the United Federation of Teachers ("UFT") entered into an agreement (the "June 27, 2008 Letter Agreement"), which recognized the "problems related to the 3020a process and the Rubber Rooms" and "committed to make certain changes for Plaintiffs and other affected teachers." (2d Am. Compl. ¶¶ 16-17, 153.)  Defendants represented to plaintiffs that the June 27, 2008 Letter Agreement would provide for "independent evaluation[s] of . . . pending 3020a charges," permit plaintiffs to enter "certain programs through which disciplinary charges [would be] dropped" and provide a mechanism for plaintiffs to "get . . . out of the Rubber Rooms" and return to their "teaching positions." (2d Am. Compl. ¶ 18.)  Plaintiffs relied on the June 27, 2008 Letter Agreement and "agreed among other things to drop certain of their claims in [t]he Teachers4Action Case." (2d Am. Compl. ¶¶ 19-20.)

City Defendants violated the June 27, 2008 Letter Agreement when they continued to confine plaintiffs in the TRCs and failed to correct the TRCs' conditions.  (2d Am. Compl. ¶¶ 22, 154-55, 270-71, 451-53.)  Defendants retaliated against plaintiffs for refusing to dismiss their Teachers4Action claims and refusing to "stop speaking about . . . a systematic pattern of retaliation, harassment, intimidation, improper imposition of discipline, withholding of benefits, and other unlawful treatment." (2d Am. Compl. ¶ 21.)

The June 27, 2008 Letter Agreement "again put" the State Defendants "on notice of the serious problems . . .  [with] the implementation of the 3020a law," yet the State Defendants "who/which are ultimately responsible for the conduct of 3020a hearings . . . did nothing." (2d Am.

Compl. ¶ 23.)   The § 3020a hearings continue to be "delayed [and] held in violation of the requirements of the law and the hearing officers['] contracts."  (2d Am. Compl. at p. 5 n.1.)

**Allegations Specific to Each Plaintiff**

     **Twana Adams**

     The DOE hired Twana Adams in 1986 to teach science.  (Dkt. No. 94: 2d Am. Compl. ¶ 27.)  She taught at "[a]lternative [s]chools, regular schools, junior high school and high schools searching for the best models in education."  (2d Am. Compl. ¶ 28.)  Adams "always" received "satisfactory end of year ratings."  (Id.)  Adams resigned from the DOE in 2000. (2d Am. Compl. ¶ 35.)  "Several years later," she returned to the DOE and was assigned to Middle School ("MS") 44.  (2d Am. Compl. ¶ 35.)  MS 44 did not have a "discipline code" and the students at MS 44 "were so unruly."  (2d Am. Compl. ¶ 37.)

     Adams complained to her principal and superintendent and commented during meetings about MS 44's "deplorable conditions" and the need for "intervention."  (2d Am. Compl. ¶¶ 37-38.)  Adams' principal, Lisa Ortiz, "was not pleased with some of [her] comments and became openly disrespectful on several occasions."  (2d Am. Compl. ¶¶ 38, 46.)  On one particular occasion, Adams "questioned [Ortiz's] motives for speaking so despairingly to her person, lacking professionalism and privacy."  (2d Am. Compl. ¶ 38.)  Ortiz responded, "'I speak to everyone in the same manner, children, parents and teachers.  It is just how I speak.'"  (Id.)  Adams "reiterated her desire to be treated . . . professionally," and Ortiz "apologized for any misgivings."  (Id.)

After that conversation, Ortiz's "attitude" toward Adams "worsened."  (2d Am. Compl. ¶ 39.)  Ortiz "staged multiple . . . visits to Plaintiff Adams' classroom" and questioned her about her lessons in front of the students.  (Id.)  Additionally, even though Adams "repeatedly requested" between April and September 2006 that Ortiz place her on the "transfer/excess list so that she could openly interview at other schools," Ortiz refused.  (2d Am. Compl. ¶ 41.)  When Ortiz finally placed her on the transfer/excess list in October 2006, Adams interviewed at a school, but Ortiz told her, "'Don't think for a minute that you are getting that position. That principal is a friend of mine and I don't want you there.'"  (Id.)

Between September 8, 2006 and October 20, 2006, Ortiz required Adams every morning to wait on the office bench for her assignment and did not allow Adams "to go anywhere else but to th[e] office."  (2d Am. Compl. ¶¶ 42-43.)  On one occasion, Ortiz reprimanded Adams for leaving the office to assist another teacher.  (2d Am. Compl. ¶ 42.)  Adams complained to Ortiz and the UFT about Ortiz's requirement.  (2d Am. Compl. ¶ 43.) "Adams was finally relieved from squatting in the office. . . . [because] [i]t was found to be a violation to publicly reprimand staff members."  (Id.)

On June 7, 2006, Adams signed Ortiz's name without permission to a "Comprehensive Injury Report" after a "running teenager" "body-slammed" and injured her.  (2d Am. Compl. ¶¶ 46, 48.)   On June 26, 2006, Ortiz "incit[ed]" the Special Commission of Investigation ("SCI") to investigate whether Adams forged Ortiz's name on the report even though Ortiz allowed other employees to fix forms instead of reporting their conduct to SCI.  (2d Am.

Compl. ¶¶ 44, 46, 49-50.)  Adams explained to two SCI detectives that "she had made a mistake and meant no harm."  (2d Am. Compl. ¶ 45.)  On March 19, 2007, Adams "received . . . charges" based on the incident.  (2d Am. Compl. ¶ 46.)  Adams "had never been brought up on charges" before.  (2d Am. Compl. ¶ 48.)

On October 27, 2006, the DOE reassigned Adams to the 7th Avenue TRC.  (2d Am. Compl. ¶ 52.)  TRC assistants "E. Anithez" and "D. Dennis" "spoke despairingly to her on several occasions. . . . in front of the teachers in the room."  (2d Am. Compl. ¶ 61.)  "On one occasion," Dennis "loudly demanded" that Adams attend a meeting before going to the restroom.  (Id.)

Adams wrote "several memos to deputy director of human resources about the blatant discriminatory treatment of [her] and the escalation of events with Ms. Anithez yelling at Plaintiff Adams in front of office staff."  (2d Am. Compl. ¶ 62.)  "Several days later," Dennis handed Adams a letter reassigning Adams to a different TRC and yelled at Adams to collect her "stuff" within ten minutes.  (2d Am. Compl. ¶¶ 53, 63.)  When Adams failed to do so, Dennis "labeled [her] uncooperative" and called the police to "rush" her out of the TRC.  (2d Am. Compl. ¶ 63.)  As a result of being confined in the 7th Avenue TRC, Adams suffered "claustrophobia, anxiety attacks, headaches, depression and lower back pain."  (2d Am. Compl. ¶ 52.)

In early 2007, "without provocation," the DOE reassigned Adams to two more TRCs.  (2d Am. Compl. ¶¶ 54-55.)  At the 125th Street TRC, where Adams was still assigned when plaintiffs filed the second amended complaint, the DOE required security guards to escort teachers to and from the TRC, confined teachers to the TRC and the building's staff kitchen and required

teachers to sign a "bathroom log." (2d Am. Compl. ¶¶ 64-66.) There are "[u]nsettling noises all day" and the "ventilation system is so bad[] that [Adams] is often fearful of getting sick." (2d Am. Compl. ¶¶ 68, 75.) The security guards are "ill-prepared" and "slow to handle crises" and do not document conflicts. (2d Am. Compl. ¶ 67.) On one occasion, the security guards "did nothing" while an "irate worker" screamed. (Id.)

       The TRCs have caused Adams to suffer "financial, physical and emotional damages that have eroded her self worth, personal life and personal plans." (2d Am. Compl. ¶¶ 79-82.) In particular, the DOE has placed Adams on the "'ineligibility' list" for after-school and summer employment. (2d Am. Compl. ¶¶ 78, 80.)

        During September 2008, Adams "was required to bring a union representative and meet with Judith Rivera, human resources deputy director after allegations that she (i) was taking pictures of the reassignment room and of the security guards sleeping there and (ii) refused to sign the 'break' book." (2d Am. Compl. ¶ 70.) Rivera has never called Adams to her office to discuss Adams' complaints about the TRC. (2d Am. Compl. ¶ 71.)

       In 2008, Adams' § 3020a hearing began. (2d Am. Compl. ¶¶ 73, 76.) The hearing officer found Adams' error "inadvertent," but fined her $10,000. (Dkt. No. 174: Pls. Opp. Br. at 18.) Adams filed an Article 75 proceeding in New York State Supreme Court moving to vacate the "arbitral award against her." (Dkt. No. 185: Hochstadt Aff. ¶ 5.) The Article 75 proceeding remained undecided as of the January 8, 2010 Hochstadt Affidavit. (Id.)

Adams filed a NYSDHR complaint.  (Hochstadt Aff. ¶¶ 12, 16.)[1/]  The EEOC issued Adams a right to sue letter on November 19, 2007.  (Hochstadt Aff. & Ex. 1: 11/19/07 Adams EEOC Right to Sue Letter.)

**Josephina Cruz**

_____Josephina Cruz began teaching for the DOE in 1994 and received tenure in 1999. (Dkt. No. 94: 2d Am. Compl. ¶¶ 85-89.)  Her school's students, teachers and administrators "recognized . . . her superior skills and dedication to students. . . . until (i) she started to complain about overcrowding in the classrooms, and policies that required teachers to teach different levels/tracks/languages and changing floors and/or rooms which affected the students and teachers alike and (ii) when she refused the principals' request that she change the grade of one of her students 'as a favor' to the principals[,] who was a friend of the student[']s parents."  (2d Am. Compl. ¶¶ 90-92.)  Afterwards, she received "inequitable teaching assignments, which affected her physical conditions."  (2d Am. Compl. ¶ 94.)  She "successfully challenged" the "inequitable" assignment through a union grievance.  (Id.)

In June 2000, Cruz suffered a "severe orthopedic injury" and took unpaid medical leave because the school refused to adjust her schedule to reduce the amount of walking and standing she had to do.  (2d Am. Compl. ¶¶ 95-99.)  When Cruz returned to work in 2001, the DOE again refused her request for a "stationary classroom or classrooms on the same floor" and assigned her

---

[1/]    Adams has not provided this Court with a copy of the NYSDHR complaint or stated what claims she raised in it, nor of the decision of the NYSDHR.  (See generally Hochstadt Aff. ¶ 12 & Ex. 1.)

to "four different rooms" across the school.  (2d Am. Compl. ¶¶ 99-101.)  Despite Cruz enduring a "great amount of pain," she continued to receive "satisfactory professional yearly evaluations."  (2d Am. Compl. ¶ 102.)  In 2001/2002 the DOE "used [Cruz's] medical condition against her as a way to try to get [her] out of the school."  (2d Am. Compl. ¶ 100.)

In July 2003, Cruz "hoped to get a seniority transfer" so that she could have a better commute.  (2d Am. Compl. ¶ 103.)  In August 2003, Cruz had surgery for a meniscus tear.  (2d Am. Compl. ¶ 105.)  During this time, Resnick, Cruz's principal at the Graphic Community Arts High School, decided that he was "going to get rid of" of Cruz because she was "experienced" and replace her with a "less qualified, unlicensed and cheaper teacher."  (2d Am. Compl. ¶¶ 84, 107-09, 116.)  As a result, when Cruz returned to school in September 2003, Resnick "ridicule[d]" her for using a cane and gave her "teaching assignments that forced her to walk all over the school, up and down stairs and be on her feet for extended period[s] of time, causing her pain and making her medical condition unbearable."  (2d Am. Compl. ¶¶ 107, 111.)  The DOE also gave Cruz "unsatisfactory" reviews.  (2d Am. Compl. ¶ 111.)  Cruz was prohibited from calling students' parents, "subjected to excessive observations," her lesson plans and curriculum were not reviewed and she was not "provide[d] . . . with necessary teaching aids and materials and [DOE] objected when Plaintiff Cruz bought and used the materials herself."  (2d Am. Compl. ¶ 112.)

Cruz's "orthopedic condition worsened due to the unfair assignments" and she took a "medical leave of absence for the remainder of the school year 2003-2004."  (2d Am. Compl. ¶¶ 113-14.)  In September 2004, Cruz returned to "active duty."  (2d Am. Compl. ¶¶ 115-17.)

However, when she returned to school, the DOE began "implementing" a policy of "getting rid of tenure and stripping the schools of 'highly paid teachers.' [Plaintiff] Cruz – a tenured and highly paid teacher – was slated for termination one way or another." (2d Am. Compl. ¶ 116.) In November 2004, Cruz received a "satisfactory" evaluation, but in February 2005, the DOE "changed the criteria for evaluation" and started giving Cruz unsatisfactory performance reviews to "try to get rid of her." (2d Am. Compl. ¶¶ 118-20.) Cruz "prepared formal and detailed responses challenging . . . the unfair systems, polices and procedures that were being used against her." (2d Am. Compl. ¶ 121.) The DOE retaliated against Cruz by continuing to assign her "inequitable and unreasonable" schedules and treating her differently than teachers with less experience and seniority. (2d Am. Compl. ¶¶ 122-23.)

Cruz filed a "grievance[]" and, from that "moment," she "became an[] 'unsatisfactory' teacher." (2d Am. Compl. ¶ 124.) Cruz received six "considerably worse" schedules between January 25 and February 8, 2005. (2d Am. Compl. ¶ 125.) Each schedule required her to "relocate[] to extreme corners of the block-long building on different floors." (Id.) "Her locker was taken away," forcing her to carry all her materials "all the time." (Id.) The DOE's payroll secretary failed to provide the proper medical insurance forms to her doctor. (2d Am. Compl. ¶ 127.)   Between February 8, 2005 and March 21, 2005, Resnick and Assistant Principal Silverman "subjected [her] to 'observations.'" (2d Am. Compl. ¶ 126.)

On August 29, 2005, Cruz filed an NYSDHR information form asserting age, color, race and disability (denial of reasonable accommodation) discrimination and retaliation. (Dkt. No.

185: Hochstadt Aff. ¶¶ 17-18 & Ex. 2: 8/29/05 Cruz NYSDHR Info. Form at 2-3.) Cruz's NYSDHR "complaint" alleged that, after Cruz "grieved" that her schedule would impact her health due to her "failed knee surgery," Silverman "retaliated" by "[u]nreasonably interfer[ing] with [her] work performance[,] . . . creat[ing] an intimidating work environment[, r]at[ing her] work unsatisfactory" despite her twelve prior years of satisfactory evaluations and "fail[ing] to provide tools[,] resources and expert support."  (8/29/05 Cruz NYSDHR Compl. at 3; see also Hochstadt Aff. ¶¶ 17-18 & Ex. 2: 9/1/05 Cruz Letter.)[2/]

In the fall of 2005, Cruz filed an EEOC "[a]ge [d]iscrimination" charge alleging that: (1) the DOE assigned Cruz a less "favorable teaching schedule[]"than other teachers with "less seniority;" (2) administrators made "hostile and discriminatory comments" about her age; and (3) the DOE retaliated against Cruz for filing grievances about her teaching assignments.  (Hochstadt Aff. ¶¶ 19, 21-22 & Ex. 3: Cruz EEOC Compl.)  On May 5, 2006, the EEOC issued Cruz a right to sue letter, which stated that "[b]ased upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes."  (Greenfield Aff. Ex. G: 5/5/06 Cruz EEOC Right to Sue Letter; Hochstadt Aff. Ex. 3: 5/5/06 EEOC Right to Sue Letter.)  Plaintiffs have conceded that this charge and right to sue letter are not relevant to the present lawsuit.  (See Dkt. No. 191: Pls. Supp. Br. at 2 & Appx. A Chart.)

---

[2/]     While Cruz does not allege that she received an EEOC right to sue letter based on the August 29, 2005 NYSDHR complaint, she provided this Court with an EEOC right to sue letter concerning an ADEA claim against the UFT, issued September 17, 2007.  (See Dkt. No. 157: Greenfield Aff. Ex. G: 9/17/07 Cruz EEOC Right to Sue Letter.)

During the 2005-2006 school year, the DOE sent grievance hearing notices to the "wrong locations, . . . causing [Cruz] to lose her objections to the inequitable schedule hearing." (2d Am. Compl. ¶ 128.) DOE employees "increased their harassing unannounced observations," during which the DOE employees sometimes encouraged students to write negative comments or make allegations against Cruz.  (Id.)

Cruz was "attacked and injured," but "was falsely accused" of physically attacking and verbally abusing a student.  (2d Am. Compl. ¶ 129.)  Cruz never saw the alleged report about the incident.  (Id.)  Resnick refused to file the appropriate paperwork so that Cruz could pursue her "Line of Duty claim."  (Id.)

In early 2006, Assistant Principal Silverman failed to properly instruct Cruz on how to administer the oral portion of the Spanish Regents Exam, "withheld the secure examination materials, . . . provided her with altered rules about the Regents manual" and failed to instruct her on "how to deal with violations."  (2d Am. Compl. ¶ 133.)  "As a result, additional charges and accusations were made against Plaintiff Cruz related to the Regents exam."  (Id.)  Cruz filed another grievance.  (2d Am. Compl. ¶ 134.)

Later in 2006, the DOE closed the school's Spanish Department, and Resnick and the DOE hired "'younger' less expensive teachers whose ethnicity and background were 'acceptable' to Principal Resnick" for the 2006-2007 school year.  (2d Am. Compl. ¶ 135.)  The DOE sent Cruz to the 7th Avenue TRC.  (Id.)  The "hard chairs, bad tables" and the "restrictions on [Cruz's] movement" at the 7th Avenue TRC caused her orthopedic problems to "worsen[]."  (2d Am. Compl.

¶¶ 138-39.)  "[T]he unsanitary and dangerous conditions" at the TRC caused Cruz to "start[]

suffering" from "Chronic Obstructive Pulmonary Disease (COPD), anxiety, sleep disorders, mood

swings and other post traumatic stress."  (2d Am. Compl. ¶ 139.)

On September 5, 2008, Cruz filed an EEOC charge asserting an Americans with

Disability Act ("ADA") claim alleging that:  (1) the DOE refused to accommodate Cruz's request for

a schedule that did not bother her legs; (2) the DOE retaliated against Cruz for "griev[ing]" her

schedule; and (3) the 7th Avenue TRC's "health hazards[,] dangerous conditions . . . [and] Domino

Steelcase plastic, unpadded chairs" caused Cruz to suffer "sacral, lumbar, coccyx and gluteal pain

and circulation problems (akin to bedsores)."  (Hochstadt Aff. ¶¶ 23-24 & Ex. 4: 9/6/08 Cruz EEOC

Compl. & Ex. 5: 11/3/08 EEOC Letter.)  On November 15, 2008, the EEOC issued a right to sue

letter, stating that Cruz's "charge was not timely filed with EEOC; in other words, [Cruz] waited too

long after the date(s) of the alleged discrimination to file [her] charge."  (Hochstadt Aff. Ex. 5:

11/15/08 Cruz EEOC Right to Sue Letter.)

At her § 3020a hearing, the UFT refused to provide Cruz with counsel due to her

membership in Teachers4Action.  (2d Am. Compl. ¶ 141; Dkt. No. 107: City Defs. Ans. Ex. A:

Riegel 11/28/08 Op. at 1-2.)  Hearing officer Arthur A. Riegel failed to (1) compel the DOE to

produce "full discovery," (2) stop the DOE from introducing "false, fabricated or manipulated"

evidence at the hearing, and (3) order that the transcripts be provided to Cruz in a "timely fashion." (2d Am. Compl. ¶¶ 149-51.)[3/]

After the June 27, 2008 Letter Agreement was signed, Cruz "dropped her claims" against the UFT and asked to re-open her hearing, which had "closed" three weeks prior, so that a lawyer could "put in additional evidence and closing statements." (2d Am. Compl. ¶¶ 149, 154; Dkt. No. 174: Pls. Opp. Br. at 10 n.13.) The hearing officer, however, refused to extend the hearing. On November 28, 2008, the hearing officer found Cruz guilty of eleven of the fourteen proffered charges, resulting in her dismissal by the DOE. (Riegel 11/28/08 Op.) In June 2009, Cruz filed an Article 75 petition against the DOE in New York County Supreme Court challenging Riegel's opinion. (Dkt. No. 157: Greenfield Aff. Ex. F: Cruz 6/30/09 State Pet.; 2d Am. Compl. ¶ 147; Dkt. No. 185: Hochstadt Aff. ¶ 6.) The state court denied Cruz's Article 75 petition on January 5, 2010. (Dkt. No. 188: City/State Defs. Supp. Br. Appx. 1: 1/5/10 Decision & Order.)

On August 24, 2009, Cruz filed an EEOC charge asserting age, national origin and disability discrimination and retaliation based on the DOE's retaliation for grieving her schedule and the Seventh Avenue TRC's "dangerous conditions." (Hochstadt Aff. ¶¶ 26-27 & Ex. 6: 8/24/09 Cruz EEOC Compl.) Cruz has not yet received an EEOC right to sue letter for her August 24, 2009 EEOC charge. (Hochstadt Aff. ¶ 28; see Pls. Supp. Br. at 3.)

---

[3/]    Hearing Arbitrator Arthur A. Riegel Esq. mentioned in his "Opinion & Award" that Cruz "did not appear for the hearing." (City Defs. Answer Ex. A: Riegel 11/28/08 Op. at 1.)

Cruz has suffered "monetary, physical and emotional injuries" as a result of the City Defendants' and State Defendants' acts.  (2d Am. Compl. ¶ 156.)

**Michael Ebewo**

Michael Ebewo was born in Nigeria and taught "Special Education" for the DOE from 1990 until 2007.   (Dkt. No. 94: 2d Am. Compl. ¶¶ 157-58, 164-65.)   During Ebewo's "entire teaching career," which began in 1978, Ebewo's "employer[s], supervisors, colleagues and peers" recognized his "performance" as "excellent" until principal Lisa Nelson, who had "inadequate experience," began reviewing Ebewo.  (2d Am. Compl. ¶¶ 168-70, 182-83, 202.)[4]

In 2006, Nelson began "target[ing]" Ebewo because he was an "'[e]xpensive' teacher," she was jealous of his "multiple advanced degrees," and he "refused to . . . keep his mouth shut about policies he knew to be wrong and detrimental [to] the students, the faculty, the school and the public education system itself."  (2d Am. Compl. ¶¶ 173-74, 185.)  Nelson commented that Ebewo "'was making too much money'" and that his salary could be used "'to hire two teachers.'"  (2d Am. Compl. ¶ 176.)  Nelson encouraged Ebewo to transfer by promising to give him "a good rating on his annual review" if he secured a transfer.  (2d Am. Compl. ¶¶ 177-78.)  Ebewo, however, was unable to find a transfer.  (2d Am. Compl. ¶ 179.)

---

[4]     In 2006, Ebewo "requested and received" a mentor from the UFT mentorship program.  (2d Am. Compl. ¶ 172.)  During the 2006-2007 school year, Ebewo received praise for his progress in "classroom management, differential instruction, students assessment and reward system."  (Id.)

Nelson "unfairly" criticized his lesson plans and "delivery," "filed inaccurate and exaggerated observation reports," gave him "increasingly onerous assignments" requiring him to work "extra . . . uncompensated hours," "yelled at him publicly," "constantly threatened him with being fired," offered students rewards "if they were disruptive in [his] class," "ridicul[ed] [his] accent, voice and diction," and "ma[de] derogatory comments about . . . Ebewo's race and national origin." (2d Am. Compl. ¶¶ 187, 189-90 192, 194.) On one occasion, Nelson refused to respond to Ebewo's "call for help" when a student assaulted Ebewo, and Nelson hid the student when the police arrived. (2d Am. Compl. ¶ 193.)

Nelson "consistently" rated Ebewo as "unsatisfactory" while rating less experienced and lower paid teachers as satisfactory. (2d Am. Compl. ¶¶ 186-88.) Ebewo complained about his 2006 unsatisfactory rating. (2d Am. Compl. ¶ 203.) During the summer of 2007, Nelson "chased [Ebewo] out of a summer school assignment." (2d Am. Compl. ¶ 191.)

In September 2007, "without any explanation," Nelson "removed [Ebewo] from [his] regular teaching assignment" and re-assigned him to a "day-to-day substitute position." (2d Am. Compl. ¶ 195.) Nelson assigned a new "uncertified" teacher to Ebewo's regular teaching assignment. (Id.)

On October 3, 2007, Nelson, without any explanation, gave Ebewo a letter directing him to report to the 7th Avenue TRC. (2d Am. Compl. ¶ 196.) The TRC caused Ebewo to suffer "elevated blood pressure, orthopedic conditions, peripheral artery disease, cold, flu, mood swings, anxiety and frustration and other physical and emotional conditions." (2d Am. Compl. ¶ 200.)

20

In March 2008, after Ebewo had been at the TRC for approximately five months, Nelson "finally proffered" charges against Ebewo alleging "incompetence, insubordination, neglect of duty and inefficiency." (2d Am. Compl. ¶¶ 197-98.) On June 2, 2009, Ebewo filed an Article 78 petition in New York County Supreme Court moving for hearing officer Martin Scheinman's recusal. (Dkt. No. 157: Greenfield Aff. Ex. H: Ebewo Article 78 Pet.)   On July 28, 2009, Scheinman withdrew because he could "no longer judge [Ebewo's] credibility with impartiality" since Ebewo made "allegations which are not true." (Greenfield Aff. Ex. I: Scheinman 7/28/09 Letter at 3.)

Ebewo has not filed any NYSDHR/EEOC complaints. (Dkt. No. 191: Pls. Supp. Br. at 5 & Appx. A Chart.)

**Joann Hart**

Joann Hart began working for the DOE in 1977, initially as a "temporary per diem substitute" and then as a special education teacher. (Dkt. No. 94: 2d Am. Compl. ¶¶ 210-12.) Until May 16, 2006, Hart consistently received satisfactory ratings and respect from her students, colleagues and administrators. (2d Am. Compl. ¶¶ 210-12, 217-20.)

On May 16, 2006, Hart tried to "gain control and get the kids to settle down" while she was administering a test. (2d Am. Compl. ¶¶ 221, 223.) When her student, "D.H[.,] . . . refused to settle down," she warned him that she would report him to the principal if he didn't stop. (2d Am. Compl. ¶ 223.) "At the end of the day," principal Robert Negron informed Hart that D.H. "reported that she [had] 'hurt him.'" (2d Am. Compl. ¶ 224.)

On May 18, 2006, Negron summoned Hart to his office.  (2d Am. Compl. ¶ 225.)
While on the phone with superintendent Jorge Izguierdo, Nelson asked Hart her age, how many years
she had "been in the system" and her "retirement plans."  (Id.)  Nelson handed Hart a letter informing
her of a "'serious allegation'" against her and reassigning her to the 7th Avenue TRC.  (2d Am.
Compl. ¶ 226.)  The DOE "used" the incident "as an opportunity to get rid of . . . Hart who was a
seniority transfer and a tenured teacher."  (2d Am. Compl. ¶ 222.)

Hart's confinement in the TRC caused her to suffer "sleep problems, insomnia,
nightmares, post traumatic stress, inability to trust others, flashbacks of being arrested[,] mood
swings[,]" "allergies[,] breathing problems and circulatory and orthopedic problems."  (2d Am.
Compl. ¶¶ 262,  276.)  On June 1, 2006, Hart received another letter informing her that "OSI" was
investigating her for "corporal punishment/inappropriate conduct."  (2d Am. Compl. ¶ 227.)  An OSI
investigator told her about "several anonymous accusations."  (2d Am. Compl. ¶ 228.)  Hart "recited
the events of the day, her 14 year unblemished record and demanded to be given the right to know
the identity of her accusers."  (2d Am. Compl. ¶ 229.)

On June 21, 2006, the Manhattan District Attorney's Office charged Hart with third
degree assault, third degree attempted assault and second degree harassment.  (2d Am. Compl.
¶¶ 231-33.)  Fifteen months later, after "thousands of dollars in lawyers fees [and] dozens of Court
appearances," the charges were dismissed.  (2d Am. Compl. ¶ 235.)  "As a result of the charges," the
DOE placed Hart on the "Ineligible/Inquiry List," which prevented Hart from working in after-school
and summer programs and taking professional development classes.  (2d Am. Compl. ¶¶ 236-37.)

22

In November 2006, NYSED informed Hart that the DOE had "proffered" charges against her.  (2d Am. Compl. ¶ 238.)  The DOE's § 3020a charge alleged that Hart pushed a student against the closet and placed her hand around the student's neck.  (Dkt. No. 107: City Defs. Answer Ex. C: 1/21/08 Tillem Op.)  Hart requested a hearing.  (2d Am. Compl. ¶ 239.)  In January 2007, the DOE requested a probable cause hearing, which could have resulted in Hart's removal from the payroll.  (2d Am. Compl. ¶¶ 241-42.)   After scheduling the hearing, the DOE "almost immediately . . . withdrew its request" for the hearing.  (2d Am. Compl. ¶ 242.)  The DOE sent Hart a letter "'reminding' her of the allegations and warning her not to return to her school."  (2d Am. Compl. ¶ 243.)

In December 2007, Hart's § 3020a hearing began.  (2d Am. Compl. ¶ 244.)  Hearing officer Jack Tillem concluded that D.H.'s and DOE teacher Erica Chasser's testimony was "'less than plausible,'" and determined that, while Hart may have "touch[ed] or momentar[ily] grasp[ed]" D.H., she did not commit "corporal punishment."  (2d Am. Compl. ¶¶ 245-46; 1/21/08 Tillem Op. at 11.)  Hearing Officer Tillem, however, found Hart guilty of "conduct unbecoming her position," and "impose[d] a fine of $1000, a penalty balancing the need to send a message that such conduct cannot be condoned against her years of exemplary service."  (1/21/08 Tillem Op. at 12; 2d Am. Compl. ¶¶ 245, 250.)  Tillem also changed Hart's status from tenured teacher to Absent Teacher Reserve and sent Hart back to the TRC. (2d Am. Compl. ¶ 250.)

On April 7, 2008, after spending 355 days in the TRC, the DOE ordered Hart to report to a school.  (2d Am. Compl. ¶ 251.)  In August 2008, the DOE began "bounc[ing Hart] from

one school to another." (2d Am. Compl. ¶ 253.)  When Hart "show[ed] up for work as a teacher," these schools assigned her to "non-teacher work [and] manual labor."  (2d Am. Compl. ¶ 254.)

"As a direct result of [d]efendants wrongdoing," Hart has lost "self esteem" and her ability to maintain personal relationships, "sustained personality changes," and lost the ability and energy to focus and concentrate.  (2d Am. Compl. ¶¶ 274-75.)  Hart also has endured financial damages.  (2d Am. Compl. ¶ 274.)

Hart  never filed a formal grievance with the New York Division of Human Rights. (Teachers4Action, 08 Civ. 548, Dkt. No. 101: Fagan Aff. Ex. 14: Hart 8/21/08 Email; see also Dkt. No. 191: Pls. Supp. Br. at 5 & Appx. A Chart.)

### Julianne Polito

Polito began working for the DOE in 1993 and was a "Director of Middle School Reform" and then an "Instructional Support Specialist."  (Dkt. No. 94: 2d Am. Compl. ¶¶ 303, 318, 322.)  Polito's peers and colleagues "respected and recognized" her for her "work ethic [and] conviction for learning," and the DOE "rewarded" her for her "educational, organizational and management skills."  (2d Am. Compl. ¶¶ 310-11, 316-17.)

In 2003, the DOE began "targeting" Polito when she received funding for her proposal to reform the "DOE's New Small School Initiative."  (2d Am. Compl. ¶¶ 323-24.)  "The targeting worsened in January 2005 when [Local Instructional Superintendent Alexis Penzell] was given authority over Plaintiff Polito."  (2d Am. Compl. ¶¶ 311, 325.)  In May and June 2005, Penzell, who had a reputation for "harassing and removing" principals, was "openly hostile, aggressive and

24

antagonistic against Plaintiff Polito."  (2d Am. Compl. ¶¶ 311-13, 328-29.)  Polito "spoke out against" Penzell's repeated violations of "employee[] privacy and other rights in interviews and staff meetings."  (2d Am. Compl. ¶ 330.)

In September 2005, Penzell "prohibited Plaintiff Polito from hiring office staff, interfered with her choices on how to staff her school, publicly reprimanded or harassed her, and made false accusations designed to cause her to be fired."  (2d Am. Compl. ¶¶ 311-13, 331.)  Penzell forced Polito "to withdraw developed curriculum, integrated and/or altered class configurations and program schedules and interfered with or withheld program budgets."  (2d Am. Compl. ¶ 332.)

In October 2005, Penzell "publicly chastised" Polito at a principals meeting.  (2d Am. Compl. ¶ 333.)  Penzell was "later reprimanded" for her behavior.  (Id.)  Penzell thereafter "verbal[ly] abuse[d], harass[ed] and attack[ed]" Polito daily.  (2d Am. Compl. ¶¶ 334-36.)  Polito complained about Penzell's behavior.  (2d Am. Compl. ¶ 337.)

In November 2005, Polito scheduled a meeting with parents, principals, safety officers and students to prevent some students from forming a gang.  (2d Am. Compl. ¶ 340.)  Penzell refused to attend and encouraged one parent to claim that Polito was "prejudiced against her son."  (2d Am. Compl. ¶¶ 340-41.)

"Thereafter," Penzell filed charges alleging that Polito committed corporal punishment, sexually molested a young girl, failed to "report an impending violation," violated "standard operating procedures [for] daily staff attendance books with signatures" and failed to implement Penzell's attendance policies.  (2d Am. Compl. ¶¶ 340-48.)  Even though the charges

were "dismissed for lack of evidence and inconsistent testimony of witnesses," Penzell instructed Polito's colleagues to avoid Polito due to the charges.  (2d Am. Compl. ¶¶ 342, 344, 347, 349, 355, 357-58.)

Penzell threatened to "place disparaging letters in Plaintiff Polito's file."  (2d Am. Compl. ¶ 350.)  Penzell filed "[a]llegations of misconduct" against Polito that Polito "interfer[ed]" with the principal selection process for Polito's school.  (2d Am. Compl. ¶ 359.)  On February 3, 2006, the DOE removed Polito from her position as "interim acting principal."  (2d Am. Compl. ¶ 363.)  When Polito complained about "due process violations," the DOE conducted further investigations "based on . . . false charges."  (2d Am. Compl. ¶ 362.)

Initially, the DOE "re-assigned" Polito to the "Regional Administrator of Special Education" position, but later "bounced [her] around from position to position, and location to location, in violation of her contract rights."  (2d Am. Compl. ¶¶ 365-66.)  In approximately March 2006, the DOE assigned Polito to a TRC and she has "bounced in and out of three [TRCs]" since then.  (2d Am. Compl. ¶¶ 319, 367, 374.)  Penzell's behavior and the TRCs have caused Polito to suffer from depression, exhaustion, humiliation and loss of self-esteem.  (2d Am. Compl. ¶¶ 353, 372.)  Polito also has "suffered losses to her pension, TDA investment options [and] ability to earn income." (2d Am. Compl. ¶ 373.)

On August 20, 2008, Polito filed a NYSDHR complaint alleging that the DOE retaliated against her for filing grievances by "contriv[ing] false charges" against her. (Dkt. No. 184: Penkovsky Aff. ¶ 7 & Ex. D: 8/20/08 NYSDHR Compl.)  On March 27, 2009, the NYSDHR

dismissed the complaint because (1) "no adverse action ha[d] been taken" against Polito because "she continues to receive full salary and benefits," (2) "the bulk of her allegations . . . are time-barred," and (3) Polito failed to allege that she "opposed discrimination upon any basis cognizable under the Human Rights Law."  (Penkovsky Aff. ¶ 8 & Ex. E: 3/27/09 Polito NYSDHR Determination & Order After Investigation.)  On May 12, 2009, the EEOC issued Polito a right to sue letter and stated that it had "adopted" the NYSDHR's findings.  (Penkovsky Aff. ¶ 6 & Ex. C: 5/12/09 Polito EEOC Right to Sue Letter.)

### **Thomasina Robinson**

Thomasina Robinson became a tenured DOE physical education teacher in 1993.  (Dkt. No. 94: 2d Am. Compl. ¶ 380.)  Throughout Robinson's "decades of teaching," her peers and colleagues "regarded and recognized" her as an "excellent teacher," and she always received "satisfactory or . . . exemplary" ratings.  (2d Am. Compl. ¶¶ 384-90.)

Robinson's principal threatened Robinson and other teachers that he would charge them with "insubordination" if they did not adjust the students' attendance records to comply with DOE guidelines.  (2d Am. Compl. ¶¶ 400-02.)  Robinson knew that the DOE guidelines "did not comply with State requirements" and criticized the DOE guidelines during a November 2006 Consultative Council meeting where Robinson was acting as the physical education department representative.  (2d Am. Compl. ¶¶ 396, 402-05.)

On December 7, 2006, her principal informed Robinson that he was charging her with "'Corporal Punishment/Verbal Abuse'" and "reassigned" her to the 7th Avenue TRC.  (2d Am.

Compl. ¶¶ 407-16.)  When Robinson refused to sign the charges, the principal directed security to remove her from the school and did not allow her to retrieve her belongings.  (2d Am. Compl. ¶ 420.)  Robinson believes that she was assigned to the 7th Avenue TRC based on "(i) her status as a tenured teacher," "earning a higher salary than certain others," and "(ii) her calling an assembly after school hours at which she promoted physical health and awareness."  (2d Am. Compl. ¶¶ 382, 448.)

When Robinson began teaching an "informal physical education and exercise class" at the TRC, the DOE "forced" her to stop.  (2d Am. Compl. ¶ 441.)  The DOE also "forced" Robinson to sign a form requiring her to comply with "new and restrictive procedures while in the [TRCs]."  (2d Am. Compl. ¶ 436.)  The punishment for failing to comply with these procedures was "additional charges."  (2d Am. Compl. ¶ 438.)  As a result of her confinement in the TRC, Robinson has "suffered muscle fatigue, blood pressure fluctuations and emotional stresses."  (2d Am. Compl. ¶ 442.)

In May 2007, after the Office of Special Investigations investigated the "allegations of corporal punishment," the DOE charged Robinson with "(i) Insubordination - parking in front of the school[;] (ii) use of unprofessional language - her principal supposedly heard Plaintiff Robinson referring to a student as a 'White Bitch' . . .[; ] and (iii) allowing students to speak aggressively and in a physically threatening manner to one another."  (2d Am. Compl. ¶¶ 444-45, 447.)

On April 27, 2009, prior to the conclusion of Robinson's § 3020a hearing, Robinson advised her school principal that she was "irrevocably reitir[ing]" effective October 23, 2009 and that

she decided to "to retire after much thought and deliberation and after consultation with [her] attorney, Charles D. Maurer, who . . . represent[ed her] in a hearing regarding certain alleged incidents." (Greenfield Aff. Ex. J.: 4/27/09 Robinson Letter.)  Robinson never filed a "formal grievance[s]" with the NYSDHR.  (Teachers4Action, 08 Civ. 548: Dkt. No. 101: Fagan Aff. Ex. 20: Robinson 8/22/08 Email; see also Dkt. No. 191: Pls. Supp. Br. at 5 & Appx. A Chart.)

**Brandi Dawn Scheiner**

The DOE hired Scheiner as a "per diem teacher" in 1984 and as a "full time" teacher in 1986.  (Dkt. No. 94: 2d Am. Compl. ¶ 464.)  Scheiner "always receiv[ed] satisfactory yearly ratings, letters of excellence and commendations from her supervisors, colleagues and peers." (2d Am. Compl. ¶¶ 457, 465-67.)

Because "interim acting principal Susan Felder determined that Plaintiff Scheiner had to go, because she was too expensive, too senior [and] too talented," Felder "set out on a course of harassment, intimidation, retaliation, excessive observations, changing of teaching assignments, verbal abuse and hostility . . . ." (2d Am. Compl. ¶¶ 468-69.)  Felder "charged" Scheiner with "'poor rug management,' 'allowing excessive use of glue,' writing below the lines and other ridiculous and frivolous charges." (2d Am. Compl. ¶ 470.)

In 2005, Scheiner filed a "grievance[]" with the DOE and an NYSDHR complaint asserting age discrimination based on Felder's "improper conduct." (2d Am. Compl. ¶ 471; Dkt. No. 184: 12/18/07 NYSDHR Decision at 1.)  The DOE never "acted" on the grievances, but the NYSDHR investigated Scheiner's complaints. (2d Am. Compl. ¶ 472.)

      In response to Scheiner filing the grievance and complaint, Felder rated Scheiner as "unsatisfactory" during the 2005-2006 school year, assigned her to teach pre-kindergarten rather than second grade, scheduled her fewer preparation periods, constantly critiqued her about "'snack time' or 'dismissal time' problems," and accused her of verbally abusing and engaging in corporal punishment.  (2d Am. Compl. ¶¶ 473-75.)  In March 2007, District Superintendent Daria Rigney observed Scheiner and rated Scheiner's performance "unsatisfactory" due to Scheiner's "'failure to control her class', 'failure to utilize appropriate methods and techniques', . . . [and] 'failure to establish a relationship with the students that promoted their attentiveness toward her as their teacher.'"  (2d Am. Compl. ¶ 476.)

      "As a result of the continued harassment and stresses," Scheiner "suffered a 'line of duty' injury," but the DOE refused her a "medical leave of absence" even though she was unable to return to work.  (2d Am. Compl. ¶ 477.)  Felder rated Scheiner's performance for the 2006-2007 school year as "unsatisfactory" based on Scheiner's "'failure to provide satisfactory instruction' and 'unexcused excessive absences.'"  (2d Am. Compl. ¶ 478.)  As a result, the DOE "re-assigned" Scheiner to the 7th Avenue TRC.  (Id.)  At the TRC, DOE employees "barked orders at her . . . , forced her . . . out of the room, yelled at her . . . publicly, referred to her . . . in demeaning and derogatory terms [and] threatened and embarrassed her . . . at every chance."  (2d Am. Compl. ¶ 490.)

      On April 25, 2007, Scheiner filed a NYSDHR complaint alleging that she received unsatisfactory performance reviews in retaliation for filing the 2005 NYSDHR complaint. (Dkt. No.

184: Penkovsky Aff. ¶ 6 & Ex. B: 12/18/07 NYSDHR Report at 2.)  On December 18, 2007, the

NYSDHR found "[p]robable [c]ause to support the allegations of the complaint" because the

"reasons [the DOE and Felder] provided for [Scheiner's] suspension [were] unworthy of credence

and pretextual" and the "evidence further suggests a nexus between the suspension and disciplinary

action being pursued against [Scheiner] and her filing of a prior discrimination complaint against"

the DOE. (12/18/07 NYSDHR Report at 6.)  The NYSDHR ordered a "full public hearing with

sworn testimony."  (12/18/07 NYSDHR Report at 6; 2d Am. Compl. ¶¶ 479-81.)

On March 17, 2008, however, Scheiner "withdr[e]w" her NYSDHR claim.

Teachers4Action, 08 Civ. 548: Dkt. No. 101: Fagan Aff. Ex. 3: Scheiner 3/17/08 Letter.)  Scheiner

also "started to speak out" against the DOE's policies related to tenured teachers and the "injustices

of the" TRCs.  (2d Am. Compl. ¶ 483.)  The "DOE increased [its] effort to intimidate, retaliate

against and harass" Scheiner when she joined Teachers4Action.  (2d Am. Compl. ¶ 485.)

On January 6, 2010, the EEOC issued a right to sue letter closing its file on Scheiner's

April 25, 2007 NYSDHR complaint because "the [c]ha[r]ging [p]arty wishes to pursue [the] matter

in Court." (Penkovsky Aff. ¶ 4 & Ex. A: 1/06/10 EEOC Right to Sue Letter; see also Dkt. No. 191:

Pls. Supp. Br. at 3 & Appx. A Chart.)

As a result of the DOE's treatment, Scheiner has "suffered loss of salary and benefits,

suffered physical and emotional injuries and other damages."  (2d Am. Compl. ¶¶ 489, 493-94.)

**Procedural Background**

The Court will briefly summarize the relevant procedural history, but assumes familiarity with the lengthy procedural history discussed in Adams v. N.Y. State Educ. Dep't, 630 F. Supp. 2d 333, 337-42 (S.D.N.Y. 2009) (Marrero, D.J. & Peck, M.J.).

On June 30, 2008, plaintiffs (and others) filed this action against NYSED and seventeen § 3020-a hearing arbitrators but not the City DOE.   (Dkt. No. 1: Compl.)   On September 22, 2008, plaintiffs' then-attorney Edward Fagan filed a Notice of Dismissal of the Teachers4Action case on behalf of plaintiffs (and others).   On October 24, 2008, Fagan filed an amended complaint on behalf of plaintiffs (and others), adding the City Defendants and including a hostile work environment claim. (Dkt. No. 40: Am. Compl.)   In December 2008, Fagan was disbarred.   On January 7, 2009, after this case was reassigned to Judge Marrero and referred to me (Dkt. Nos. 43, 46), I directed plaintiffs to file a second amended complaint by January 30, 2009 and ordered defendants to "answer the Second Amended Complaint(s) by February 27, 2009, . . . even if defendants also [planned on] making any motions to dismiss or for costs." (Dkt. No. 56: 1/7/09 Order.)   On February 4, 2009, plaintiffs, now pro se, filed the second amended complaint. (Dkt. No. 94: 2d Am. Compl.)

On March 16, 2009, the City and State Defendants filed their answers.   (Dkt. Nos. 106-07: City Defs. Answers; Dkt. Nos. 108-09: State Defs. Answers.)   At the August 5, 2009 conference, I offered plaintiffs the opportunity to file a third amended complaint and ordered plaintiffs to provide "copies of any EEOC Right to Sue Letters to defense counsel and the Court by

August 10, 2009."  (See Dkt. No. 136: 8/5/09 Order.)  Plaintiffs declined to file a third amended complaint.  (See Dkt. No. 157: Greenfield Aff. Ex. C: Adams, Ebewo, Polito, Scheiner, Hart, & Robinson 8/24/09 Letters.)  Plaintiff Josephina Cruz complied with my order to file her EEOC right to sue letter, but the other plaintiffs claimed that the Court's "demand that [they] produce further documents [was] improper at this procedural stage" and did not produce right to sue letters.  (Adams, Ebewo, Polito, Scheiner, Hart, & Robinson 8/24/09 Letters; Dkt. No. 152: Dahlberg Aff. Ex. 8: Cruz Right to Sue Letters.)

On September 11, 2009, the City Defendants moved to dismiss the complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure or alternatively for judgment on the pleadings pursuant to Rule 12(c), and the State Defendants moved for judgement on the pleadings pursuant to Rule 12(c).  (Dkt. No. 153: City Defs. Notice of Motion; Dkt. No. 149: State Defs. Notice of Motion.)

On September 23, 2009, Nicholas Penkovsky filed a notice of appearance as counsel for all plaintiffs.  (Dkt. Nos. 161 & 163: Penkovsky Notice of Appearance.)  Joy Hochstadt appeared as counsel for Cruz on October 24, 2009 and for Adams on November 10, 2009.  (Dkt Nos. 169 & 171: Hochstadt Notices of Appearance.)

On December 23, 2009, I again ordered plaintiffs to provide "all charges that plaintiffs have filed with the Equal Employment Opportunity Commission ('EEOC') or New York State Division of Human Rights ('NYSDHR'), any EEOC right to sue letters or NYSDHR or EEOC findings that plaintiffs have received and any related documents that plaintiffs believe are the basis

for the federal employment discrimination claims in their current complaint." (Dkt. No. 183: 12/23/09 Order.) I informed the parties:

> The Court is converting the motions to dismiss into summary judgment motions for the limited purpose of considering plaintiffs' EEOC and related filings. If plaintiffs do not provide the Court with the requested documents by January 8, 2010, the Court will assume that such documents do not exist and will write its Report and Recommendation on that basis.

(12/23/09 Order.) Scheiner, Polito, Cruz and Adams filed documents relating to their EEOC and NYSDHR complaints. (See Dkt. No. 184: Penkovsky Aff. Exs. A-E: Scheiner & Polito EEOC & NYSDHR documents; Dkt. No. 185: Hochstadt Aff. Exs. 1-6: Cruz & Adams EEOC & NYSDHR documents.)

### Plaintiffs' Causes of Action in Their Second Amended Complaint

The second amended complaint alleges that: (1) defendants violated plaintiffs' First Amendment rights by retaliating against them after they spoke out against the polices and programs that City Defendants "implement[ed]" in the New York City school system and the "unconstitutionality" of New York Education Law § 3020-a "as enacted, changed and/or implemented against them." (Dkt. No. 94: 2d Am. Compl. ¶¶ 556-66, 627, 631-34); (2) the City Defendants deprived them of their due process rights to "fair and impartial" § 3020-a hearings by "negotiating Article 21G in contravention of NYS Education Law §§ 3020 and 3020-a" (2d Am. Compl. ¶¶ 591-605); (3) the State Defendants violated plaintiffs' Fourteenth Amendment due process rights by employing and failing to supervise "Hearing Officers" who failed to comply with Education Law §§ 3020 and 3020a, 8 NYCRR § 82-1 and the "Arbitration Contract" (2d Am. Compl. ¶¶ 568-

81, 584-88); (4) defendants subjected plaintiffs to a hostile work environment by confining them in

the TRCs (2d Am. Compl. ¶¶ 608-20); and (5) defendants breached the June 27, 2008 Letter

Agreement between the DOE and the UFT (2d Am. Compl. ¶¶ 622-29).

### The Defendants' Pending Motions

    The City Defendants moved to dismiss the second amended complaint pursuant to

Rule 12(b)(6) of the Federal Rules of Civil Procedure or alternatively for judgment on the pleadings

pursuant to Rule 12(c) (Dkt. No. 153: City Defs. Notice of Motion), on the grounds that:

(1) plaintiffs' Title VII hostile work environment claim fails to allege that plaintiffs "filed a charge

with the EEOC and/or . . . received a right to sue letter" (Dkt. No. 156: City Defs. Br. at 15-20);

(2) plaintiffs' Title VII retaliation claim alleges that only two of the plaintiffs filed "charge[s] of

discrimination prior to instituting their federal lawsuits" and fails "to identify with any specificity

any action allegedly taken by City defendants since June or July 2008 in retaliation for plaintiffs'

federal lawsuits/protected activities" (City Defs. Br. at 20-23); (3) plaintiffs' First Amendment

retaliation claim fails to allege "any details of the plaintiffs' alleged protected speech, and contains

only conclusory allegations of retaliation" (City Defs. Br. at 23-27); (4) plaintiffs fail to properly

allege a 42 U.S.C. § 1981 claim because plaintiffs, with the exception of Ebewo, fail to identify their

race or allege racial discrimination and Ebewo "makes [a] conclusory allegation of race

discrimination but offers no additional details to support his allegation" (City Defs. Br. at 27-29);

and (5) plaintiffs' due process claim fails to establish that any of the plaintiffs, besides Cruz, had a

"constitutionally protected property interest" and did not receive the process that was due (City Defs. Br. at 29-35).

The State Defendants moved for judgement on the pleadings pursuant to Rule 12(c) (Dkt. No. 149: State Defs. Notice of Motion) on the grounds that:  (1) "plaintiffs' § 1981, 1983 and state law claims against the State Defendants are barred by the Eleventh Amendment" (Dkt. No. 151: State Defs. Br. at 7-9); (2) "to the extent that plaintiffs' due process claims were resolved in prior state court proceedings, they are collaterally estopped from re-litigating such claims in this action" (State Defs. Br. at 9-10); (3) this Court should "abstain from consideration of plaintiffs' due process claims under the <u>Younger</u> abstention doctrine" (State Defs. Br. at 11-12); (4) plaintiffs' First Amendment retaliation claim fails to allege that plaintiffs "engage[d] in constitutionally protected speech" and that the State Defendants "retaliated against them because of their speech" (State Defs. Br. at 12-15); (5) plaintiffs' due process claim fails to assert that plaintiffs "were deprived of a constitutionally protected property interest without due process of law" (State Defs. Br. at 15-17); and (6) plaintiffs' Title VII hostile work environment and retaliation claims fail to allege that the State Defendants employed plaintiffs, that plaintiffs exhausted their administrative remedies, that the State Defendants subjected them to a hostile work environment based on their membership in a protected class, or that plaintiffs opposed any practice prohibited by Title VII (State Defs. Br. at 17-21).

At plaintiffs' counsel's request, the Court heard oral argument on the pending motions on February 19, 2010.  Plaintiffs' counsel filed a post-argument brief on February 22, 2010.

## ANALYSIS

### I.    THE STANDARDS GOVERNING A MOTION TO DISMISS[5/]

#### A.    The Twombly-Iqbal "Plausibility" Standard

In two decisions in the last few years, the Supreme Court significantly clarified the standard for a motion to dismiss, as follows:

> Under Federal Rule of Civil Procedure 8(a)(2), a pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to relief."  As the Court held in Twombly, the pleading standard Rule 8 announces does not require "detailed factual allegations," but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation. A pleading that offers "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do."  Nor does a complaint suffice if it tenders "naked assertion[s]" devoid of "further factual enhancement."

> To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face."  A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.  The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully.  Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'"

> Two working principles underlie our decision in Twombly.  First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.  Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do

---

[5/]    The standard for evaluating a motion for judgment on the pleadings pursuant to Rule 12(c) is the same as that for a motion to dismiss under Rule 12(b)(6). LaFaro v. N.Y. Cardiothoracic Group, PLLC, 570 F.3d 471, 475 (2d Cir. 2009); Irish Lesbian & Gay Org. v. Giuliani, 143 F.3d 638, 644 (2d Cir.1998).

<u>not suffice</u>.  Rule 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.  <u>Second, only a complaint that states a plausible claim for relief survives a motion to dismiss</u>.  Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.  But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged - but it has not "show[n]" - "that the pleader is entitled to relief."  Fed. Rule Civ. Proc. 8(a)(2).

In keeping with these principles a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth.  While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations.  When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.

<u>Ashcroft</u> v. <u>Iqbal</u>, 129 S. Ct. 1937, 1949-50 (2009) (citations omitted & emphasis added) (quoting

<u>Bell Atl. Corp.</u> v. <u>Twombly</u>, 550 U.S. 544, 556-57, 570, 127 S. Ct. 1955, 1965-66, 1974 (2007)

(retiring the <u>Conley</u> v. <u>Gibson</u>, 355 U.S. 41, 45-46, 78 S. Ct. 99, 102 (1957), pleading standard that

required denying a Rule 12(b)(6) motion to dismiss "unless it appears beyond doubt that the plaintiff

can prove no set of facts in support of his claim which would entitle him to relief.")).[6]

---

[6]     Accord, <u>e.g.</u>, <u>Harris</u> v. <u>Mills</u>, 572 F.3d 66, 71-72 (2d Cir. 2009); <u>Lindner</u> v. <u>Int'l Bus. Machs. Corp.</u>, 06 Civ. 4751, 2008 WL 2461934 at *3 (S.D.N.Y. June 18, 2008); <u>Joseph</u> v. <u>Terrence Cardinal Cooke Health Care Ctr.</u>, 07 Civ. 9325, 2008 WL 892508 at *1 (S.D.N.Y. Apr. 2, 2008); <u>Elektra Entm't Group, Inc.</u> v. <u>Barker</u>, 551 F. Supp. 2d 234, 237 (S.D.N.Y. 2008); <u>Edison Fund</u> v. <u>Cogent Inv. Strategies Fund, Ltd.</u>, 551 F. Supp. 2d 210, 216-17 (S.D.N.Y. 2008); <u>Diana Allen Life Ins. Trust</u> v. <u>BP P.L.C.</u>, 06 Civ. 14209, 2008 WL 878190 at *3 (S.D.N.Y. Mar. 31, 2008).

### B.    Consideration Of Documents Attached To Or Referred To In The Complaint

A Rule 12(b)(6) motion to dismiss challenges only the face of the pleading.  Thus, in deciding such a motion to dismiss, "the Court must limit its analysis to the four corners of the complaint." Vassilatos v. Ceram Tech Int'l, Ltd., 92 Civ. 4574, 1993 WL 177780 at *5 (S.D.N.Y. May 19, 1993) (citing Kopec v. Coughlin, 922 F.2d 152, 154-55 (2d Cir. 1991)).[7]  The Court, however, may consider documents attached to the complaint as an exhibit or incorporated in the complaint by reference.  E.g., ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2002); Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002) ("Because this standard has been misinterpreted on occasion, we reiterate here that a plaintiff's *reliance* on the terms and effect of a document in drafting the complaint is a necessary prerequisite to the court's consideration of the document on a dismissal motion; mere notice or possession is not enough."); Rothman v. Gregor, 220 F.3d 81, 88 (2d Cir. 2000) ("For purposes of a motion to dismiss, we have deemed a

---

[7]    Accord, e.g., Faulkner v. Beer, 463 F.3d 130, 134 (2d Cir. 2006); Aniero Concrete Co. v. N.Y.C. Constr. Auth., 94 Civ. 3506, 2000 WL 863208 at *31 (S.D.N.Y. June 27, 2000); Six W. Retail Acquisition, Inc. v. Sony Theatre Mgmt. Corp., 97 Civ. 5499, 2000 WL 264295 at *12 (S.D.N.Y. Mar. 9, 2000) ("When reviewing the pleadings on a motion to dismiss pursuant to Rule 12(b)(6), a court looks only to the four corners of the complaint and evaluates the legal viability of the allegations contained therein.").

When additional materials are submitted to the Court for consideration with a 12(b)(6) motion, the Court must either exclude the additional materials and decide the motion based solely upon the complaint, or convert the motion to one for summary judgment under Fed. R. Civ. P. 56.  See Fed. R. Civ. P. 12(b); Friedl v. City of N.Y., 210 F.3d 79, 83 (2d Cir. 2000); Fonte v. Bd. of Managers of Cont'l Towers Condo., 848 F.2d 24, 25 (2d Cir. 1988). With respect to plaintiffs' EEOC filings and right to sue letters, the Court notified the parties that it would consider that part of their motions as one for summary judgment.  (See page 31 above.)

complaint to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference. . . .").[8/]

"However, before materials outside the record may become the basis for a dismissal, several conditions must be met.  For example, even if a document is 'integral' to the complaint, it must be clear on the record that no dispute exists regarding the authenticity or accuracy of the document.  It must also be clear that there exists no material disputed issue of fact regarding the relevance of the document."  Faulkner v. Beer, 463 F.3d at 134 (citations omitted).

In this case, documents that plaintiffs referred to or attached to their complaint may be considered on the motion to dismiss, subject to the Faulkner v. Beer proviso, because they demonstrate further factual support for the allegations in the complaint.

\* \* \* \*

The Court's role in deciding a motion to dismiss "'is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof.'"  Saunders v. Coughlin, 92 Civ. 4289, 1994 WL 88108 at \*2 (S.D.N.Y. Mar. 15, 1994) (quoting Geisler v. Petrocelli, 616 F.2d 636, 639 (2d Cir. 1980)); accord, e.g., Watson v. McGinnis, 964 F. Supp. 127, 130-31 (S.D.N.Y. 1997) (Kaplan, D.J. & Peck, M.J.).

---

[8/]    See also, e.g., Yak v. Bank Brussels Lambert, 252 F.3d 127, 130 (2d Cir. 2001) (citing Cortec Indus., Inc. v. Sum Holding L.P., 949 F.2d 42, 47 (2d Cir. 1991), cert. denied, 503 U.S. 960, 112 S. Ct. 1561 (1992)); Paulemon v. Tobin, 30 F.3d 307, 308-09 (2d Cir. 1994); Brass v. Am. Film Techs., Inc., 987 F.2d 142, 150 (2d Cir. 1993).

Even after <u>Twombly</u> and <u>Iqbal</u>, when reviewing a pro se complaint, the Court must use less stringent standards than if the complaint had been drafted by counsel and must construe a pro se complaint liberally.  <u>See</u>, <u>e.g.</u>, <u>Harris</u> v. <u>Mills</u>, 572 F.3d 66, 72 (2d Cir. 2009); <u>LaBounty</u> v. <u>Adler</u>, 933 F.2d 121, 123 (2d Cir. 1991); <u>Watson</u> v. <u>McGinnis</u>, 964 F. Supp. at 131; <u>Saunders</u> v. <u>Coughlin</u>, 1994 WL 88108 at *2 (citing <u>Hughes</u> v. <u>Rowe</u>, 449 U.S. 5, 101 S. Ct. 173 (1980)). However, "[d]ismissal under Rule 12(b)(6) is proper if the complaint lacks an allegation regarding an element necessary to obtain relief. . . ."  2 <u>Moore's Federal Practice</u> § 12.34[4][a], at 12-72.7 (2005).  Thus, the "'duty to liberally construe a plaintiff's complaint [is not] the equivalent of a duty to re-write it.'"  <u>Id.</u>, § 12.34[1][b], at 12-61; <u>see also</u>, <u>e.g.</u>, <u>Joyner</u> v. <u>Greiner</u>, 195 F. Supp. 2d 500, 503 (S.D.N.Y. 2002) (action dismissed because pro se plaintiff "failed to allege facts tending to establish" that defendants violated his constitutional rights).

## II.   PLAINTIFFS' CLAIMS AGAINST THE STATE DEFENDANTS ARE BARRED BY THE ELEVENTH AMENDMENT

With respect to their claims against the State Defendants, plaintiffs demand damages and "just and equitable relief," but do not request injunctive relief.  (Dkt. No. 94: 2d Am. Compl. Wherefore ¶¶ after ¶¶ 566, 582, 589, 606, 620, 629, 635.)[9/]

---

[9/]   At oral argument and in their post-argument brief, plaintiffs' counsel relied only on the "just and equitable relief" language but could point to nothing else in the second amended complaint that supports any claim for injunctive or other equitable relief.  (<u>See</u> 2/19/10 Oral Arg. Tr. at 9-12; Pls. 2/22/10 Supp. Br. at 1-2.)  While plaintiffs' counsel seeks to re-write the second amended complaint, the Court previously gave plaintiffs a chance to file a third amended complaint, which plaintiffs declined to do, and the Court has denied plaintiffs' counsel's request to allow amendment of the complaint.  Moreover, at oral argument, I
(continued...)

NYSED is "protected from suit by sovereign immunity under the Eleventh Amendment, regardless of whether the relief sought from [it] was legal or equitable in nature," because it is a state agency.  Jacobs v. Mostow, 271 Fed. Appx. 85, 88 (2d Cir. 2008) (Eleventh Amendment bars a suit against NYSED); Bd. of Educ. of Pawling Cent. Sch. Dist. v. Schutz, 290 F.3d 476, 479-80 (2d Cir. 2002) (Eleventh Amendment bars the Board of Education's due process claim against NYSED and a state review officer acting in his "official capacity"), cert. denied, 537 U.S. 1227, 123 S. Ct. 1284 (2003).

The Eleventh Amendment bars suit against the other State Defendants, Mills and Marriot, because they are state officials who acted in their official capacities and plaintiffs are seeking damages rather than injunctive relief.  E.g., Brown v. DeFrank, 06 Civ. 2235, 2006 WL 3313821 at *16 (S.D.N.Y. Nov. 15, 2006) (Peck, M.J.) (& cases cited therein); Freeman v. Strack, 99 Civ. 9878, 2000 WL 1459782 at *1 (S.D.N.Y. Sept. 29, 2000) (Peck, M.J.) ("'It is black letter law that a suit against a state official in his official capacity seeking damages is barred by the Eleventh Amendment. . . .'") (quoting Jackson v. Johnson, 30 F. Supp. 2d 613, 618 (S.D.N.Y. 1998) (Kaplan, D.J. & Peck, M.J.) (& cases cited therein); accord, e.g., Dunn v. Carrier, 137 Fed. Appx. 387, 389

---

9/    (...continued)
advised plaintiffs that I would consider allowing them to voluntarily dismiss without prejudice the present second amended complaint (see 2/19/10 Oral Arg. Tr. at 32-33, 47-52), but plaintiffs rejected this option (see Pls. 2/22/10 Supp. Br. at 11).

(2d Cir. 2005); Ford v. Reynolds, 316 F.3d 351, 354 (2d Cir. 2003); Davis v. New York, 316 F.3d 93, 101 (2d Cir. 2002).[10]

       Accordingly, plaintiffs' claims against the State Defendants should be DISMISSED.[11]

## III.   PLAINTIFFS' FIRST AMENDMENT RETALIATION CLAIM AGAINST THE CITY DEFENDANTS SHOULD BE DISMISSED[12]

---

[10]    See also, e.g., Odom v. Calero, 06 Civ. 15527, 2008 WL 2735868 at *9 (S.D.N.Y. July 10, 2008); Denis v. N.Y.S. Dep't of Corr. Servs., 05 Civ. 4495, 2006 WL 217926 at *12 (S.D.N.Y. Jan. 30, 2006) (Peck, M.J.), report & rec. adopted, 2006 WL 406313 (S.D.N.Y. Feb. 22, 2006) (Kaplan, D.J.); Johnson v. Goord, 01 Civ. 9587, 2004 WL 2199500 at *4 (S.D.N.Y. Sept. 29, 2004); Baker v. Welch, 03 Civ. 2267, 2003 WL 22901051 at *6 (S.D.N.Y. Dec. 10, 2003) (Peck, M.J.); Walker v. Pataro, 99 Civ. 4607, 2002 WL 664040 at *5 (S.D.N.Y. Apr. 23, 2002) (Peck, M.J.).

[11]    In any event, plaintiffs' claims against the State Defendants are meritless.  Plaintiffs' claim that the State Defendants subjected them to a hostile work environment should be dismissed because plaintiffs do not allege that they were employed by the State Defendants or that the State Defendants confined plaintiffs to the TRCs.  (See pages 4-5, 7, 9-10, 11, 13, 15, 18-19, 20-22, 23, 25, 26, 28-29 above & page 71 below.)  Plaintiffs claim that the State Defendants breached the June 27, 2008 Letter Agreement should be dismissed because plaintiffs specifically allege that the Agreement was between the UFT and the DOE, not any of the State Defendants, and in any event their breach of contract claim lacks merit.  (See pages 5-6 above & Point VI below.)  Plaintiffs' First Amendment retaliation claim against the State Defendants should be dismissed because plaintiffs do not allege that the State Defendants retaliated against them.  (See pages 5, 7-10, 11, 13-17, 18-19, 24-27 above.)  Plaintiffs' claims that the hearing officers violated their due process rights by failing to follow established State laws and procedures also is meritless, as discussed at Point IV.C below.

[12]    To the extent that plaintiffs' second amended complaint raises a Title VII retaliation claim (see Dkt. No. 94: 2d Am. Compl. ¶¶ 632-33), this Court deems any such claim abandoned because plaintiffs failed to respond (or even mention) in their opposition papers to defendants' arguments for dismissing such a claim (or at oral argument).  E.g., Bonilla v. Smithfield Assoc. LLC, 09 Civ. 1549, 2009 WL 4457304 at *4 (S.D.N.Y. Dec. 4, 2009) (Chin, D.J.) (Dismissing plaintiff's claims as abandoned by failing to address them in his opposition motion to defendant's motion to dismiss all claims.); Thomas v. Atl. Express Corp., 07 Civ. 1978, 2009 WL 856993 at *2 (S.D.N.Y. Mar. 31, 2009) ("[Defendant] has
(continued...)

Plaintiffs claim that the City Defendants violated their First Amendment rights by retaliating against them after they spoke out against the polices and programs that the City Defendants "implement[ed]" in the New York City school system and the "unconstitutionality" of New York Education Law § 3020-a "as enacted, changed and/or implemented against them." (2d Am. Compl. ¶¶ 556-66, 627, 631-34.)

The City Defendants move to dismiss plaintiffs' First Amendment retaliation claim because (1) plaintiffs "complete[ly] fail[ed] to identify" how particular conduct constituted retaliation; and (2) all of plaintiffs' speech addressed "personal grievances" and was not "protected speech." (Dkt. No. 156: City Defs. Br. at 24-27.)

---

12/    (...continued)
       moved to dismiss [plaintiff's] due process and breach of contract claims. In his opposition, [plaintiff] failed to respond to [defendant]'s argument that his due process claim should be dismissed, and therefore that claim is deemed abandoned."); Burchette v. Abercrombie & Fitch Stores, Inc., 08 Civ. 8786, 2009 WL 856682 at *9 (S.D.N.Y. Mar. 30, 2009) (dismissing plaintiff's constructive discharge claim because plaintiff abandoned it by failing to address it in her opposition motion to defendant's motion to dismiss all claims); Hanig v. Yorktown Cent. Sch. Dist., 384 F. Supp. 2d 710, 723 (S.D.N.Y. 2005) ("[B]ecause plaintiff did not address defendant's motion to dismiss with regard to this claim, it is deemed abandoned and is hereby dismissed."); Martinez v. Sanders, 02 Civ. 5624, 2004 WL 1234041 at *3 (S.D.N.Y. June 3, 2004) ("Because Plaintiff did not address Defendant's motion to dismiss with regard to these claims, they are deemed abandoned."); Anti-Monopoly, Inc. v. Hasbro, Inc., 958 F. Supp. 895, 907 n.11 (S.D.N.Y.) ("[T]he failure to provide argument on a point at issue constitutes abandonment of the issue . . . which provides an independent basis for dismissal."), aff'd, 130 F.3d 1101 (2d Cir.1997), cert. denied, 525 U.S. 813, 119 S. Ct. 48 (1998).

A.    **Legal Principles Regarding Public Employees' First Amendment Rights**

It is well-settled that "public employees do not surrender all their First Amendment rights by reason of their employment. Rather, the First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern." Garcetti v. Ceballos, 547 U.S. 410, 417, 126 S. Ct. 1951, 1957 (2006).[13] "A public employee, however, must 'by necessity . . . accept certain limitations on his or her freedom,' because, his or her speech can 'contravene governmental policies or impair the proper performance of governmental functions.'" Weintraub v. Bd. of Educ., 07-2376-cv, --- F.3d ----, 2010 WL 292663 at *3 (2d Cir. Jan. 27, 2010) (quoting Garcetti v. Ceballos, 547 U.S. at 418-19, 126 S. Ct. at 1958). "Accordingly, the Supreme Court has strived 'to arrive at a balance between the interests of the teacher, as a citizen, in commenting on matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.'" Weintraub v. Bd. of Educ., 2010 WL 292663 at *3  (quoting Pickering v. Bd. of Educ., 391 U.S. at 568, 88 S. Ct. at 1734-35).

---

[13]    See, e.g., Connick v. Myers, 461 U.S. 138, 140, 103 S. Ct. 1684, 1686 (1983); Pickering v. Bd. of Educ., 391 U.S. 563, 568, 88 S. Ct. 1731, 1734 (1968); Cobb v. Pozzi, 363 F.3d 89, 101 (2d Cir. 2004); Johnson v. Ganim, 342 F.3d 105, 112 (2d Cir. 2003); Mandell v. County of Suffolk, 316 F.3d 368, 382 (2d Cir. 2003); Morris v. Lindau, 196 F.3d 102, 109 (2d Cir. 1999); Blum v. Schlegel, 18 F.3d 1005, 1010-11 (2d Cir. 1994); Pisano v. Mancone, 08 Civ. 1045, 2009 WL 2337131 at *3 (S.D.N.Y. July 30, 2009) (Chin, D.J.); Ricioppo v. County of Suffolk, No. 04-3630, 2009 WL 577727 at *9 (E.D.N.Y. Mar. 4, 2009), aff'd, 2009 WL 4042877 (2d Cir.  Nov. 24, 2009); DeVittorio v. Hall, 589 F. Supp. 2d 247, 258 (S.D.N.Y. 2008), aff'd, 2009 WL 3109865 (2d Cir.  Sept. 30, 2009); Barry v. N.Y.C. Police Dep't, 01 Civ. 10627, 2004 WL 758299 at *5 (S.D.N.Y. Apr. 7, 2004).

"In Garcetti, the Supreme Court, while keeping these principles in mind, narrowed the Court's jurisprudence in the area of employee speech by further restricting the speech activity that is protected." Weintraub v. Bd. of Educ., 2010 WL 292663 at *4 (citation & quotations omitted). The Garcetti Court instructed that:

> [Supreme Court caselaw] identif[ies] two inquiries to guide interpretation of the constitutional protections accorded to public employee speech. The first requires determining whether the employee spoke as a citizen on a matter of public concern. If the answer is no, the employee has no First Amendment cause of action based on his or her employer's reaction to the speech. If the answer is yes, then the possibility of a First Amendment claim arises. The question becomes whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public. This consideration reflects the importance of the relationship between the speaker's expressions and employment. A government entity has broader discretion to restrict speech when it acts in its role as employer, but the restrictions it imposes must be directed at speech that has some potential to affect the entity's operations.

Garcetti v. Ceballos, 547 U.S. at 418, 126 S. Ct. at 1958 (citations omitted).[14]

> The Supreme Court explained that the purpose of the two part test is

> both to promote the individual and societal interests that are served when employees speak as citizens on matters of public concern and to respect the needs of government employers attempting to perform their important public functions. . . . [W]hile the First Amendment invests public employees with certain rights, it does not empower

---

[14]    Accord, e.g., Sousa v. Roque, 578 F.3d 164, 170 (2d Cir. 2009) ("To determine whether or not a plaintiff's speech is protected, a court must begin by asking 'whether the employee spoke as a citizen on a matter of public concern.' If the court determines that the plaintiff either did not speak as a citizen or did not speak on a matter of public concern, 'the employee has no First Amendment cause of action based on his or her employer's reaction to the speech.'") (quoting Garcetti v. Ceballos, 547 U.S. at 418, 126 S. Ct. at 1958); Healy v. City of N.Y. Dep't of Sanitation, 286 Fed. Appx. 744, 746 (2d Cir. 2008); Woodlock v. Orange Ulster B.O.C.E.S., 281 Fed. Appx. 66, 68 (2d Cir. 2008); Ruotolo v. City of N.Y., 514 F.3d 184, 188 (2d Cir. 2008).

them to "constitutionalize the employee grievance." . . . Restricting speech that owes
its existence to a public employee's professional responsibilities does not infringe any
liberties the employee might have enjoyed as a private citizen. It simply reflects the
exercise of employer control over what the employer itself has commissioned or
created.

Garcetti v. Ceballos, 547 U.S. at 420-22, 126 S. Ct. at 1959-60.

Garcetti did not "articulate a comprehensive framework" for determining whether an

employee speaks pursuant to his official duties, as opposed to as a citizen, but instead instructed that

the test is a "practical one." Garcetti v. Ceballos, 547 U.S. at 424-25, 126 S. Ct. at 1961.[15/]  The

Supreme Court reasoned:

Formal job descriptions often bear little resemblance to the duties an employee
actually is expected to perform, and the listing of a given task in an employee's
written job description is neither necessary nor sufficient to demonstrate that
conducting the task is within the scope of the employee's professional duties for First
Amendment purposes.

Garcetti v. Ceballos , 547 U.S. at 424-25, 126 S. Ct. at 1962.  The Second Circuit recently joined

other circuits in interpreting Garcetti to mean that "speech can be 'pursuant to' a public employee's

official job duties even though it is not required by, or included in, the employee's job description,

or in response to a request by the employer." Weintraub v. Bd. of Educ., 2010 WL 292663 at *6.

While not "articulat[ing] a comprehensive framework," the Garcetti Court provided

the following examples of protected speech: making "public statements outside the course of

---

[15/]    Accord, e.g., Wesolowski v. Bockelmann, No. 07-4175-cv, 2009 WL 3199058 at *2 (2d Cir.
Oct. 7, 2009); Kelly v. Huntington Union Free Sch. Dist., No. 09-CV-2101, - F. Supp. 2d -,
2009 WL 4981182 at *6 (E.D.N.Y. Dec. 23, 2009); Almontaser v. N.Y.C. Dep't of Educ.,
07 Civ. 10444, 2009 WL 2762699 at *3 (S.D.N.Y. Sept. 1, 2009).

performing their official duties," "writing a letter to a local newspaper," and "discussing politics with a co-worker."  <u>Garcetti</u> v. <u>Ceballos</u>, 547 U.S. at 423, 126 S. Ct. at 1961.[16/]  Since <u>Garcetti</u>, some lower courts have considered the following factors, none of which are dispositive, in determining whether speech is made pursuant to a public employee's official duties: "the plaintiff's job description; the persons to whom the speech was directed; and whether the speech resulted from special knowledge gained through the plaintiff's employment." <u>Kelly</u> v. <u>Huntington Union Free Sch. Dist.</u>, 2009 WL 4981182 at *7; <u>Caraccilo</u> v. <u>Village of Seneca Falls, N.Y.</u>, 582 F. Supp. 2d 390, 405 (W.D.N.Y. 2008) ("With respect to whether the employee spoke 'as a citizen,' the court may consider a number of factors, no one of which is necessarily dispositive, including: the plaintiff's job description; the person or persons to whom the plaintiff's speech was directed; and whether the speech resulted from special knowledge gained through the plaintiff's employment."); <u>Gentilello</u> v. <u>Rege</u>, No. 07-CV-1564, 2008 WL 2627685 at *3 (N.D. Tex. June 30, 2008).[17/]

---

[16/]    <u>Accord</u>, <u>e.g.</u>, <u>Davis</u> v. <u>McKinney</u>, 518 F.3d 304, 311 (5th Cir. 2008); <u>Spiegla</u> v. <u>Hull</u>, 481 F.3d 961, 967 (7th Cir.), <u>cert. denied</u>, 552 U.S. 975, 128 S. Ct. 441 (2007); <u>Kelly</u> v. <u>Huntington Union Free Sch. Dist.</u>, 2009 WL 4981182 at *6; <u>Brady</u> v. <u>County of Suffolk</u>, 657 F. Supp. 2d 331, 343 (E.D.N.Y. 2009).

[17/]    The <u>Garcetti</u> Court did "not decide whether its analysis 'would apply in the same manner to a case involving speech related to scholarship or teaching' because '[t]here is some argument that expression related to academic scholarship or classroom instruction implicates additional constitutional interests that are not fully accounted for by this Court's customary employee-speech jurisprudence.'"  <u>Panse</u> v. <u>Eastwood</u>, 303 Fed. Appx. 933, 934 (2d Cir. 2008) (quoting <u>Garcetti</u> v. <u>Ceballos</u>, 547 U.S. at 425, 126 S. Ct. at 1962); <u>Ezuma</u> v. <u>City Univ.</u>, No. 07 Civ. 3561, - F. Supp. 2d -, 2009 WL 3418539 at *14 (E.D.N.Y. Mar. 27, 2009).

"Speech by a public employee is on a matter of public concern if it relates 'to any matter of political, social, or other concern to the community.'"  Johnson v. Ganim, 342 F.3d at 112 (quoting Connick v. Myers, 461 U.S. 138, 146, 103 S. Ct. 1684, 1690 (1983)).[18/]  Thus, "[t]he first part of the inquiry, commonly referred to as the public concern test, serves a gatekeeping function for employee speech claims in federal court.  The First Amendment protects an employee only when he is speaking 'as a citizen upon matters of public concern' as opposed to when he speaks only on matters of personal concern."  Melzer v. Bd. of Educ., 336 F.3d 185, 193 (2d Cir. 2003).  If the speech "is focused on matters personal to the employee, it cannot be classified as being on a matter of public concern and the government, acting as an employer, 'has greater latitude to discipline' the employee."  Johnson v. Ganim, 342 F.3d at 111.[19/]  "In general, an employee's protests about the conditions of his or her own employment situation do not rise to the level of public concern necessary for First Amendment protections to attach."  Munafo v. Metro. Transp. Auth., Nos. 98-

---

[18/]  Accord, e.g., Singh v. City of N.Y., 524 F.3d 361, 372 (2d Cir. 2008); Reuland v. Hynes, 460 F.3d 409, 416 (2d Cir. 2006), cert. denied, 552 U.S. 819, 128 S. Ct. 119 (2007); Catletti v. Rampe, 334 F.3d 225, 229 (2d Cir.  2003); Mandell v. County of Suffolk, 316 F.3d at 383; Morris v. Lindau, 196 F.3d at 110.

[19/]  Accord, e.g., Melzer v. Bd. of Educ., 336 F.3d at 193; Tucker v. N.Y. City, 05 Civ. 2804, 2008 WL 4450271 at *10 (S.D.N.Y. Sept. 30, 2008); Peres v. Oceanside Union Free Sch. Dist., No. 05 Civ. 1807, 2008 WL 305342 at *13 (E.D.N.Y. Jan. 31, 2008); Cahill v. O'Donnell, 75 F. Supp. 2d 264, 272 (S.D.N.Y. 1999) (Parker, D.J.).

CV-4572, 00-CV-0134, 2003 WL 21799913 at *8 (E.D.N.Y. Jan. 22, 2003);[20] accord, e.g., Cahill

v. O'Donnell, 75 F. Supp. 2d at 272.[21]

      "'Whether an employee's speech addresses a matter of public concern must be

determined by the content, form, and context of a given statement, as revealed by the whole record.'"

Johnson v. Ganim, 342 F.3d at 112. (quoting Connick v. Myers, 461 U.S. at 147-48, 103 S. Ct. at

1690).[22]  "While this determination may be somewhat fact-intensive, it presents a question of law

---

[20]    "[M]aking a strictly employment-related complaint on behalf of another does not transform the matter into one of public concern." Munafo v. Metro. Transp. Auth., 2003 WL 21799913 at *8 (citing Nonnenmann v. City of N.Y., 174 F. Supp. 121, 136 (S.D.N.Y. 2001)).

[21]    See also, e.g., Tiltti v. Weise, 155 F.3d 596, 602-03 (2d Cir. 1998) (allegations related to the nature of the work assigned to plaintiffs and their pay were matters of personal interest, not public concern.); Brennan v. Straub, 246 F. Supp. 2d 360, 365-66 (S.D.N.Y. 2003) ("Speech pertaining to internal personnel disputes and working conditions is generally held not to involve matters of public concern."). Moreover, "'[e]ven as to an issue that could arguably be viewed as a matter of public concern, if the employee has raised the issue solely in order to further his own employment interest, his First Amendment right to comment on that issue is entitled to little weight.'" Cahill v. O'Donnell, 75 F. Supp. 2d at 273 (quoting White Plains Towing Corp. v. Patterson, 991 F.2d 1049, 1058 (2d Cir.), cert. denied, 510 U.S. 865, 114 S. Ct. 185 (1993)); see also Blum v. Schlegel, 18 F.3d at 1012 ("It is true that the fact that an employee's speech touches on matters of public concern will not render that speech protected where the employee's motive for the speech is private and personal."). "'A communication by an employee to an employer in the course of the employee's normal duties, in routine form, and containing standard contents, is not likely to address a matter of public concern.'" Cahill v. O'Donnell, 75 F. Supp. 2d at 273.

[22]    Accord, e.g., Singh v. City of N.Y., 524 F.3d at 372; Ruotolo v. City of N.Y., 514 F.3d 184, 189 (2d Cir. 2008); Reuland v. Hynes, 460 F.3d at 418; Konits v. Valley Stream Cent. High Sch. Dist., 394 F.3d 121, 124 (2d Cir. 2005); Melzer v. Bd. of Educ., 336 F.3d at 196; Catletti v. Rampe, 334 F.3d at 229; Pappas v. Giuliani, 290 F.3d 143, 146 (2d Cir. 2002), cert. denied, 539 U.S. 958, 123 S. Ct. 2642 (2003).

for the court to resolve." <u>Johnson</u> v. <u>Ganim</u>, 342 F.3d at 112.[23/]  In making this determination, "'the court should focus on the motive of the speaker, attempting to discern whether the speech was calculated to redress personal grievances or whether it had a broader public purpose.'" <u>Brennan</u> v. <u>Straub</u>, 246 F. Supp. 2d at 366.[24/] Nevertheless, "the Second Circuit [has] clarified that for purposes of <u>Garcetti</u>, 'a speaker's motive is not dispositive.'" <u>Dorcely</u> v. <u>Wyandanch Union Free Sch. Dist.</u>, No. 06 CV 1265, --- F. Supp. 2d ----, 2009 WL 3232866 at *24 (E.D.N.Y. Sept. 30, 2009) (quoting <u>Sousa</u> v. <u>Roque</u>, 578 F.3d at 173-74).

   To establish a prima facie case of First Amendment retaliation, a public employee "must demonstrate that '(1) his speech addressed a matter of public concern, (2) he suffered an adverse employment action, and (3) a causal connection existed between the speech and the adverse employment action, so that it can be said that his speech was a motivating factor in the determination.'" <u>Cobb</u> v. <u>Pozzi</u>, 363 F.3d at 102.[25/]  If a plaintiff satisfies these factors, the

---

[23/]  <u>See also</u>, <u>e.g.</u>, <u>Singh</u> v. <u>City of N.Y.</u>, 524 F.3d at 372; <u>Ruotolo</u> v. <u>City of N.Y.</u>, 514 F.3d at 189; <u>Konits</u> v. <u>Valley Stream Cent. High Sch. Dist.</u>, 394 F.3d at 124; <u>Melzer</u> v. <u>Bd. of Educ.</u>, 336 F.3d at 196; <u>Morris</u> v. <u>Lindau</u>, 196 F.3d at 110; <u>McGuire</u> v. <u>Warren</u>, 490 F. Supp. 2d 331, 338 (S.D.N.Y. 2007); <u>Munafo</u> v. <u>Metro. Transp. Auth.</u>, 2003 WL 21799913 at *7 ("'Whether an employee's speech addresses a matter of public concern is a question of law for the court to decide, taking into account the content, form, and context of a given statement as revealed by the whole record.'"); <u>Walker</u> v. <u>N.Y. City Trans. Auth.</u>, 99 Civ. 3337, 2001 WL 1098022 at *11 (S.D.N.Y. Sept. 19, 2001).

[24/]  <u>Accord</u>, <u>e.g.</u>, <u>Ruotolo</u> v. <u>City of N.Y.</u>, 514, F.3d at 189; <u>Harris</u> v. <u>S. Huntington Sch. Dist.</u>, No. 06-CV-3879, 2009 WL 875538 at *12 (E.D.N.Y. Mar. 30, 2009); <u>McGuire</u> v. <u>Warren</u>, 490 F. Supp. 2d at 338.

[25/]  <u>Accord</u>, <u>e.g.</u>, <u>Woodlock</u> v. <u>Orange Ulster B.O.C.E.S.</u>, 281 Fed. Appx. at 68; <u>Konits</u> v. <u>Valley Stream Cent. High Sch. Dist.</u>, 394 F.3d at 124; <u>Casucci</u> v. <u>Faughnan</u>, 109 Fed. Appx. 450,
                    (continued...)

government can still prevail if it either "(1) demonstrate[s] by a preponderance of the evidence that it would have taken the same adverse action regardless of the protected speech, or (2) show that the plaintiff's expression was likely to disrupt the government's activities, and that the likely disruption was sufficient to outweigh the value of the plaintiff's First Amendment expression." Cobb v. Pozzi, 363 F.3d at 102.[26/]  The second of these options is known as the  "Pickering balancing test." Cobb v. Pozzi, 363 F.3d at 102.  If the government relies on the Pickering balancing test "and the balance of interests indeed weighs in the government's favor, plaintiff may still succeed by proving that the adverse action was in fact motivated by retaliation rather than by fear of disruption." Mandell v. County of Suffolk, 316 F.3d at 383; accord, e.g., Nonnenmann v. City of N.Y., 2004 WL 1119648 at *15.

---

[25/]     (...continued)
451 (2d Cir. 2004); Scott v. Coughlin, 344 F.3d 282, 287 (2d Cir. 2003); Nicholas v. Davis, No. 03-0011, 74 Fed. Appx. 131, 134, 2003 WL 22056224 at *2 (2d Cir. Sept. 4, 2003); Johnson v. Ganim, 342 F.3d at 112; Mandell v. County of Suffolk, 316 F.3d at 382; Diesel v. Town of Lewisboro, 232 F.3d 92, 107 (2d Cir. 2003); Conlon v. Austin, No. 01-9280, 48 Fed. Appx. 816, 817, 2002 WL 31262078 at *1 (2d Cir. Oct. 10, 2002); Morris v. Lindau, 196 F.3d at 110; Blum v. Schlegel, 18 F.3d at 1010; Brescia v. Sia, 07 Civ. 8054, 2008 WL 1944010 at *3 (S.D.N.Y. Apr. 30, 2008); Deans v. Spano,  05 Civ. 7634, 2007 WL 102987 at *3 (S.D.N.Y. Jan. 12, 2007); Barry v. N.Y.C. Police Dep't, 2004 WL 758299 at *5.

[26/]     See also, e.g., Johnson v. Ganim, 342 F.3d at 114; Melzer v. Bd. of Educ., 336 F.3d at 193; Mandell v. County of Suffolk, 316 F.3d at 382-83; Abato v. N.Y.C. Off-Track Betting Corp., 03 Civ. 5849, 2007 WL 1659197 at *6 (S.D.N.Y. June 7, 2007); Forras v. Andros, 470 F. Supp. 2d 283, 289-90 (S.D.N.Y. 2005), appeal dismissed, 184 Fed.  Appx.  33 (2d Cir. 2006); Barry v. N.Y.C. Police Dep't, 2004 WL 758299 at *5.

_____**B.**      **Application to Plaintiffs' Claims**

1.      **Twana Adams**

Adams alleges that after she complained to her principal and at meetings about her school's "deplorable conditions" and unruly students and the need for "intervention," her principal spoke "despairingly to her person," "stag[ed]" multiple visits to her classroom and tried to block her from obtaining a particular transfer position.  (See pages 7-8 above.)

Adams' complaints do not amount to protected speech because she made these complaints pursuant to her official job responsibilities as a teacher rather than as a citizen.  Her complaints concerned the students' safety and behavior, which are responsibilities that are "quintessentially those of a teacher."   Felton v. Katonah Lewisboro Sch. Dist., No. 08 Civ. 9340, 2009 WL 2223853 at *5 (S.D.N.Y. July 27, 2009) (plaintiffs spoke pursuant to their official duties as educators rather than as citizens where their statements "concerned solely their classroom and their students and were addressed to their direct supervisors" and noting that the case law "recognize[s] that these responsibilities – ensuring that a classroom is well supplied, safe, and conducive to learning and that the curriculum is substantively appropriate – are quintessentially those of a teacher. . . ."); accord, e.g., Weintraub v. Bd. of Educ., 07-2376-cv, --- F.3d ----, 2010 WL 292663 at *6 (2d Cir. Jan. 27, 2010) (Plaintiff teacher's "grievance was 'pursuant to' his official duties because it was 'part-and-parcel of his concerns' about his ability to 'properly execute his duties,' as a public school teacher – namely, to maintain classroom discipline, which is an indispensable pre-requisite to effective teaching and classroom learning. . . . [Plaintiff's] speech

challenging the school administration's decision to not discipline a student in his class was a 'means to fulfill,' and 'undertaken in the course of performing,' his primary employment responsibility of teaching.") (citations omitted); Woodlock v. Orange Ulster B.O.C.E.S., 281 Fed. Appx. 66, 68 (2d Cir. 2008) ("[Plaintiff]'s communications regarding [a student] and the lack of physical education and art classes at the Cornwall satellite were made pursuant to her 'official duties' as a special education counselor, in which capacity she was responsible for monitoring her students' behavior, needs, and progress.  In reporting her concerns she was 'perform[ing] the tasks [s]he was paid to perform.'") (citation omitted); Dorcely v. Wyandanch Union Free Sch. Dist., No. 06 CV 1265 , - F. Supp. 2d -, 2009 WL 3232866 at *25  (E.D.N.Y. Sept. 30, 2009) ("The substance of Plaintiff's complaints concerning the lack of sufficient educational and instructional resources and the appropriateness of the counseling curriculum are matters relating to [plaintiff]'s own job responsibilities as an educator and school psychologist, and therefore is unprotected speech."); Rodriguez v. Int'l Leadership Charter Sch., 08 Civ. 1012, 2009 WL 860622 at *1, 3-4 (S.D.N.Y. Mar. 30, 2009) (Where plaintiff, who was a special education teacher, wrote a letter to the Department of Education about her school's failure to provide special needs students "with certain educational services to which they were legally entitled," plaintiff made her complaints "in an official capacity, not as a private citizen on a matter of public interest.").

Furthermore, Adams made the complaints to her principal, who was her direct supervisor, rather than to the public.  E.g., Dorcely v. Wyandanch Union Free Sch. Dist., 2009 WL 3232866 at *25 (Plaintiff's having made his complaints to his supervisor and then to the district

superintendent was a significant factor weighing in favor of finding that plaintiff acted pursuant to official responsibilities rather than as a citizen.); <u>Felton</u> v. <u>Katonah Lewisboro Sch. Dist.</u>, 2009 WL 2223853 at *5 (Addressing one's speech to "direct supervisors" weighs in favor of finding that the employee spoke pursuant to official job responsibilities rather than as a teacher.); <u>Caraccilo</u> v. <u>Vill. of Seneca Falls</u>, 582 F. Supp. 2d 390, 410 (W.D.N.Y. 2008) ("[T]he reported cases 'are consistent in holding that when a public employee raises complaints or concerns up the chain of command at his workplace about his job duties, that speech is undertaken in the course of performing his job.'").

  Adams also alleges that after she wrote "several memos" to the Deputy Director of Human Resources about the "blatant discriminatory treatment" and "Ms. Anithexz yelling at . . . Adams in front of office staff," City Defendants called the police to "rush" Adams out of the TRC and transferred Adams to a different TRC.  (<u>See</u> page 9 above.)  Adams' grievances about how the DOE treated her in the TRC did "not amount to speech as [a] 'citizen[] for First Amendment purposes.'"  <u>Loris</u> v. <u>Moore</u>, No. 08-4637-CV, 2009 WL 2778443 at *2 (2d Cir. Sept. 3, 2009); <u>accord</u>, <u>e.g.</u>, <u>Garcetti</u> v. <u>Ceballos</u>, 547 U.S. 410, 420, 126 S. Ct. 1951, 1959 (2006) ("Underlying our cases has been the premise that while the First Amendment invests public employees with certain rights, it does not empower them to 'constitutionalize the employee grievance.'"); <u>Weintraub</u> v. <u>Bd. of Educ.</u>, 2010 WL 292663 at *4, 6 (Plaintiff spoke pursuant to his official duties when he filed a "grievance with his union to complain about his supervisor's failure to discipline a child in his classroom." "Our conclusion that [plaintiff] spoke pursuant to his job duty is supported by the fact that his speech ultimately took the form of an employee grievance, for which there is no relevant

55

citizen analogue."); Ruotolo v. City of N.Y., 514 F.3d 184, 189 (2d Cir. 2008) ("The heart of the matter is whether the employee's speech was 'calculated to redress personal grievances or whether it had a broader public purpose.'"); Gangadeen v. City of N.Y., 654 F. Supp. 2d 169, 185 (S.D.N.Y. 2009) (Plaintiff made her complaints to her supervisor about the lack of training and request for a transfer pursuant to her official duties rather than as a citizen); Caraccilo v. Vill. of Seneca Falls, 582 F. Supp. 2d at 410 ("[T]he reported cases are consistent in holding that when a public employee raises complaints or concerns up the chain of command at his workplace about his job duties, that speech is undertaken in the course of performing his job.") (quotations & citation omitted).

Accordingly, Adams' First Amendment retaliation claims should be DISMISSED.

## 2.     Josephina Cruz

Cruz alleges that after she complained about classroom overcrowding and teacher schedules, she received "inequitable teaching assignments."  (See pages 11-13 above.)  Cruz made her complaints pursuant to her official job responsibilities as a teacher rather than as a citizen because "ensuring that [the] classroom [was] . . .  conducive to learning," is  "quintessentially" a responsibility of a teacher.  Felton v. Katonah Lewisboro Sch. Dist., No. 08 Civ. 9340, 2009 WL 2223853 at *5 (S.D.N.Y. July 27, 2009); see cases cited at pages 52-53 above.  Furthermore, Cruz's complaints did not address a matter of public concern, but instead concerned her personal grievances with her schedule and the number of children in her classroom.  (See cases cited at pages 54-55 above.)

Cruz also alleges that after she filed a "grievance[]" based on her "inequitable teaching assignments," she received "'unsatisfactory'" ratings and a "considerably worse schedule," her principal subjected her to observations, "[h]er locker was taken away" and the DOE's payroll secretary failed to provide the proper medical insurance forms to her doctor.  (See page 13 above.) Cruz's filing of a grievance about her work assignment did "not amount to speech as [a] 'citizen for First Amendment purposes.'"  Loris v. Moore, No. 08-4637-CV, 2009 WL 2778443 at *2 (2d Cir. Sept. 3, 2009); see, e.g., Weintraub v. Bd. of Educ., 07-2376-cv, --- F.3d ----, 2010 WL 292663 at *7 (2d Cir. Jan. 27, 2010) ("The lodging of a union grievance is not a form or channel of discourse available to non-employee citizens, . . . . Rather than voicing his grievance through channels available to citizens generally, [plaintiff] made an internal communication made pursuant to an existing dispute-resolution policy established by his employer, the Board of Education.  As with speech at issue in Garcetti, [plaintiff] could only speak in the manner that he did by filing a grievance with this teacher's union as a public employee.  His grievance filing, therefore, lacked a relevant analogue to citizen speech and 'retain[ed no] possibility' of constitutional protection.") (citations omitted); see also cases cited at pages 54-55 above.

Accordingly, Cruz's First Amendment retaliation claims should be DISMISSED.

**3.     Michael Ebewo**

Ebewo alleges that after he "refused to . . . keep his mouth shut about policies he knew to be wrong and detrimental [to] the students, the faculty, the school and the public education system itself," principal Nelson began consistently rating Ebewo as unsatisfactory.  (See pages 18-19

above.)  Ebewo's speech essentially focused on how the school was running and the school's curriculum, which are concerns that are "quintessentially those of a teacher." <u>Felton</u> v. <u>Katonah Lewisboro Sch. Dist.</u>, No. 08 Civ. 9340, 2009 WL 2223853 at *5 (S.D.N.Y. July 27, 2009); <u>see</u> cases cited at pages 52-53 above.  Accordingly, because Ebewo was not speaking as private citizen but rather pursuant to his official job responsibilities as a teacher, Ebewo's claim should be <u>DISMISSED</u>.

### 4.     **Joann Hart**

Hart failed to allege any speech or any retaliation based on speech.  (<u>See</u> pages 20-23 above.)  Thus, her First Amendment retaliation claim should be <u>DISMISSED</u>.

### 5.     **Julianne Polito**

Polito alleges that she "spoke out against" superintendent Penzell's "openly hostile, aggressive and antagonistic" behavior and "repeated violations of privacy and other rights in interviews and staff meetings."  (<u>See</u> pages 23-24 above.)  Polito's grievances to Penzell about how he treated her personally "d[o] not amount to speech as [a] 'citizen for First Amendment purposes.'" <u>Loris</u> v. <u>Moore</u>, No. 08-4637-CV, 2009 WL 2778443 at *2 (2d Cir. Sept. 3, 2009); <u>see</u> cases cited at pages 54-55 above.   Accordingly, Polito's First Amendment retaliation claim should be <u>DISMISSED</u>.

### 6.     **Thomasina Robinson**

Robinson alleges that after she commented at a Consultative Council meeting that the DOE's guidelines concerning grading student attendance "did not comply with State

requirements," the DOE charged her with "'Corporal Punishment/Verbal Abuse.'" (See pages 26-27 above.)  As the physical education department representative at the Consultative Council meeting, Robinson had a professional duty to attend to her students' educational needs and the concerns of the teachers that she represented.  (See Dkt. No. 94: 2d Am. Compl. ¶ 399 ("As a member of the Consultative Council committee, Plaintiff Robinson sought to collaborate and work with her principal to clarify policies as they related to the department and to insure that the proposed changes were in compliance with the state regulations.").)  Thus, when Robinson complained at the meeting, she did so in her official capacity as the physical education department representative, not as a private citizen on a matter of public interest.  E.g., Rodriguez v. Int'l Leadership Charter Sch., 08 Civ. 1012, 2009 WL 860622 at *3-4 (S.D.N.Y. Mar. 30, 2009) (When plaintiff wrote a letter to the Department of Education detailing her concerns that her school was failing "to provide . . . special needs students with certain educational services to which they were legally entitled," the court held that, "[a]s a teacher assigned to special needs students, [plaintiff] had a professional duty to attend to her students' educational needs. When she complained to [her school] and, eventually, to the Department of Education that these needs were not being met, she did so in an official capacity, not as a private citizen on a matter of public interest."); Shums v. N.Y.C. Dep't of Educ., No. 04-CV-4589, 2009 WL 750126 at *14-15 ( E.D.N.Y. Mar. 17, 2009) (Plaintiff acted pursuant to her official responsibilities as an English as a second language teacher rather than as a citizen when she wrote a letter to her supervisor stating that the students' schedule did not provide them with "the legally required amount of instruction because it failed to account for the time it took to pull students

out of their regular classrooms and situate them in plaintiff's instruction area. . . . [P]laintiff's duties included making sure that students received the requisite ESL instruction . . . . [T]hough some of plaintiff's statements may touch upon matters of public concern, . . . [plaintiff's] concern [wa]s administrative in nature, and weighs further in favor of the holding that plaintiff's letter was written as an employee."); see also cases cited at pages 52-53 above.

      Accordingly, Robinson's First Amendment retaliation claim should be DISMISSED.

**7.    Brandi Dawn Scheiner**

      Scheiner alleges that as a result of filing DOE "grievances" and an NYSDHR charge concerning her principal's "improper conduct" towards her, her principal rated her "unsatisfactory" during the 2005-2006 school year, assigned her to teach pre-kindergarten rather than second grade, scheduled her fewer preparation periods, constantly critiqued her about "'snack time' or 'dismissal time' problems" and accused her of verbally abusing students and engaging in corporal punishment. (See pages 28-29 above.) Scheiner's grievances about how her principal personally treated her in her capacity as a teacher do not amount to speech as a citizen for First Amendment purposes. (See cases cited at pages 54-55 above.)

      Scheiner also alleges that when she "started to speak out" against the DOE's policies concerning tenured teachers and the "injustices of the" TRCs, the "DOE increased [its] effort to intimidate, retaliate against and harass" her. (See page 30 above.) Because Scheiner's complaints only concerned the conditions under which the DOE forced her and other teachers to work, she was speaking pursuant to her official responsibilities as a teacher rather than as a citizen. E.g., Sousa v.

Roque, 578 F.3d 164, 173-74 (2d Cir. 2009) ("[S]peech on a purely private matter, such as an employee's dissatisfaction with the conditions of his employment, does not pertain to a matter of public concern. . . . An employee who complains solely about his own dissatisfaction with the conditions of his own employment is speaking upon matters only of personal interest.") (quotations & citations omitted); Ruotolo v. City of N.Y., 514 F.3d 184, 190 (2d Cir. 2008) ("As the Eleventh Circuit observed, '[a] public employee may not transform a personal grievance into a matter of public concern by invoking a supposed popular interest in the way public institutions are run.'"); Grillo v. N.Y.C. Transit Auth., 291 F.3d 231, 235-36 (2d Cir. 2002) (dismissing plaintiff's First Amendment retaliation claim where there was "no evidence that these statements were uttered for any other reason than to protect [his] own rights or to air his personal grievances"); Dorcely v. Wyandanch Union Free Sch. Dist., 06 CV 1265, - F. Supp. 2d -, 2009 WL 3232866 at *25 (E.D.N.Y. Sept. 30, 2009) (plaintiff's challenge at his Board of Education hearing to the superintendent's recommendation for termination "focused entirely on his individual situation at the Middle School" and thus "his speech in connection with his successful challenge was not of a public concern and is not protected for purposes of his First Amendment retaliation claim."); Harris v. S. Huntington Sch. Dist., No. 06-CV-3879, 2009 WL 875538 at *13 (E.D.N.Y. Mar. 30, 2009) (Although plaintiff's complaint dealt with defendant violating the civil service law by promoting another employee, plaintiff's complaint did not address a matter of public concern because his letter, "which is filled with references to his desire and qualifications for the Lead IMC Technician position, demonstrates that plaintiff was more concerned with the fact that he was passed over for a promotion."); Ricioppo

v. County of Suffolk, Civil Action No. 04-3630, 2009 WL 577727 at *12 (E.D.N.Y. Mar. 4, 2009)

("Plaintiff's memorandum[, which] was manifestly calculated to address his personal grievance, i.e.,

his termination," "was not on a matter of public concern."), aff'd, 2009 WL 4042877 (2d Cir.

Nov. 24, 2009); Caraccilo v. Vill. of Seneca Falls, 582 F. Supp. 2d 390, 410 (W.D.N.Y.2008)

("[T]he reported cases are consistent in holding that when a public employee raises complaints or

concerns up the chain of command at his workplace about his job duties, that speech is undertaken

in the course of performing his job.") (quotation & citation omitted); Witt v. Moffe, No. 03-CV-397,

2008 WL 324255 at *20 (W.D.N.Y. Feb. 6, 2008) (Plaintiff's "complaints about [defendant] were

clearly made in an attempt to improve her individual work environment. As a result, her complaints

are not entitled to constitutional protection."); Kelly v. City of Mount Vernon, 344 F. Supp. 2d 395,

402 (S.D.N.Y. 2004) ("[S]peech that relates primarily to matters of personal interest or internal

office affairs, in which the individual speaks as an employee rather than as a citizen, will not support

a First Amendment retaliation claim.").

Plaintiffs' First Amendment retaliation claim should be DISMISSED.

## IV.   PLAINTIFFS' DUE PROCESS CLAIMS SHOULD BE DISMISSED

### A.   Legal Principles of Due Process Claims

In order to formulate a claim under the Fourteenth Amendment's Due Process Clause,

a plaintiff must demonstrate that he or she possesses a constitutionally protected liberty or property

interest, and that state action has deprived him or her of that interest.  See U.S. Const. amend. XIV,

§ 1; see also, e.g., Bd. of Regents v. Roth, 408 U.S. 564, 569, 92 S. Ct. 2701, 2705 (1972) ("The

requirements of procedural due process apply only to the deprivation of interests encompassed by the Fourteenth Amendment's protection of liberty and property.").[27/] Courts "examine procedural due process questions in two steps: the first asks whether there exists a liberty or property interest which has been interfered with by the State; the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient." Ky. Dep't of Corr. v. Thompson, 490 U.S. 454, 460, 109 S. Ct. 1904, 1908 (1989) (citation omitted).[28/]

"Property interests . . . are not created by the Constitution. Rather they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law-rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." Bd. of Regents v. Roth, 408 U.S. 564, 577, 92 S. Ct. 2701, 2709 (1972).[29/] "To have a property interest in a benefit, a person clearly must have more than an abstract

---

[27/]    Accord, e.g., Arteta v. County of Orange, 141 Fed. Appx. 3, 6 (2d Cir. 2005); Rojas-Reyes v. I.N.S., 235 F.3d 115, 124 (2d Cir. 2000); Coggins v. County of Nassau, No. 07-CV-3624, 2009 WL 29310 at *13 (E.D.N.Y. Jan. 5, 2009); Okolie v. Paikoff, 589 F. Supp. 2d 204, 213 (E.D.N.Y. 2008); Anemone v. Metro. Transp. Auth., 410 F. Supp. 2d 255, 268 (S.D.N.Y. 2006); Cassidy v. Scoppetta, 365 F. Supp. 2d 283, 286 (E.D.N.Y. 2005).

[28/]    Accord, e.g., Ciambriello v. County of Nassau, 292 F.3d 307, 313 (2d Cir. 2002); Valmonte v. Bane, 18 F.3d 992, 998 (2d Cir. 1994); Hernandez v. Coughlin, 18 F.3d 133, 136 (2d Cir.), cert. denied, 513 U.S. 836, 115 S. Ct. 117 (1994); Finch v. N.Y.S. Office of Children & Family Servs., 04 Civ. 1668, 2008 WL 5330616 at *2 (S.D.N.Y. Dec. 18, 2008); Mental Hygiene Legal Serv. v. Spitzer, 07 Civ. 2935, 2007 WL 4115936 at *4 (S.D.N.Y. Nov. 16, 2007), aff'd, No. 07-5548, 2009 WL 579445 (Mar. 4, 2009); Jackson v. Roslyn Bd. of Educ., 438 F. Supp. 2d 49, 53 (E.D.N.Y. 2006); Andree v. County of Nassau, 311 F. Supp. 2d 325, 335 (E.D.N.Y. 2004).

[29/]    Accord, e.g., Rolon v. Henneman, 517 F.3d 140, 148 (2d Cir. 2008); DSI Assocs. LLC v. United States, 496 F.3d 175, 186 n.16 (2d Cir. 2007); Velez v. Levy, 401 F.3d 75, 85 (2d Cir.
(continued...)

need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." Bd. of Regents v. Roth, 408 U.S. at 577, 92 S. Ct. at 2709; see also, e.g., Perry v. Sindermann, 408 U.S. 593, 601, 92 S. Ct. 2694, 2699 (1972) ("A person's interest in a benefit is a 'property' interest for due process purposes if there are such rules or mutually explicit understandings that support his claim of entitlement to the benefit and that he may invoke at a hearing.").[30] "While state law creates the underlying substantive interest the plaintiff seeks to vindicate, 'federal constitutional law determines whether that interest rises to the level of a "legitimate claim of entitlement" protected by the Due Process Clause.'" DSI Assocs. LLC v. United States, 496 F.3d at 186 n.16 (quoting Memphis Light, Gas & Water Div. v. Craft, 436 U.S. 1, 98 S. Ct. 1554, 1560 (1978)).

The second step of any Due Process analysis "asks what process was due to the plaintiff, and inquires whether that constitutional minimum was provided in the case under review."

---

[29]     (...continued)
2005); Ricioppo v. County of Suffolk, No. 04-3630, 2009 WL 577727 at *15 (E.D.N.Y. Mar. 4, 2009), aff'd, 2009 WL 4042877 (2d Cir. Nov. 24, 2009); Cooper v. Metro. Transp. Auth., 04 Civ. 525, 2006 WL 1975936 at *5 (S.D.N.Y. July 14, 2006); Ford Motor Credit Co. v. N.Y.C. Police Dep't, 394 F. Supp. 2d 600, 609 (S.D.N.Y. 2005), aff'd, 503 F.3d 186 (2d Cir. 2007).

[30]     Accord, e.g., Velez v. Levy, 401 F.3d at 85 ("[O]nly where a plaintiff can demonstrate that state law confers 'a legitimate claim of entitlement' to a particular position will a property interest in that position arise."); Goetz v. Windsor Cent. Sch. Dist., 698 F.2d 606, 608 (2d Cir. 1983) ("In deciding whether a person possesses a property interest a court must carefully sift through abstract needs and unilateral expectations until it locates a legitimate claim of entitlement."); Elliot v. City of N.Y., 06 Civ. 296, 2008 WL 4178187 at *6 (S.D.N.Y. Sept. 8, 2008); Assoko v. City of N.Y., 539 F. Supp. 2d 728, 737 (S.D.N.Y. 2008); Howard v. Town of Bethel, 481 F. Supp. 2d 295, 305 (S.D.N.Y. 2007).

Narumanchi v. Bd. of Trs. of Conn. State Univ., 850 F.2d 70, 72 (2d Cir. 1988) (citing Mathews v.

Eldridge, 424 U.S. 319, 333-34, 96 S. Ct. 893, 902 (1976)).[31]  "An essential principle of due process

is that a deprivation of life, liberty, or property 'be preceded by notice and opportunity for hearing

appropriate to the nature of the case.'" Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 542, 105

S. Ct. 1487, 1493 (1985) (quoting Mullane v. Cent. Hanover Bank & Trust Co., 339 U.S. 306, 313,

70 S. Ct. 652, 656-57 (1950)).[32]  "Due process requires, as a general matter, an 'opportunity to be

heard "at a meaningful time and in a meaningful manner."'" Calhoun v. N.Y.S. Div. of Parole

Officers, 999 F.2d 647, 653 (2d Cir.1993) (quoting Mathews v. Eldridge, 424 U.S. at 333, 96 S. Ct.

at 902).[33]  In particular, "[t]he tenured public employee is entitled to oral or written notice of the

charges against him, an explanation of the employer's evidence, and an opportunity to present his

side of the story." Cleveland Bd. of Educ. v. Loudermill, 470 U.S. at 546, 547-48, 105 S. Ct. at

---

[31]    Accord, e.g., Siino v. Bd. of Trs. of N.Y.C. Teachers' Ret. Sys., 08 Civ. 4529, 2009 WL
        166557 at *3 (S.D.N.Y. Jan. 26, 2009); Boss v. Kelly, 07 Civ. 2113, 2007 WL 2412261 at
        *3 (S.D.N.Y. Aug. 23, 2007) (Stein, D.J.), aff'd, 306 Fed. Appx. 649 (2d Cir. 2009); Gansas
        v. City of N.Y., No. 05-CV-5484, 2006 WL 2166869 at *5 (E.D.N.Y. July 31, 2006), aff'd,
        240 Fed. Appx. 435 (2d Cir. 2007); Chandler v. Moran, 03 Civ. 2024, 2005 WL 2249779 at
        *6 (S.D.N.Y. Apr. 25, 2005).

[32]    Accord, e.g., Siino v. Bd. of Trs. of N.Y.C. Teachers' Ret. Sys., 2009 WL 166557 at *3;
        DeMasi v. Benefico, 567 F. Supp. 2d 449, 454 (S.D.N.Y. 2008); Tavarez v. State of N.Y.
        Office of Parks, Recreation & Historic Pres., 04 Civ. 9541, 2007 WL 945383 at *5 (S.D.N.Y.
        Mar. 28, 2007); Dinsey v. Dep't of Homeland Sec.-U.S. Citizenship & Immigration Servs.,
        03 Civ. 10081, 2004 WL 1698630 at *4 (S.D.N.Y. July 28, 2004).

[33]    Accord, e.g., Palkovic v. Johnson, 281 Fed. Appx. 63, 66 (2d Cir. 2008); Gansas v. City of
        N.Y., 2006 WL 2166869 at *6; Bicaj v. Ashcroft, 01 Civ. 11568, 2003 WL 21355488 at *4
        (S.D.N.Y. June 11, 2003).

1495-96 ("We conclude that all the process that is due is provided by a pretermination opportunity to respond, coupled with post-termination administrative procedures . . .").[34]

The Second Circuit has stated:

> When reviewing alleged procedural due process violations, the Supreme Court has distinguished between (a) claims based on established state procedures and (b) claims based on random, unauthorized acts by state employees.  In the latter case, the Due Process Clause of the Fourteenth Amendment is not violated when a state employee intentionally deprives an individual of property or liberty, so long as the State provides a meaningful postdeprivation remedy.  When the deprivation occurs in the more structured environment of established state procedures, rather than random acts, the availability of postdeprivation procedures will not, ipso facto, satisfy due process.

Hellenic Am. Neighborhood Action Comm. v. City of N.Y., 101 F.3d 877, 880 (2d Cir. 1996) (citations omitted), cert. dismissed, 521 U.S. 1140, 118 S. Ct.  15 (1997).[35]

## B.    Plaintiffs' Due Process Claim Against City Defendants Should be Dismissed

Plaintiffs claim that City Defendants deprived them of their due process rights to "fair and impartial" 3020-a hearings by "negotiating Article 21G in contravention of NYS Education Law

---

[34]    Accord, e.g., Locurto v. Safir, 264 F.3d 154, 171, 173-74 (2d Cir.  2001) ("When such a [tenured] public employee is terminated, procedural due process is satisfied if the government provides notice and a limited opportunity to be heard prior to termination, so long as a full adversarial hearing is provided afterwards."); Chernoff v. City of N.Y., No. 06-CV-2897, 2009 WL 816474 at *3 (E.D.N.Y. Mar. 26, 2009); DeMasi v. Benefico, 567 F. Supp. 2d at 454.

[35]    Accord, e.g., Rivera-Powell v. N.Y.C. Bd. of Elections, 470 F.3d 458, 465 (2d Cir. 2006); DeMasi v. Benefico, 567 F. Supp. 2d 449, 455 (S.D.N.Y. 2008); Buonanotte v. Noonan, 534 F. Supp. 2d 385, 392 (E.D.N.Y. 2008); Murawski v. Pataki, 514 F. Supp. 2d 577, 585 (S.D.N.Y. 2007); Ridgeview Partners, LLC v. Entwistle, 354 F. Supp. 2d 395, 401 (S.D.N.Y. 2005).

§§ 3020 and 3020-a." (<u>See</u> pages 1-2 above.)

    1.    <u>**Property Interest**</u>

        Plaintiffs claim that their status as tenured teachers is the relevant property interest that City Defendants have denied them by negotiating Article 21G in contravention to § 3020-a. (<u>See</u> Dkt. No. 94: 2d Am. Compl. ¶ 598; Dkt. No. 174: Pls. Opp. Br. at 48.)  Plaintiffs are correct (and Defendants do not dispute) that their status as tenured teachers provides them with a constitutionally protected property interest in their continued employment.  <u>See</u>, <u>e.g.</u>, <u>Harhay</u> v. <u>Town of Ellington Bd. of Educ.</u>, 323 F.3d 206, 212-13 (2d Cir. 2003) ("This Circuit . . . has held that tenured public employees have a constitutionally protected property interest in their employment."); <u>Ciambriello</u> v. <u>County of Nassau</u>, 292 F.3d 307, 313-14 (2d Cir. 2002); <u>Hawkins</u> v. <u>Steingut</u>, 829 F.2d 317, 321 (2d Cir. 1987); <u>Banigo</u> v. <u>Bd. of Educ. of Roosevelt Union Free Sch. Dist.</u>, No. 06-4792, 2009 WL 577974 at *9 (E.D.N.Y. Mar. 4, 2009) ("It has been held that a public school teacher has a property interest in his or her tenure and cannot be fired without due process."); <u>Rosendale</u> v. <u>Mahoney</u>, 04 Civ. 1966, 2008 WL 2061266 at *6 (S.D.NY. Mar. 27, 2008) ("In the context of employment, 'there appears to be general agreement that a property interest arises only when an individual possesses a legitimate claim of entitlement to continued job tenure.'") (citation & quotation omitted), <u>report & rec. adopted</u>, 2008 WL 2061267 (S.D.N.Y. May 12, 2008); <u>Ramberran</u> v. <u>Dellacona</u>, No. 07-CV-304, 2008 WL 905217 at *4 (E.D.N.Y. Mar. 31, 2008) (Plaintiff "has a property right in his employment as a tenured teacher.").  Plaintiffs' property interest in their tenured status is sufficient to trigger due process rights.

2.      **Process That Is Due**

Plaintiffs argue that Article 21G of the Collective Bargaining Agreement between the

DOE and United Federation of Teachers ("UFT"), which modifies Education Law § 3020-a,

violates plaintiffs' due process rights.[36/]   (See pages 1-2 above; see also Dkt. No. 157: Greenfield Aff.

Ex. L: DOE and UFT Collective Bargaining Agreement Article 21.)

To the extent that plaintiffs claim that they are legally entitled to the specific

procedures provided for in § 3020-a, that claim is meritless because § 3020(4)(a) authorizes the DOE

and the UFT to enter into a collective bargaining agreement modifying the procedures set forth in

§ 3020-a as long as such modification ensures that tenured teachers are not "disciplined or removed

during a term of employment except for just cause."  Educ. Law § 3020(4)(a).  Thus, the Court need

only consider whether the modified procedures provided for in Article 21G violate plaintiffs' due

process rights.

_____

[36/]    Notably, plaintiffs do not claim that the procedures provided for in Education Law §§ 3020
and 3020-a do not provide adequate due process.  Even if plaintiffs had made such a claim,
that claim would be meritless because "it is well established that the disciplinary procedures
outlined in § 3020-a provide 'more than adequate procedural safeguards to satisfy the
plaintiff[s'] due process rights under the Fourteenth Amendment.'"  Cozzi v. Great Neck
Union Free Sch. Dist., No. 05-cv-1389, 2009 WL 2602462 at *13 (E.D.N.Y. Aug. 21, 2009);
see also, e.g., Jacobs v. Mostow, 271 Fed. Appx. 85, 89 (2d Cir. 2008) (holding that § 3020-a
is not "inadequate to satisfy the requirements of due process"); Roemer v. Bd. of Educ., 150
Fed. Appx. 38, 40 (2d Cir. 2005) ("summarily reject[ing plaintiff's] facial challenge" to
§ 3020-a because § 3020-a "provides all the process due"), cert. denied, 549 U.S. 884, 127
S. Ct. 370 (2006); Ramberran v. Dellacona, No. 07-CV-304, 2008 WL 905217 at *4
(E.D.N.Y. Mar. 31, 2008) ("[T]he procedures outlined by § 3020-a of the Education Law,
when followed, are 'more than adequate procedural safeguards to satisfy the plaintiff's due
process rights under the Fourteenth Amendment.'"); Montefusco v. Nassau County, 39 F.
Supp. 2d 231, 239-40 (E.D.N.Y.1999).

Plaintiffs claim that the following Article 21G modifications violate their due process rights:  (1) replacing the three-member panel with a single hearing officer; (2) providing for an "expedited hearing process" where the DOE seeks to discipline teachers for absences or lateness and does not seek to terminate them;[37] and (3) implementing a "permanent rotational panel" of hearing officers who are allowed to serve "excessive periods of time" and earn up to $1900 per day. (Dkt. No. 94: 2d Am. Compl. ¶¶ 540, 592, 594.)

Replacing the three-member panel with a single hearing officer and implementing a "permanent rotational panel," neither affects whether a tenured teacher receives "oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story," as due process requires.  Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 546, 547-48, 105 S. Ct. 1487, 1495-96 (1985) ("We conclude that all the process that is due is provided by a pretermination opportunity to respond, coupled with post-termination administrative procedures . . ."); accord, e.g., Jacobs v. Mostow, 271 Fed. Appx. at  89 (failure to provide plaintiff with a three-member panel at the § 3020-a hearing does not violate due process). In fact, Article 21G leaves unchanged § 3020-a(3)(c), which provides tenured teachers with a "reasonable opportunity to defend [themselves] . . . [,] an opportunity to testify in [their] own behalf[,] . . . the right to be represented by counsel, to subpoena witnesses, . . . to cross-examine witnesses" and to have all testimony taken under oath.  Educ. Law § 3020-a(3)(c).

---

[37]    None of the plaintiffs allege that the DOE is seeking an expedited hearing to discipline them for tardiness or lateness.  (See pages 7-30 above.)  Thus, the Court will not address plaintiffs' argument that the expedited hearings violate their due process rights.

Accordingly, plaintiffs' due process against the City Defendants claim should be

DISMISSED.

**C.    To the Extent that Plaintiffs' Due Process Claim Against State Defendants is Not Barred by the Eleventh Amendment, It Should be Dismissed as Meritless**

Plaintiffs claim that State Defendants violated their Fourteenth Amendment due process rights by employing and failing to supervise "Hearing Officers" who failed to comply with Education Law §§ 3020 and 3020a, 8 NYCRR § 82-1 and the "Arbitration Contract." (See page 2 above.)  In addition to the Eleventh Amendment bar to this claim (see Point II above), it also should be dismissed as meritless.  Only Cruz, Hart and Adams have alleged that their hearings have concluded, and, thus, the other plaintiffs do not have standing to challenge the hearing officers' behavior. (See pages 10, 16-17, 20, 22, 24-26, 26-28, 28-30 above; see also Dkt. No. 107: City Defs. Ans. Ex. A: Cruz  § 3020-a Opinion & Award; City Defs. Ans. Ex. C: Hart § 3020-a Opinion & Award.)  As to Cruz, Hart and Adams, their claims about how the hearing officers violated their due process rights by failing to follow state law and procedure amounts to a complaint about "random, unauthorized acts by state employees." Hellenic Am. Neighborhood Action Comm. v. City of N.Y., 101 F.3d 877, 880 (2d Cir. 1996) (Where a plaintiff complains about "random, unauthorized acts by state employees, . . . the Due Process Clause of the Fourteenth Amendment is not violated . . . so long as the State provides a meaningful postdeprivation remedy."), cert. dismissed, 521 U.S. 1140, 118 S. Ct.  15 (1997).  Education Law § 3020-a(5) provides tenured teachers with a "meaningful postdeprivation remedy" by permitting them to appeal a "hearing officer's decision" by filing an Article 75 petition in New York State Supreme Court.  Educ. Law § 3020-a(5); see, e.g., Massi v.

Flynn, No. 08-5588-cv, 2009 WL 4042903 at *2 (2d Cir. Nov. 24, 2009) (Plaintiff "did receive a hearing [before he was suspended without pay] and has challenged the result of that hearing by bringing an Article 78 proceeding – an adequate pre- and post-deprivation procedure available under New York law."); Chaffer v. Bd. of Educ., 75 Fed. Appx. 12, 13 & n.** (2d Cir. 2003) ("Article 78 provides an adequate post-deprivation remedy sufficient to satisfy procedural due process requirements" where plaintiff had a hearing before the school board terminated him.  "[T]he availability of a post-termination Article 78 proceeding where a public employee has been provided with notice and a pre-termination hearing provides adequate due process protection regardless of whether the alleged misconduct is 'random and unauthorized.'"); Whiting v. Old Brookville Bd. of Police Comm'rs, 4 Fed. Appx. 11, 13 (2d Cir. 2001) (Plaintiff's "complaint, in other words, is not with the rules governing the process due under New York law to a police officer facing termination but is exclusively with the manner in which those rules were applied in his case.  As the district court correctly recognized, any alleged errors committed by the persons investigating and adjudicating the charges against [plaintiff] cannot themselves constitute a denial of due process since New York's Article 78 procedure provides [plaintiff] a further opportunity for judicial review of those errors."). Longo v. Suffolk County Police Dep't, 429 F. Supp. 2d 553, 559 (E.D.N.Y. 2006) ("Courts in this [district] as well as the Second Circuit Court of Appeals have held, clearly and repeatedly, that the combination of Section 75 and 78 provide a terminated public employee with remedies that are consistent with the requirements of the due process clause of the Constitution.").  Notably, "it matters not whether a plaintiff actually avails himself of the state court post-deprivation process.  So long

as that process is available, a due process claim must be dismissed." <u>Longo</u> v. <u>Suffolk County Police</u> <u>Dep't</u>, 429 F. Supp. 2d at 559-60 (citing <u>Hellenic Am. Neighborhood Action Comm.</u> v. <u>City of N.Y.</u>, 101 F.3d at 881, & <u>Whiting</u> v. <u>Inc. Vill. of Old Brookville</u>, 8 F. Supp. 2d 202, 202 (E.D.N.Y. 1998), <u>aff'd</u>, 4 Fed. Appx. 11 (2d Cir. 2001). Thus, it is immaterial that Cruz and Adams have filed Article 75 petitions and Hart has not. (<u>See</u> pages 10, 17, 22-23 above.) By having the opportunity to file an Article 75 petition, Cruz, Hart and Adams have received all the process that is due.

Accordingly, to the extent that plaintiffs' due process claim against State Defendants is not barred by the Eleventh Amendment, it should nevertheless be <u>DISMISSED</u> as meritless.

## V.   PLAINTIFFS' HOSTILE WORK ENVIRONMENT CLAIM AGAINST THE CITY DEFENDANTS SHOULD BE DISMISSED[38/]

Plaintiffs claim that the City Defendants subjected them to a hostile work environment by imposing dangerous, dirty, uncomfortable and degrading conditions in the TRCs. (<u>See</u> pages 2, 4-5 above.)

Hostile work environment claims do not exist by themselves or in the abstract; plaintiffs must raise a hostile work environment claim pursuant to Title VII, the ADEA or possibly

---

[38/]   While plaintiffs claim that NYSED also is plaintiffs' employer (<u>see</u> 2/19/10 Oral Arg. Tr. at 26-32; Pls. 2/22/10 Supp. Br. at 205), relying on the "identity of interest" test that allows suit against an employer not named in the EEOC complaint but related to the employer named in the EEOC complaint, the Second Circuit clearly has held that the City DOE and not NYSED is a New York City teacher's employer. <u>Gulino</u> v. <u>N.Y.S. Educ. Dep't</u>, 460 F.3d 361, 373 (2d Cir. 2006) ("[W]e find that [NY]SED is not an employer [of NYC teachers] under any view of Title VII, and we dismiss the Title VII claims against the state defendant."), <u>cert. denied</u>, 128 S. Ct. 2986 (2008); <u>see also Gulino</u> v. <u>N.Y.S. Educ. Dep't</u>, 460 F.3d at 378-79 (declining to find NYSED to be the teacher's employer for Title VII as a "joint employer" with the DOE).

the ADA.[39]  See, e.g., Lore v. City of Syracuse, 583 F. Supp. 2d 345, 375 (N.D.N.Y. 2008) ("Hostile

work environment claims under Title VII are consistently rejected when the plaintiff neglects to

plead facts that objectively rise to a level of hostility based upon her membership in a protected class,

i.e., in this case, plaintiff's status as a woman."); Brown v. N.Y. State Dep't of Corr. Servs., 583 F.

Supp. 2d 404, 416 (W.D.N.Y. 2008) (To succeed on a hostile work environment claim, "'[a] plaintiff

must . . . demonstrate that [he] was subjected to the hostility because of h[is] membership in a

protected class.'"); Ortega v. N.Y.C. Off-Track Betting Corp., 97 Civ. 7582, 1999 WL 342353 at *4

(S.D.N.Y. May 27, 1999) (dismissing hostile work environment claim where the facts alleged failed

to support a claim that defendant's actions "created an atmosphere that was abusive or hostile

because of plaintiff's race, ethnicity or sex – i.e., that the alleged hostile environment was created by

race-related, ethnicity-related, or sex-related conduct on the part of defendant"); see cases cited at

page 78 below.   Indeed, plaintiffs' counsel conceded at oral argument that a hostile work

environment claim can only be brought pursuant to federal (or state or local) anti-discrimination

statutes.  (See 2/19/10 Oral Arg. Tr. at 20.)

Title VII, the ADA and the ADEA require claimants to file a charge of discrimination

with the EEOC (or with the similar state agency, here, the New York State Division of Human

Rights) within 300 days of the alleged discriminatory employment action; claims for acts that

occurred more than 300 days before the filing are time-barred in federal court.   29 U.S.C.

---

[39]     For a discussion of whether a plaintiff may raise a hostile work environment claim pursuant
to the ADA, see pages 73-74 below.

§ 626(d)(1)(B); 42 U.S.C. § 12117(a), incorporating the timeliness requirements of Title VII, as

codified in 42 U.S.C. § 2000e-5(e)(1); see, e.g., Kendall v. Fisse, 149 Fed. Appx. 19, 20 (2d Cir.

2005) (ADA claim properly dismissed because plaintiff failed to file a claim with the EEOC "within

300 days of the alleged discriminatory act . . . as required by the ADA."); Boise v. Boufford, 121

Fed. Appx. 890, 892 (2d Cir. 2005) ("To sue under the ADEA, a plaintiff must file a discrimination

charge with the Equal Employment Opportunity Commission ('EEOC') within 300 days of the

conduct at issue."  The "district court correctly granted [summary] judgment in favor of" defendant

on claims for discriminatory conduct occurring over 300 days before EEOC filing.).[40/]

---

[40/]    See also, e.g., Quarless v. Bronx Lebanon Hosp. Ctr., 75 Fed. Appx. 846, 847-48 (2d Cir. 2003); Staff v. Pall Corp., 76 Fed. Appx. 366, 368 n* (2d Cir. 2003) ("A claim based on a discrete act of alleged discrimination . . . must be filed with the EEOC within 300 days after the act occurred."); Robinson v. Front-Line Sec., Inc., 68 Fed. Appx. 258, 259-60 (2d Cir. 2003); Tewksbury v. Ottaway Newspapers, 192 F.3d 322, 325-29 (2d Cir. 1999);  Van Zant v. KLM Royal Dutch Airlines, 80 F.3d 708, 712 (2d Cir. 1996); Butts v. City of New York Dep't of Hous. Pres. & Dev., 990 F.2d 1397, 1401 (2d Cir. 1993) ("In states such as New York that have an agency with the authority to address charges of discriminatory employment practices, the statute of limitations for filing a charge of discrimination with the EEOC is 300 days."); Gallo v. Glen Cove City Sch. Dist., No. 08-CV-3582, 2009 WL 1161818 at *4 & n.7 (E.D.N.Y. Apr. 29, 2009) ("[I]t is well-settled that, prior to filing a claim in federal court pursuant to the ADA, ADEA or Title VII, a plaintiff must institute proceedings with a state or local agency within 300 days of the alleged act of discrimination.  These statutory filing periods are 'analogous to [] statute[s] of limitations,' and, as such, 'a failure to timely file a charge acts as a bar to the plaintiff's action.'") (citations omitted); Alston v. Microsoft Corp., 08 Civ. 3547, 2009 WL 1116360 at *6 (S.D.N.Y. Apr. 27, 2009) ("In New York State, Title VII and the ADA require a plaintiff to file an administrative charge of discrimination with the EEOC no more than 300 days after the alleged discriminatory act to maintain an action in federal court.").

Title VII and the ADA also require a complaint to be filed in federal court within ninety days of receipt of an EEOC right-to-sue letter. 42 U.S.C. § 2000e-5(F)(1);[41] see, e.g., Jenkins v. N.Y.S. Banking Dep't, 07 Civ. 6322, 2009 WL 585851 at *5 (S.D.N.Y. Mar. 6, 2009); Johnson v. St. Barnabas Nursing Home, 568 F. Supp. 2d 399, 400 (S.D.N.Y. 2008); Celestine v. Cold Crest Care Ctr., 495 F. Supp. 2d 428, 431 (S.D.N.Y. 2007); Wong v. Health First, Inc., 04 Civ. 10061, 2005 WL 1676705 at *3 (S.D.N.Y. July 19, 2005) (Peck, M.J.), report & rec. adopted, 2006 WL 2457944 (S.D.N.Y. Aug. 23, 2006).[42]

---

[41]    42 U.S.C. § 2000e-5(f)(1) states, in relevant part:

>  If a charge filed with the Commission pursuant to subsection (b) of this section is dismissed by the Commission, . . . the Commission . . . shall so notify the person aggrieved and within ninety days after the giving of such notice a civil action may be brought against the respondent named in the charge (A) by the person claiming to be aggrieved . . . .

(Emphasis added.) 42 U.S.C. § 12117(a) makes § 2000e-5(f)(1) applicable to ADA claims.

[42]    See also, e.g., Smith v. St. Luke's Roosevelt Hosp., 08 Civ. 4710, 2009 WL 2447754 at *11 (S.D.N.Y. Aug. 11, 2009) (Peck, M.J.), report & rec. adopted, 2009 WL 2878093 (S.D.N.Y. Sept. 2, 2009); Marshall v. Nat'l Ass'n of Letter Carriers, 03 Civ. 1361, 2003 WL 22519869 at *10 (S.D.N.Y. Nov. 7, 2003) (Peck, M.J.), report & rec. adopted, 2004 WL 2202574 (S.D.N.Y. Sept. 30, 2004); Heard v. MTA Metro-N. Commuter R.R., 02 Civ. 7565, 2003 WL 22176008 at *2-3 (S.D.N.Y. Sept. 22, 2003) ("Having received the right-to-sue letter, the claimant has ninety days to bring suit."); Toolan v. Bd. of Ed., 02 Civ. 6989, 03 Civ. 576, 2003 WL 22015437 at *2 (S.D.N.Y. Aug. 25, 2003) ("To be timely, actions for violations of Title VII . . . must be filed within 90 days after receipt of a right to sue letter from the EEOC. . . .  As the Second Circuit has held, 'in the absence of a recognized equitable consideration the court cannot extend the limitations period by even one day.'"); McFarland v. Metro-North Commuter R.R., 993 F. Supp. 210, 210 (S.D.N.Y. 1998) (Kaplan, D.J. & Peck, M.J.) ("An employment discrimination suit under Title VII must be filed within 90 days of plaintiff's receipt of a right to sue letter from the EEOC. . . . [F]ailure to bring suit
(continued...)

"Unlike Title VII, the ADEA does not require an aggrieved party to receive a right-to sue letter from the EEOC before filing suit in federal court." Holowecki v. Fed. Express Corp., 440 F.3d 558, 563 (2d Cir. 2006), aff'd, 552 U.S. 389, 128 S. Ct. 1147 (2008).  Instead, "ADEA plaintiffs need only wait 60 days after filing the EEOC charge." Hodge v. N.Y. Coll. of Podiatric Med., 157 F.3d 164, 168 (2d Cir. 1998); see also e.g., Holowecki v. Fed. Express Corp., 440 F.3d at 563. "However, in the event that the EEOC issues a right-to sue letter to an ADEA claimant, the claimant must file her federal suit within 90 days after receipt of the letter." Holowecki v. Fed. Express Corp., 440 F.3d at 563; see also 29 U.S.C. § 626(e).

Where a plaintiff has filed a timely EEOC claim, the Second Circuit recognizes that "claims that were not asserted before the EEOC [also] may be pursued in a subsequent federal court action if they are 'reasonably related' to those that were filed with the agency." Shah v. N.Y.S. Dep't of Civil Serv., 168 F.3d 610, 614 (2d Cir. 1999); see also, e.g., Legnani v. Alitalia Linee Aeree Italiane, S.P.A., 274 F.3d 683, 686 (2d Cir. 2001); Malarkey v. Texaco, Inc., 983 F.2d 1204, 1208-09 (2d Cir. 1993).  The Second Circuit has "recognized three situations in which claims not raised in an EEO charge are 'sufficiently related to the allegations in the charge that it would be unfair to civil rights plaintiffs to bar such claims in a civil action': 1) where 'the conduct complained of would fall within the "scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination"'; 2) where the complaint is 'one alleging retaliation by an employer against

----

42/       (...continued)
          within the prescribed 90-day limit is grounds for dismissal.").

an employee for filing an EEOC charge'; and 3) where the complaint 'alleges further incidents of discrimination carried out in precisely the same manner alleged in the EEOC charge.'" Terry v. Ashcroft, 336 F.3d 128, 151 (2d Cir. 2003); see also, e.g., Legnani v. Alitalia Linee Aeree Italiane, S.P.A., 274 F.3d at 686; Hassan v. NYC Off Track Betting Corp., 05 Civ. 9677, 2007 WL 678422 at *3 (S.D.N.Y. Mar. 6, 2007).

     A.     **Plaintiffs' Ebewo, Hart, Robinson, Adams, Polito and Scheiner**

     With the exception of Cruz, plaintiffs' hostile work environment claims are either time barred or not reasonably related to their EEOC/NYSDHR complaints.  Ebewo, Hart and Robinson never filed EEOC claims, and, thus, are barred from raising a hostile work environment claim.  (See Dkt. No. 191: Pls. Supp. Opp. Br. at 6; see cases cited at pages 72-73 above.)  Adams' hostile work environment claim is barred because she has failed to provide this Court with a copy of her alleged NYSDHR complaint or state what claims she raised in the NYSDHR complaint; thus, this Court cannot determine whether the claims in her NYSDHR complaint are reasonably related to her present TRC hostile work environment claim, and defendants are entitled to summary judgment on this claim.  (See page 11 above.)  Likewise, Polito's hostile work environment claim is barred because she never filed an NYSDHR or EEOC complaint regarding TRC conditions, and her August 20, 2008 NYSDHR complaint regarding her principals' retaliation for Polito's filing of grievances is not "reasonably related" to the second amended complaint's TRC hostile work environment claim.  (See pages 25-26 above.) Similarly, Scheiner never filed a NYSDHR complaint or EEOC charge regarding TRC conditions, and her 2005 NYSDHR complaint based on her

principal's "improper conduct" and her 2007 NYSDHR complaint based on her principal's alleged

retaliation for Scheiner's filing the 2005 NYSDHR complaint are not "reasonably related" to the

second amended complaint's TRC hostile work environment claim.  (See pages 28-30 above.)

> ### B.   **Plaintiff Cruz**

Unlike the other plaintiffs, Cruz's September 5, 2008 EEOC charge addressed TRC

conditions, and plaintiffs filed the second amended complaint on February 4, 2009, within 90 days

of Cruz's November 15, 2008 EEOC right to sue letter.[43/]  (See pages 16, 31 above.)  Thus, Cruz's

TRC hostile work environment claim is properly before the Court.

Cruz's  September 5, 2008 EEOC charge, which had the "disability" box checked off

in the "cause of discrimination" section, alleged <u>inter alia</u> that the TRC's "health hazards[,] dangerous

conditions . . . [and] Domino Steelcase plastic, unpadded chairs" caused Cruz to suffer "sacral,

lumbar, coccyx and gluteal pain and circulation problems (akin to bedsores)."  (See page 16 above.)

Plaintiffs' second amended complaint, like Cruz's EEOC charge, alleges that the TRC's "hard chairs,"

"bad tables" and "restrictions on [her] movement" caused Cruz's orthopedic problems to "worsen[]"

and that the TRC's "unsanitary and dangerous conditions" caused her to "start[] suffering" from

"Chronic Obstructive Pulmonary Disease . . . , anxiety, sleep disorders, mood swings and other post

traumatic stress."  (See pages 15-16 above.)

---

[43/]   Cruz's fall 2005 EEOC "Age Discrimination" charge and her August 29, 2005 NYSDHR
charge concerned events that occurred before the DOE assigned Cruz to the TRC, and thus
they are not reasonably related to Cruz's present TRC hostile work environment claim.  (See
pages 13-14 above.)

"As an initial matter, . . . 'the Second Circuit has not determined whether the ADA gives rise to a cause of action for hostile work environments'. . . . On the other hand, some other circuits and some district courts within this circuit have recognized such a cause of action." Murphy v. BeavEx, Inc., 544 F. Supp. 2d 139, 149 (D. Conn. 2008) (citations omitted); accord, e.g., Bonura v. Sears Roebuck & Co., 62 Fed. Appx. 399, 400 n.3 (2d Cir. 2003) (declining to decide whether the ADA "gives rise to a cause of action for hostile work environments," but noting that "the circuits that have reached this question have answered it in the affirmative." ), cert. denied, 540 U.S. 1113, 124 S. Ct. 1042 (2004).[44]  Courts which have recognized a hostile work environment claim under the ADA "apply the same standard utilized in Title VII cases." Murphy v. BeavEx, Inc., 544 F. Supp. 2d at 149; see, e.g., Braun v. Securitas Sec. Servs. USA, Inc., 2009 WL 150937 at *8; De La Cruz v. Guilliani, 00 Civ. 7102, 2002 WL 32830453 at *9 (S.D.N.Y. Aug. 26, 2002); Disanto v. McGraw-Hill/Platt's Div., 97 Civ. 1090, 1998 WL 474136 at * 5 (S.D.N.Y. Aug. 10, 1998); Hendler v. Intelecom USA, Inc., 963 F. Supp. 200, 208 (E.D.N.Y. 1997); Hudson v. Loretex Corp., No. 95-CV-844, 1997 WL 159282, at *2-3 (N.D.N.Y. Apr. 2, 1997).

---

[44]    See also, e.g., Konieczny v. N.Y.S. Div. of Parole, 647 F. Supp. 2d 256, 263 n.1 (W.D.N.Y. 2009) ("To the extent that plaintiff alleges that she was subjected a hostile work environment, 'the Second Circuit has not determined whether the ADA gives rise to a cause of action for hostile work environments.'"); Braun v. Securitas Sec. Servs. USA, Inc., No. 07 CV 02198, 2009 WL 150937 at *8 (E.D.N.Y. Jan. 20, 2009) ("Although the Second Circuit has not determined whether the ADA gives rise to a cause of action for hostile work environment, several district courts in this circuit have held that such claims are cognizable.") (citation omitted).

Under Title VII, to establish a hostile work environment claim, a plaintiff must show that the defendant's conduct was:

> "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Harris v. Forklift Sys., 510 U.S. 17, 21, 114 S. Ct. 367, 370 (1993) (quoting Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 67, 106 S. Ct. 2399, 2405 (1986)) (internal brackets and quotation marks omitted). The conduct must be intimidating, hostile, or offensive, with discriminatory intimidation, ridicule, and insult permeating the workplace. See Tomka v. Seiler Corp., 66 F.3d 1295, 1305 (2d Cir. 1995). All of the circumstances must be considered; a reasonable person would have to find the environment hostile or abusive, and the victim must have subjectively so perceived it. See Harris v. Forklift Sys., 510 U.S. 17, 21-23, 114 S. Ct. 367, 370-71 (1993); Tomka v. Seiler Corp., 66 F.3d 1295, 1305 (2d Cir. 1995).

Gallagher v. Delaney, 139 F.3d 338, 346-47 (2d Cir. 1998), abrogated on other grounds by, Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 118 S. Ct. 2257 (1998).[45/] "Conduct that is 'merely offensive' and 'not severe or pervasive enough to create an objectively hostile or abusive work environment'" is insufficient to establish a discrimination claim. Torres v. Pisano, 116 F.3d at 631;

---

[45/]    Accord, e.g., Feingold v. New York, 366 F.3d 138, 149-50 (2d Cir. 2004); Mormol v. Costco Wholesale Corp., 364 F.3d 54, 58 (2d Cir. 2004); Terry v. Ashcroft, 336 F.3d 128, 147-48 (2d Cir. 2003); Alfano v. Costello, 294 F.3d 365, 373-74 (2d Cir. 2002); see also, e.g., Dayes v. Pace Univ., 2 Fed. Appx. 204, 207 (2d Cir. 2001); Whidbee v. Garzarelli Food Specialties, Inc., 223 F. 3d 62, 69-71 (2d Cir. 2000); Howley v. Town of Stratford, 217 F.3d 141, 153-54 (2d Cir. 2000); Richardson v. N.Y.S. Dep't of Corr. Serv., 180 F.3d 426, 437-40 (2d Cir. 1999), abrogated on other grounds by, Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 118 S. Ct. 2257 (1998); Torres v. Pisano, 116 F.3d 625, 630 (2d Cir.), cert. denied, 522 U.S. 997, 118 S. Ct. 563 (1997); Cosgrove v. Sears, Roebuck & Co., 9 F.3d 1033, 1042 (2d Cir. 1993); Slaitane v. Sbarro, Inc., 03 Civ. 5503-04, 2004 WL 1202315 at *12-13 (S.D.N.Y. June 2, 2004) (Peck, M.J.); Viruet v. Citizen Advice Bureau, 01 Civ. 4594, 2002 WL 1880731 at *15 (S.D.N.Y. Aug. 15, 2002) (Peck, M.J.); Williams v. NYC Dep't of Sanitation, 00 Civ. 7371, 2001 WL 1154627 at *12-13 (S.D.N.Y. Sept. 28, 2001) (Peck, M.J.); Adeniji v. Admin. for Children Servs., 43 F. Supp. 2d 407, 421 (S.D.N.Y.) (Wood, D.J. & Peck M.J.), aff'd, No. 99-7561, 201 F.3d 430 (table), 1999 WL 1070027 (2d Cir. Nov. 18, 1999).

accord, e.g., Slaitane v. Sbarro, Inc., 2004 WL 1202315 at *13; Williams v. NYC Dep't of Sanitation, 2001 WL 1154627 at *13; see also, e.g., Dayes v. Pace Univ., 2 Fed. Appx. at 207 (Defendant's "comments and behavior, although boorish and inappropriate, simply do not rise to the level of behavior necessary for a jury reasonably to conclude that they were sufficiently severe or pervasive to alter the condition of [plaintiff]'s employment.").

"Thus, harms suffered in the workplace are cognizable under Title VII, even when they are not the result of 'tangible employment actions,' if they arise from conduct (1) that is 'objectively' severe or pervasive – that is, if it creates 'an environment that a reasonable person would find hostile or abusive' [the 'objective' requirement], (2) that the plaintiff 'subjectively perceive[s]' as hostile or abusive [the 'subjective' requirement], and (3) that creates such an environment because of plaintiff's sex (or other characteristic protected by Title VII) [the 'prohibited causal factor' requirement]." Gregory v. Daly, 243 F.3d 687, 691-92 (2d Cir. 2001) (citations omitted, bracketed material in original).

This Court need not determine whether the ADA gives rise to a hostile work environment claim because, even if it does, Cruz has not alleged facts to prove discriminatory causation. It may well be that conditions in the TRCs – or, as plaintiffs call them, the Rubber Rooms – are sufficiently severe to constitute a hostile environment. What is absent here, however, is any factual allegation that plaintiff Cruz was subjected to the TRCs because of her protected status, i.e., because of her disability. As Judge Lynch recently stated:

> [T]he parties argue as though a hostile environment is something that exists in some absolute way, like poisonous chemicals in the air, affecting everyone who comes in

contact with it. In doing so, the parties all but ignore the prohibited causal factor requirement, which is critical to liability.

Title VII does not prohibit employers from maintaining nasty, unpleasant workplaces, or even ones that are unpleasant for reasons that are sexual in nature. Rather, it prohibits employers from discriminating against an employee (including by subjecting him or her to hostile working conditions) "because of such individual's . . . sex."  42 U.S.C. § 2000e-2(a)(1). The prohibited causal factor requirement thus flows directly from the text of Title VII, and from the very essence of its nature as an anti-discrimination law.

It follows "that mistreatment at work, whether through subjection to a hostile environment or through such coercive deprivations as being fired or being denied a promotion, is actionable under Title VII only when it occurs because of an employee's sex, or other protected characteristic."

Krasner v. HSH Nordbank AG, 08 Civ. 8499, -- F. Supp. 2d --, 2010 WL 86845 at *6-7 (S.D.N.Y. Jan. 7, 2010) (Lynch, C.J.); see, e.g., Brown v. Henderson, 257 F.3d 246, 252 (2d Cir. 2001) ("It is axiomatic that mistreatment at work, whether through subjection to a hostile environment or through such concrete deprivations as being fired or being denied a promotion, is actionable under Title VII only when it occurs because of an employee's sex, or other protected characteristic."); Parekh v. Swissport Cargo Servs., Inc., No. CV-08-1994, 2009 WL 290465 at *4-5 (E.D.N.Y. Feb. 5, 2009) ("Although '[t]he incidents comprising a hostile work environment claim need not make reference to any trait or condition on the basis of which the discrimination has occurred,' they must occur under circumstances in which 'the incidents can reasonably be interpreted as having taken place on the basis of that trait or condition.' . . . [T]here [is not] any indication in the Joint Charge or plaintiff's complaint that the defendant acted the way it did because of the plaintiff's race, color, or national origin . . . .  Plaintiff has simply alleged in his complaint that defendant harassed him and subjected

him to a hostile work environment on the basis of his race, color, religion, national origin, and/or age.  These conclusory allegations do not suffice to state a claim.") (citations omitted).  Cruz has not supported her TRC hostile work environment discrimination claim with any facts supporting the causal element of her claim, and, therefore, her claim should be dismissed.  See Ashcroft v.  Iqbal, 129 S. Ct.  1937, 1949 (2009) ("To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"); see also cases cited in Point I above.

          To the extent that Cruz claims that the DOE subjected her (and the other plaintiffs) to the hostile environment of the TRC based on her status as an expensive tenured teacher (see 2/19/10 Oral Arg. Tr. at 21-25), that claim is barred for failure to exhaust because Cruz's EEOC charge claiming disability discrimination is not reasonably related to any age and/or tenured status claim.[46]  Cruz's EEOC charge did not mention discrimination based on her age or tenured status, but instead focused on the DOE's failure to accommodate her disabilities and the DOE's discrimination against her based on her disabilities.  (See page 16 above.)  Thus, Cruz could hardly expect that the scope of the EEOC's investigation would include investigating discrimination based on Cruz's age. See, e.g., Marshall v. N.Y.C. Bd. of Elections, 322 Fed. Appx. 17, 18 (2d Cir. 2009) (dismissing religious discrimination claim where EEOC complaint only alleged race and gender discrimination

----

[46]     Cruz cannot rely on her August 24, 2009 EEOC charge raising a hostile work environment claim based on her age because Cruz did not file the charge until after filing the second amended complaint and, in any event, she has not received an EEOC right to sue letter for that charge.  Thus, Cruz failed to exhaust her administrative remedies with respect to claims arising from the 2009 EEOC charge.  (See cases cited at pages 74-75 above.)

and did not "include any incidents that would have allowed the CCHR to investigate such allegations"); Carter v. New Venture Gear, Inc., 310 Fed. Appx. 454, 458 (2d Cir. 2009) (dismissing gender discrimination claim where EEOC complaint only alleged race discrimination); Sotolongo v. N.Y.C. Transit Auth., No. 99-9195, 216 F.3d 1073 (table), 2000 WL 777958 at *3 (2d Cir. June 15, 2000) (ADA claim dismissed where plaintiff only asserted Title VII and ADEA claims in EEOC charge, and ADA claim was not reasonably related to other claims cited in EEOC charge); Wali v. One Source Co., --- F. Supp. 2d ---, 07 Civ. 7550, 2009 WL 5247505 at *11 (S.D.N.Y. Dec. 30, 2009) (dismissing religious discrimination claim where EEOC complaint alleged racial discrimination and mere fact that plaintiff's "name may appear to be a Muslim name" was not enough to put the EEOC on notice of such claims); Moultrie v. VIP Health Care Servs., No. 08-CV-0457, 2009 WL 750219 at *3 (E.D.N.Y. Mar. 19, 2009) ("[P]laintiff only alleged disability discrimination in the 'Particulars' section of her EEOC filing. Thus, there is no information in plaintiff's EEOC filing indicating that she was subjected to race or national origin discrimination. Plaintiff, therefore, has not exhausted her administrative remedies with respect to her Title VII claims, because these claims were not included in nor reasonably related to the allegations in her EEOC filing.").[47/]

---

[47/]   See also, e.g., White v. N.Y.C. Dep't of Educ., No. 05-CV-2064, 2008 WL 4507614 at *1-3 (E.D.N.Y. Sept. 30, 2008); Hassan v. NYC Off Track Betting Corp., 2007 WL 678422 at *3 (dismissing ADEA and ADA claims where plaintiff asserted only Title VII claim in his EEOC charge); Punsal v. Mount Sinai Servs. of the Mount Sinai Sch. of Med., 01 Civ. 5410, 2004 WL 736892 at *5 (S.D.N.Y. Apr. 6, 2004) (age discrimination claim dismissed where plaintiff only asserted national origin discrimination in SDHR/EEOC complaint, and age discrimination claim was not reasonably related to national origin discrimination claim); Joseph v. Am. Works, Inc., 01 Civ. 8287, 2002 WL 1033833 at *5-6 (S.D.N.Y. May 21, (continued...)

Even if Cruz's hostile work environment claim based on her tenured status were "reasonably related" to her EEOC disability claim, that claim still would not survive because discrimination based on tenured status is not actionable, even as an age discrimination claim pursuant to the ADEA.  See Cross v. N.Y.C. Transit Auth., 417 F.3d 241 (2d Cir. 2005) ("The law recognizes that 'seniority is not a sufficiently accurate indicator of age' that, by itself, can support an inference that adverse actions based on seniority necessarily evidence age discrimination."); Woodman v. WWOR-TV, Inc., 411 F.3d 69, 85 (2d Cir. 2005) ("'[A]n employee's age is analytically distinct from his years of service.'  Thus, seniority is not a sufficiently accurate indicator of age to allow, as a matter of course, a defendant's knowledge of the former to substitute for knowledge of the latter.") (quoting Hazen Paper Co. v. Biggins, 507 U.S. 604, 611, 113 S. Ct. 1701, 1706-07 (1993)); Ludovicy v. Dunkirk Radiator Corp., 922 F.2d 109, 11 (2d Cir. 1990) ("Because 'seniority as a function of age is dependent upon the age at which the employee began to work for the company,' employees with greater seniority are not necessarily older than employees with less.  Moreover, greater seniority does not mean that an employee has necessarily reached the age of 40, the minimum age for protection under the ADEA.  We therefore agree with the district court that elimination or derogation of seniority rights is not sufficient by itself to raise an inference of age discrimination in violation of the ADEA.") (citations omitted); Hodges v. Rensselaer Hartfor Graduate Ctr., Inc., No. 06-CV-850, 2008 WL 793594 at *10 (D. Conn. Mar. 20, 2008) ("[C]ourts

---

47/      (...continued)
        2002) (ADA claim dismissed where plaintiff only asserted Title VII claims in her EEOC complaint, and ADA claim was not reasonably related to Title VII claims).

in the Second Circuit have consistently held that 'senior status is not indicative of age, but rather the length of time an employee has worked for the employer.'"); Diamantopulos v. Brookside Corp., 683 F. Supp. 322, 329 (D. Conn.1988) ("An actionable ADEA claim cannot be premised on the mere fact that higher salaried workers were terminated because a person may not be within the ADEA protected class yet still receive a large salary because of particular qualifications, merit increases, or long tenure.").[48]

It may well be that, as plaintiffs allege (see pages 4-5, 9-10, 15-16, 29 above), conditions in the TRCs are deplorable.  However, those same poor conditions are alleged by all of the plaintiffs – white and black, male and female, disabled and not disabled – and plaintiffs further allege that the conditions in the TRCs apply to all teachers in the TRCs, regardless of what protected status, if any, they have.  (See page 4 above.)  That further demonstrates that the conditions in the TRCs, however "hostile," were not because of Cruz's disability – or because of any other protected classification.  (See cases cited at pages 80-82 above.)  Plaintiffs are attempting to use the label "hostile work environment" to cover poor work conditions, unrelated to any discrimination or retaliation based on a protected status.  As Judge Lynch explained, the civil rights statutes cannot be used in this way.  (See cases cited at pages 80-81 above.)

---

[48]    The Court further notes that despite the lengthy factual allegations in the second amended complaint, there is no allegation as to any of the plaintiffs' ages.

**C.**      **The Other Plaintiffs Cannot Piggy-Back on Cruz's Right to Sue Letter**

The other plaintiffs argue that they can "piggyback" onto Cruz's timely hostile work environment claim.  (Dkt. No. 174: Pls. Opp. Br. at 34-36; <u>see also</u> Dkt. No. 191: Pls.  Supp.  Br. at 4-5.)

"According to the piggybacking rule, 'where one plaintiff has filed a timely EEOC complaint, other non-filing plaintiffs may join in the action if their individual claims aris[e] out of similar discriminatory treatment in the same time frame.'"  <u>Holowecki</u> v. <u>Fed. Express Corp.</u>, 440 F.3d 558, 564 (2d Cir. 2006).  "The underlying purpose of the filing requirement, 'to give prompt notice to the employer,' is adequately served 'where two plaintiffs allege that they were similarly situated and received the same discriminatory treatment.'"  <u>Spector</u> v. <u>Bd. of Trustees of Cmty.-Technical Coll.</u>, Civil Action No. 3:06-cv-129, 2007 WL 4800726 at *11 (D. Conn. Dec. 27, 2007) (quoting <u>Snell</u> v. <u>Suffolk County</u>, 782 F.2d 1094, 1100 (2d Cir. 1986)).

While all of the plaintiffs claim that the TRCs constitute a hostile work environment, only Cruz asserted a claim for disability discrimination.  Thus, the other plaintiffs cannot piggyback on Cruz's disability claim – they are not disabled and hence are not similarly situated.  To the extent the other plaintiffs, like Cruz, claim that the DOE subjected them to the TRC hostile work environment because of their tenured status (<u>see</u> pages 4, 17, 18-19, 21, 27, 28-29 above), discrimination based on tenured status is not actionable.  (<u>See</u> cases cited at pages 84-85 above.) Thus, even under the "piggyback" rule, plaintiffs' TRC hostile work environment claims do not survive.

Accordingly, plaintiffs' hostile work environment claims should be <u>DISMISSED</u>.

## VI.   PLAINTIFFS' CLAIM THAT THE CITY DEFENDANTS BREACHED THE JUNE 27, 2008 AGREEMENT SHOULD BE DISMISSED

Plaintiffs claim that City Defendants breached the June 27, 2008 Letter Agreement between the DOE and the UFT by failing to:  (1) "review" and conduct "an independent evaluation of the pending 3020a charges," (2) "permit Plaintiffs to enter certain programs through which disciplinary charges [would be] dropped," (3) "get Plaintiffs out of the Rubber Rooms," <u>i.e.</u>, TRCs, and (4) "take necessary steps to restore Plaintiffs to their teaching positions."  (Dkt. No. 94: 2d Am. Compl. ¶¶ 17-20, 22, 622-28.)

In their opposition brief, plaintiffs failed to respond to (or even mention) the City Defendants' and the State Defendants' arguments for dismissal of this claim.  Accordingly, this Court deems such claim abandoned and the Court should grant defendants' motion to dismiss accordingly. (<u>See</u> cases cited at fn.12 above.)

In any event, plaintiffs' claim is meritless because the June 27, 2008 Letter Agreement does not say what plaintiffs claim.  Plaintiffs appear to rely on the following portion of the June 27, 2008 Letter Agreement:

> Absent unusual circumstances, effective immediately, allegations being investigated by principals will not result in an Employee being removed from his or her school.
>
> The DOE has conducted a central review of all investigations of currently reassigned Employees conducted by principals and, where appropriate, reassigned Employees back to their schools. . . .

> Should a principal reassign an Employee without proper approval pursuant to the central DOE process, the central DOE shall return the Employee to the school from which the Employee was reassigned . . . .

(2d Am. Compl. Ex. 1: 6/27/08 Letter Agreement at 2.)  This paragraph, however, addresses how the DOE will treat teachers who principals are investigating, not teachers like plaintiffs who have had § 3020-a charges proffered against them.  (Compare 6/27/08 Letter Agreement at 3-4, dealing with § 3020-a hearings.)

Accordingly, plaintiffs' claim that defendants breached the June 27, 2008 Letter Agreement should be DISMISSED.

## CONCLUSION

For the reasons stated above, defendants' motions to dismiss (Dkt. Nos. 149 & 153) should be GRANTED.  Because plaintiffs previously had been given a chance to file a third amended complaint and declined to do so, plaintiffs should not now be allowed to amend.

## FILING OF OBJECTIONS TO THIS REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report to file written objections.  See also Fed. R. Civ. P. 6.  Such objections (and any responses to objections) shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable Victor Marrero, 500 Pearl Street, Room 660, and to my chambers, 500 Pearl Street, Room 1370. Any requests for an extension of time for filing objections must be directed to Judge Marrero (with a courtesy copy to my chambers).  Failure to file objections will result in a waiver of those objections

for purposes of appeal. Thomas v. Arn, 474 U.S. 140, 106 S. Ct. 466 (1985); IUE AFL-CIO Pension

Fund v. Herrmann, 9 F.3d 1049, 1054 (2d Cir. 1993), cert. denied, 513 U.S. 822, 115 S. Ct. 86

(1994); Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993); Frank v. Johnson, 968 F.2d 298, 300 (2d

Cir.), cert. denied, 506 U.S. 1038, 113 S. Ct. 825 (1992); Small v. Sec'y of Health & Human Servs.,

892 F.2d 15, 16 (2d Cir. 1989); Wesolek v. Canadair Ltd., 838 F.2d 55, 57-59 (2d Cir. 1988);

McCarthy v. Manson, 714 F.2d 234, 237-38 (2d Cir. 1983); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P.

72.

Dated:      New York, New York
            February 23, 2010

            Respectfully submitted,

            _____
            Andrew J. Peck
            United States Magistrate Judge

Copies to:  Nicholas Penkovsky, Esq.
            Joy Hochstadt, Esq.
            Blanche Greenfield, Esq.
            Antoinette W. Blanchette, Esq.
            Judge Victor Marrero

H:\OPIN\TWANA ADAMS